Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

|  |  |
|---|---|
| (1) MELISA BARR;<br>(2) JOHNNIE BUNCH;<br>(3) DUSTIN MAYBEE;<br>(4) LAKEVIEW FARMS LLC;<br>(5) LESLIE HARP;<br>(6) LANCE LOGAN;<br>(7) LINDA SPARKS;<br>(8) MIKE UNRUH;<br>(9) STUART TANNER;<br>(10) TONY WAGONER;<br>(11) DARREN SWOFFORD;<br>(12) GREGORY WILSON; and<br>(13) BILL MELBOURNE,<br><br>    *Plaintiffs,*<br><br>    *v.*<br><br>(1) MATTHEW WADIAK;<br>(2) JOHN NIEMANN;<br>(3) BLAKE EVANS; and<br>(4) TIM SINGLETON,<br><br>    *Defendants.* | CASE NO.: _____<br><br>**ORIGINAL COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED COMPLAINT

Plaintiffs Dustin Maybee, Lakeview Farms LLC, Melisa Barr, Leslie Harp, Lance Logan,

Gregory Wilson, Linda Sparks, Mike Unruh, Stuart Tanner, Tony Wagoner, Darren Swofford,

Johnnie Bunch, and Bill Melbourne (collectively, "Plaintiffs" or "Growers") bring this action for

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

deceptive and otherwise unlawful conduct against Matthew Wadiak, John Niemann, Blake Evans, and Tim Singleton (collectively, "Defendants"), to seek monetary damages, attorney's fees and costs, and other relief under the Packers and Stockyards Act of 1921, as amended (the "Packers and Stockyards Act"). In support of their claims, Plaintiffs allege the following based on personal knowledge as to matters relating to themselves, and based on information and belief and the investigation of undersigned counsel as to all other matters.

## REQUEST FOR TRIAL BY JURY

Plaintiffs request a trial by jury on all issues so triable.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................6

II.   PARTIES .........................................................................................12

     A.  Plaintiffs ..................................................................................12

     B.  Defendants and Related Parties .............................................14

          i.    The Cooks Venture Companies ........................................15

          ii.   The Cooks Venture Joint Enterprise ...............................16

          iii.  The Cooks Venture Officers .............................................17

     C.  Co-Conspirators .......................................................................21

III.  JURISDICTION, VENUE, AND COMMERCE ...............................21

IV.   BACKGROUND ON THE POULTRY INDUSTRY ..........................23

     A.  Poultry integrators use contract growers to raise their broiler
         chickens. ..................................................................................23

     B.  Integrators routinely exploit disparities of power and
         information to offload risks and costs onto contract growers. .......27

     C.  The USDA has promulgated rules under the Packers and
         Stockyards Act to protect contract growers from such
         exploitation. ............................................................................31

V.    BACKGROUND ON COOKS VENTURE ......................................37

     A.  Cooks Venture was founded and directed by Blake Evans and
         Matthew Wadiak. ....................................................................38

     B.  Cooks Venture cultivated an image as a progressive, farmer-
         friendly integrator with strong management. ...........................41

     C.  In reality, Cooks Venture was an under-capitalized startup
         whose principal officers recklessly chased scale over
         sustainability — and landed their enterprise in bankruptcy. ........43

          i.    Mr. Wadiak and Mr. Evans directed Cooks Venture to exploit contract
                growers so they could pursue scale without adequate capital. ..............43

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

ii.  As Cooks Venture's financial condition deteriorated, Mr. Singleton, Mr. Evans, and Mr. Wadiak collaborated to hide the truth from the public. ............. 46

iii.  Mr. Niemann was appointed CEO as a last-ditch effort to save Cooks Venture, but his appointment was presented to growers as a vote of confidence in the integrator. ................................................................................ 48

**D.  Cooks Venture announced its business failure in November 2023 — and exploited growers even in the process of shutting down its operations. .................................................................................... 49**

i.  Cooks Venture killed over a million birds on its contract-growers' farms in an attempt to avoid its obligation to feed, process, and pay for them. ................. 51

ii.  These actions were not unavoidable — as Cooks Venture represented — but reflected a choice by Cooks Venture to treat its contract growers and processing workers as expendable. .......................................................... 53

**VI.  DEFENDANTS' UNLAWFUL CONDUCT ....................................................... 54**

**A.  Under Defendants' control and direction, Cooks Venture employed deceptive practices and devices to induce Growers to enter poultry growing arrangements. ............................................ 55**

i.  Cooks Venture recruited Growers into poultry growing arrangements through an integrated scheme of deceptive practices and devices. ..................... 56

ii.  Cooks Venture made false or misleading promises and representations about material terms of the Poultry Production Agreements. .............................. 58

iii.  Cooks Venture concealed and camouflaged the nature and content of material terms in the Poultry Production Agreements. .......................................... 65

iv.  Cooks Venture failed to disclose material information about its discretion under the Poultry Production Agreements. ............................................................ 71

v.  Cooks Venture misrepresented and failed to disclose material information about the economic returns of its contract growers. ............................................... 72

vi.  Cooks Venture misrepresented and failed to disclose material information about its financial history and condition. ............................................................... 73

vii.  Growers relied on the false and misleading information they received from Cooks Venture to make substantial, debt-financed investments and to enter Poultry Production Agreements. ................................................................... 77

---

**VERIFIED COMPLAINT**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

B. Under Defendants' control and direction, Cooks Venture employed deceptive practices and devices to hide material contract breaches from Growers and to keep Growers from taking protective action. ..........................................................................79

    i. Cooks Venture is obligated to place, support, and process four flocks of heirloom birds with Growers annually until the termination of their Poultry Production Agreements. ...........................................................................80

    ii. Cooks Venture concealed material breaches of its obligations regarding flock size, bonus compensation, fuel allowances, and other matters.....................82

    iii. Cooks Venture carried out a deceptive conspiracy with Arkansas state officials to deprive Growers of owed compensation and offload its own costs onto Growers under false color of law..................................................................87

C. Under Defendants' control and direction, Cooks Venture employed deceptive practices or devices to conceal its financial condition in 2023 and to keep Growers from taking precautionary measures against its prospect of failure....................................97

VII.   CAUSES OF ACTION ....................................................................................100

VIII.  PETITION FOR RELIEF ..............................................................................108

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

## I.     INTRODUCTION

1.     From its much-vaunted launch in 2019 through its shocking failure in 2023, the principal executive officers of Cooks Venture — Defendants Matthew Wadiak, Blake Evans, Tim Singleton, and John Niemann — held themselves out as "progressive" business leaders building a "next-generation" chicken processor. They claimed their business practices were "rooted in re-generative agriculture and transparency." They insisted Cooks Venture was a "disruptive" startup dedicated to "changing the chicken farming system," "raising a better bird," and even "mitigat[ing] climate change." In reality, Defendants launched and ran Cooks Venture with one overriding objective: To corner the fast-growing demand for heirloom-bred, pasture-raised chicken by flooding the market with below-cost product and driving rivals out of business — and then hogging its premium sales for themselves.

2.     The pursuit of Defendants' predatory business strategy turned Cooks Venture into a *de facto* Ponzi scheme almost from the start. It required Cooks Venture to burn capital at a breakneck pace to secure and operate an ever-expanding array of chicken breeding, growing, and processing facilities, dump the ever-swelling inventories those facilities generated at cut-rate prices that could not replace the capital burned to produce them, and then seek more capital to repeat the cycle until market dominance was achieved. Defendants did not care. Defendants be-lieved reaching mass-production scale in the specialty chicken industry would yield its own re-turn, and they were willing to risk Cooks Venture's financial stability to pursue their ambitions. Shortly after founding the firm, Mr. Wadiak and Mr. Evans directed Cooks Venture to expand production *twelve-fold* within less than three years — from around 50,000 chickens a week in March 2019 to around 700,000 chickens a week by the beginning of 2022. When Mr. Singleton and Mr. Niemann later joined Cooks Venture as principal executive officers alongside Mr. Wadiak and Mr. Evans, they affirmed the co-founders' predatory vision — and pursued it just as zealously.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

3.      From Defendants' perspective, there was just one problem with their grand plan to dominate the specialty-chicken market: Cooks Venture had no capital to burn. Defendants never had (or were unwilling to risk) enough capital of their own to grow Cooks Venture to the scale they wanted, and sophisticated investors were wary of pouring their money into an unproven firm in a niche market. Unable to raise the capital required to fuel the growth of their enterprise through legitimate methods, Defendants directed Cooks Venture to secure the chicken-growing facilities and services they needed through a systematic campaign of fraud and deceit against the poultry farmers of Northwest Arkansas. While holding themselves out to the public as "improv[ing] the poultry system . . . in the Ozarks" and seeking to enhance the whole country's "food anthropology," Defendants led Cooks Venture to do just the opposite.

4.      Under Defendants' direction and control, Cooks Venture carried out an aggressive farmer recruitment program from 2019 through 2023 that methodically deployed a series of deceptive practices and devices to induce Ozark farmers to make large, debt-financed investments in chicken houses for its benefit and then to sign restrictive contracts binding them to raise Cooks Venture birds exclusively for three-year terms. As part of this recruitment program, Cooks Venture agents systematically lied to farmers that, if they prepared poultry houses to its specifications, Cooks Venture would offer them three-year poultry-growing contracts that — unlike the contracts offered by virtually every other poultry processor in the Ozarks — obligated the processor to (a) place four bird flocks of a specific size on their farms annually, (b) compensate them for raising those flocks at fixed base and bonus rates, and (c) pay them a heating fuel allowance on at least two flocks each year. To complement this lie, Cooks Venture agents gave farmers exaggerated projections of the returns they could earn from entering a poultry growing arrangement with Cooks Venture. They also misrepresented Cooks Venture's financial condition to give farmers the impression that it could, in fact, deliver on its false promises.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

5.      In reality, Defendants had no intention of keeping their word to the farmers they directed Cooks Venture to recruit with these promises and representations. Once a farmer made the four- or five-figure investment necessary to prepare poultry houses for Cooks Venture's birds, Defendants directed Cooks Venture to offer the farmer a deceptive adhesion contract (styled a "Regenerative Agriculture Poultry Production Agreement") that was purposely crafted to give Cooks Venture the power to renege on its recruitment promises — and hide that breach of faith behind deliberately confusing design and ambiguous language. To make sure farmers remained none the wiser as they signed on the dotted line, Defendants even directed Cooks Venture agents to brazenly lie to farmers — both orally and in writing — that the Poultry Production Agreements did, in fact, honor the promises that Cooks Venture had used to recruit them.

6.      As a result of Cooks Venture's deceptive recruitment practices, between 2019 and 2024, dozens of Ozark farmers were conned into liquidating their life savings, mortgaging their farms and homes, sinking tens or hundreds of thousands of dollars into chicken houses for Cooks Venture's birds, and, ultimately, signing contracts that deceptively subjected them to Cooks Venture's exclusive and discretionary control for three whole years. Using the tens of millions of dollars' worth of poultry growing capacity extracted from these deceived farmers, Defendants transformed Cooks Venture into the largest processor of pasture-raised chicken in the United States practically overnight. By November 2021— only two-and-a-half years after launch — Cooks Venture' had expanded its chicken production capacity to around 600,000 birds per week. The pace of Cooks Venture's growth dwarfed that of other firms in the specialty poultry sector and soon made it the dominant producer of pasture-raised chicken in the United States by far. As the dazzling pace of expansion burnished Cooks Venture's image as a "scalable," "Ag Tech" startup, it also became a winning selling point for Defendants in their pitches to investors — allowing them to raise nearly $180 million in debt and equity capital for their ambitions between 2019 and 2023.

---

**VERIFIED COMPLAINT**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

7.      Beneath this high-flying façade, however, the truth was that Cooks Venture's financial condition was steadily deteriorating. Never able to generate adequate revenues to cover its operating- and investing-capital needs, Cooks Venture was chronically dependent on infusions of outside capital to keep its doors open. While Defendants' headlong pursuit of growth at all costs created hype that Defendants could exploit to raise funds from venture capitalists, it also led Cooks Venture to burn through its cash faster year after year — worsening its financial stability over time. In an attempt to stem Cooks Venture's slide toward insolvency, Defendants tried to cut costs by directing the firm to shortchange farmers out of birds, feed, medicine, and compensation to which they were legally entitled. In tandem with that direction, Defendants implemented a series of deceptive procedures that made it nearly impossible for farmers to determine whether Cooks Venture was complying with its obligations to them or not — and allowed it to breach those obligations with impunity. In the end, however, malfeasance could only get the Defendants so far.

8.      Like all Ponzi schemes, Cooks Venture eventually ran out of steam. By the beginning of 2023, Cooks Venture either had ceased operating as a going concern or was on its way to doing so within the coming year. In the Summer of 2023, the firm's board of directors made a last-ditch effort to turn Cooks Venture's fortunes around by replacing Mr. Wadiak as CEO with Mr. Niemann, but it was to no avail. As Fall turned to Winter in 2023, one or more key investors refused to pump more money into Cooks Venture — and the enterprise crumbled. On November 17, 2023, Cooks Venture abruptly delivered a terse letter to its farmers and workers announcing that its business had failed and that it intends to shut down operations by the end of the month.

9.      This development came as a shock to Cooks Venture's farmers. Despite knowing that Cooks Venture's status as a going concern was in grave jeopardy as early as January 2023, Defendants had directed Cooks Venture to mislead farmers about its perilous financial condition until the very day that Defendants announced its failure. Following this direction, Cooks Venture — with the approval and participation of Mr. Niemann specifically — encouraged farmers to enter

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

and perform under Poultry Production Agreements, and even to build entirely new broiler houses for its benefit, as if the firm were operating normally up to the moment Defendants delivered their letter. Deprived of this critical information about Cooks Venture's rapid slide toward insolvency, farmers spent hundreds of thousands of dollars on their operations in the months leading up to Cooks Venture's abrupt shut down — on things like preparing to receive new flocks that never came or, as explained below, that were illegally destroyed by Defendants shortly after arriving — that they otherwise would have saved. More broadly, Defendants' dishonesty robbed farmers of any opportunity to reasonably prepare themselves for Cooks Venture's failure, causing many of them to suffer extreme financial hardships and attendant injuries in its aftermath that they otherwise would have avoided.

10.     After all of the foregoing had come to pass, however, perhaps the worst of Defendants' deceptive schemes came after November 17, 2023, not before. Since Defendants had insisted on operating Cooks Venture normally throughout the year, farmers were in the middle of raising more than a million Cooks Venture birds when Defendants announced their failure. Some farmers, like Mr. Maybee, had flocks that were already at processing age or close to processing age. Others had received their flocks from Cooks Venture just days or weeks before. Indeed, one farmer, Ms. Harp, received her flock *on November 17*, just hours before getting word of Cooks Venture's imminent shutdown. In all cases, Cooks Venture had an obligation under the Poultry Production Agreements to feed, process, and pay farmers for raising the birds it had placed on their farms — and could only avoid that obligation in the event of a "catastrophic loss" that is not of its own doing. Desperate to bypass this obligation, over the two-month period after November 17, 2023, Defendants went further than ever before in their efforts to stiff, swindle, and exploit their poultry farmers.

11.     From November 2023 through January 2024, Defendants conspired with state officials to weaponize the Arkansas Department of Agriculture against the very farmers it is

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

supposed to protect. Rather than murder the birds in farmers' poultry houses themselves. Defendants conspired with the Director of the Livestock and Poultry Division of the Arkansas Department of Agriculture, Mr. Patrick Fisk, to have agents of the state do their dirty work. Solely at Defendants' request and in exchange for a promise of reimbursement made by Mr. Evans himself, Mr. Fisk directed his agents to barge onto farmers' property without any legal authority, lie to farmers that they were acting pursuant to nonexistent animal-welfare laws, flood the farmers' poultry houses with a suffocating chemical foam to kill the thousands of birds inside, and leave the rotting carcasses of the dead animals on the ground for the farmers to clean up.

12.     The laws of this country do not condone this kind of rank injustice against its livestock farmers. Nor do they permit the executive officers of meat processors to escape liability after directing their firms to perpetrate the same. For nearly a century, the Packers and Stockyards Act has forbidden poultry processors like Cooks Venture from deploying "any . . . deceptive practice or device" in their dealings with poultry farmers. Since an amendment in 1987, the Act has also forbidden processors from using any artifice to deprive — or attempt to deprive — poultry farmers of full and timely compensation for the chickens they have raised to slaughter. When these prohibitions are violated because of the "the act, omission, or failure" of an "officer" of a poultry processor, the Packers and Stockyards Act goes even further — and makes that officer jointly and severally liable with his employer to "the person or persons injured thereby for the full amount of damages sustained in consequence of such violation."

13.     Plaintiffs are thirteen of the scores of farmers in the Western District of Arkansas who have sustained grievous injuries in consequence of the Defendants' malfeasance. To vindicate the law and hold Defendants accountable for their reprehensible conduct in directing, controlling, and executing Cooks Venture's deceptive and unlawful practices, the Plaintiffs bring this action for violations of the Packers and Stockyards Act against the Defendants— and ask the Court to do justice.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

## II.    PARTIES

### A. Plaintiffs

14.    Plaintiffs are poultry farmers who provide broiler chicken[1] growing services on their family farms in Northwest Arkansas. Each of the Plaintiffs has been engaged by Defendants to raise Cooks Venture chickens for slaughter under a poultry growing arrangement. All of them have been subjected to — and injured by — the deceptive and otherwise unlawful conduct of Defendants alleged in this Complaint.

15.    **Plaintiff Dustin Maybee** entered into a three-year poultry growing contract with Cooks Venture in June 2023 to raise Cooks Venture broilers for slaughter in Carrol County, Arkansas.

16.    **Plaintiff Melissa Barr** (d/b/a RTS Farms) entered into a three-year poultry growing contract in May 2023 to raise Cooks Venture broilers for slaughter in Carrol County, Arkansas.

17.    **Plaintiff Lakeview Farms LLC** is an Arkansas limited liability company owned and operated by Richard Butterbaugh, his wife, his daughter, and his son-in-law (collectively, "Lakeview Farms"). Lakeview Farms entered into a three-year poultry growing contract with Cooks Venture in June 2021 to raise Cooks Venture broilers for slaughter in Carrol County, Arkansas.

18.    **Plaintiff Johnnie Bunch** entered into a three-year poultry growing contract with Cooks Venture in or about the Fall of 2023 to raise Cooks Venture broilers for slaughter in Carrol County, Arkansas.

---

[1] As used in the poultry industry, the terms "broiler" and "broiler chicken" refer to a chicken that is raised, slaughtered, and processed for people to eat.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

19.     **Plaintiff Linda Sparks** (d/b/a Linda Sparks Farms) entered into a three-year poultry growing contract with Cooks Venture in or about March 2021 to raise Cooks Venture broilers for slaughter in Madison County, Arkansas.

20.     **Plaintiff Lance Logan** (d/b/a Logan Farm) entered into a three-year poultry growing contract with Cooks Venture sometime in or about February 2023 to raise Cooks Venture broilers for slaughter in Carroll County, Arkansas.

21.     **Plaintiff Darren Swofford** entered into a three-year poultry growing contract with Cooks Venture sometime in 2021 to raise Cooks Venture broilers for slaughter in or near Alpena, Arkansas.

22.     **Plaintiff Bill Melbourne** entered into a three-year poultry growing contract with Cooks Venture in or about August 2021 to raise Cooks Venture broilers for slaughter in Boone County, Arkansas.

23.     **Plaintiff Leslie Harp** (d/b/a Empty Pockets Ranch) entered into a three-year poultry growing contract with Cooks Venture in August 2021 to raise Cooks Venture broilers for slaughter in Carrol County, Arkansas.

24.     **Plaintiff Tony Wagoner** entered into a three-year poultry growing contract with Cooks Venture sometime in 2021 to raise Cooks Venture broilers for slaughter in Benton County, Arkansas.

25.     **Plaintiff Michael Unruh** (d/b/a Michael Unruh Farms) entered into a three-year poultry growing contract with Cooks Venture sometime in 2021 to raise Cooks Venture broilers for slaughter in Benton County, Arkansas.

26.     **Plaintiff Gregory Wilson** entered into a three-year poultry growing contract with Cooks Venture in March 2023 to raise Cooks Venture broilers for slaughter in or near Alpena, Arkansas.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

27.     **Plaintiff Stuart Tanner** (d/b/a Tanner Farms) borrowed or spent over $110,000 between August 2023 and October 2023 to renovate and otherwise prepare broiler houses to Cooks Venture's specifications in reasonable reliance upon deceptive promises, representations, and verbal agreements he received from Cooks Venture to the effect that, if he completed certain broiler-house preparations, Cooks Venture will enter a poultry-growing contract with him upon certain terms (as more fully alleged in Part VI(A) of the Complaint). Mr. Tanner completed the Cooks Venture-required broiler-house preparations in or about October 2023. The next month, Defendants shut down Cooks Venture's broiler-growing and processing operations, and since then have failed to commence the poultry growing arrangement which they promised Mr. Tanner — causing him to suffer ruinous injuries for which the law entitles him to just compensation.

## B. Defendants and Related Parties

28.     Defendants are current and former principal executive officers of three closely-held, for-profit corporations — Cooks Venture, Inc., Cooks Venture Poultry, Inc., and Cooks Venture Poultry Jay, Inc. (collectively, the "CV Companies"; each individually, a "CV Company") — that were engaged in a joint venture to mutually operate a vertically integrated chicken processing enterprise under the name of "Cooks Venture" from March 2019 until May 2024.[2]

29.     Each of the CV Companies has engaged in, and conspired to engage in, the deceptive and otherwise unlawful conduct alleged in this Complaint. The aim and effect of this conduct has been to avoid fair competition for Growers' services, trick Growers into entering poultry growing arrangements with greater risk and lower compensation, deprive Growers of rights and compensation to which they are legally entitled, and force Growers to bear costs that only Cooks Venture should rightfully have borne.

---

[2] As used in this Complaint, the terms "Cooks Venture," "Cooks Venture enterprise," and "enterprise" refer to this joint venture enterprise, the three CV Companies, and all of their agents, officers, and employees at all times material, collectively.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

30.    Directly or through their agents, Defendants have perpetrated all of the violations of the Packers and Stockyards Act that have been committed by or on behalf of Cooks Venture as alleged in this Complaint. Each of the Defendants had an active management role in Cooks Venture, directed operations and activities of Cooks Venture that violated the Packers and Stockyards Act, knew or should have known of these violations when they occurred, and had the authority and opportunity to stop said violations from occurring or continuing.

31.    Because of their responsibility for Cooks Venture's violations of the Packers and Stockyards Act's prohibitions on abuse and malfeasance in the live poultry trade, Section 403 of the Act, 7 U.S.C. § 223, makes the Defendants jointly and severally liable with the CV Companies for the unlawful conduct alleged in this Complaint.

### i.    The Cooks Venture Companies

32.    **Cooks Venture, Inc.,** is a corporation organized under Delaware law and head-quartered in Decatur, Arkansas. It is the parent of the other two CV Companies — Cooks Venture Poultry, Inc., and Cooks Venture Poultry Jay, Inc. — either by ownership or control. In or around March 2019, it acquired the business and assets of Crystal Lake Farms ("**CLF**"), a poultry breeding, growing, and processing business with facilities primarily in Northwest Arkansas and Northeast Oklahoma. As part of this transaction, CLF's principal controller, Mr. Evans, became the Executive Vice President of Cooks Venture, Inc., and the acquired CLF assets were split between the CV Companies. Cooks Venture, Inc., was the successor to CLF's intellectual property in poultry breeding methods and genetics. Since that time, most of Cooks Venture, Inc.'s executive officers and other personnel have operated primarily out of CLF's former headquarters and other facilities in and around Decatur, Arkansas, and Jay, Oklahoma.

33.    **Cooks Venture Poultry, Inc.,** is a corporation organized under Delaware law and headquartered in CLF's former offices in Decatur, Arkansas. It is a wholly-owned or controlled subsidiary of Cooks Venture, Inc., and has shared all executive officers with the parent

---

**VERIFIED COMPLAINT**                                                    **PAGE 15 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

company since its formation in 2019. Cooks Venture Poultry, Inc., was the successor to CLF's breeding stock, hatcheries, growing houses, and other assets on its 800-acre farm near Decatur, Arkansas. Soon thereafter, Cooks Venture Poultry, Inc. — together with its related entities and affiliates in the business of processing and selling heirloom chickens, including the two other CV Companies — entered poultry growing contracts with several dozen farmers (including Plaintiffs) to raise Cooks Venture chickens for slaughter.

34.     **Cooks Venture Poultry Jay, Inc.,** is a corporation organized under Delaware law and headquartered in the same offices in Decatur, Arkansas. It is also a wholly-owned or controlled subsidiary of Cooks Venture, Inc., and it has also shared all executive officers with the parent company since its formation in 2019. Cooks Venture Poultry Jay, Inc., was the successor to CLF's large processing plant in Jay, Oklahoma, and soon thereafter acquired a smaller processing facility in Tahlequah, Oklahoma.

### ii. The Cooks Venture Joint Enterprise

35.     The CV Companies have been combined in a joint venture to carry on the Cooks Venture enterprise since March 2019 or thereabout. Since their formation in or around March 2019, the CV Companies have combined their personnel, operations, and assets to jointly carry on the business they had acquired from CLF. Under identical beneficial ownership and shared executive control, the CV Companies have operated the Cooks Venture business as one integrated enterprise — much like it was when CLF owned it.

36.     Together, the CV Companies have deployed capital, intellectual property, and employees from Cooks Venture, Inc., hatcheries, poultry houses, and contract growers from Cooks Venture Poultry, Inc., processing facilities from Cooks Venture Poultry Jay, Inc., and, finally, websites and other marketing and fulfillment efforts from Cooks Venture, Inc., to produce, market, sell, and ship Cooks Venture chicken products to customers nationwide.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

37.     Each of the CV Companies has had an equal right to control or manage Cooks Venture. The CV Companies have always had the same controlling principals, and those principals have always been empowered to make decisions for the Cooks Venture enterprise as a whole. Therefore, every decision made with respect to Cooks Venture necessarily reflected the will of all the CV Companies.

38.     The profits and losses resulting from Cooks Venture were shared among the CV Companies according to implied or expressed understandings between them. These understandings included, without limitation, joint decisions by the CV Companies (acting through their controlling principals) regarding the allocation of profits and losses from the Cooks Venture enterprise among the various companies, assets, and operations involved in carrying on that enterprise.

### iii. The Cooks Venture Officers

39.     **Defendant Matthew Wadiak** co-founded Cooks Venture with Defendant Blake Evans. Mr. Wadiak served as President and Chief Executive Officer of Cooks Venture, Inc., Cooks Venture Poultry, Inc., Cooks Venture Poultry Jay, Inc., and the Cooks Venture enterprise from their formation sometime in or about March 2019 until August 2023, when he stepped down from the CEO role. According to the corporate documents of the CV Companies on file with the Delaware Secretary of State, Mr. Wadiak continues to serve as President.

40.     In these roles, Mr. Wadiak has enjoyed all of the duties and powers ordinarily attributed to the President and Chief Executive Officer of a business enterprise. These have included, without limitation: (a) formulating and executing Cooks Venture's business strategies; (b) directing Cooks Venture's operations and business activities; (c) controlling all other Cooks Venture officers, including the Executive Vice President and the Chief Operating Officer, and the enterprise functions within their purviews; (d) shaping Cooks Venture's organizational culture; and (e) ensuring Cooks Venture's compliance with all applicable laws and regulations.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

41.    From March 2019 through August 2023, Mr. Wadiak was also the public face of
Cooks Venture, shaping its image and reputation among poultry growers and in the broader poul-
try industry through public statements, media appearances, and other communications.

42.    At all times material during his tenure with Cooks Venture, Mr. Wadiak has been
a principal executive officer of Cooks Venture, and has been responsible for establishing, main-
taining, and enforcing a governance framework that is reasonably designed to ensure Cooks Ven-
ture's compliance with its obligations under the Packers and Stockyards Act and regulations
promulgated thereunder.

43.    Mr. Wadiak perpetrated some or all of the violations of the Packers and Stockyards
Act alleged in this Complaint through acts, omissions, or failures that: (a) he directly committed
within the scope of his corporate office; and (b) his agents as a corporate officer committed within
the scope of their agency.

44.    Mr. Wadiak resides in or near New York, New York.

45.    **Defendant John Niemann** served as Chief Executive Officer of Cooks Venture,
Inc., Cooks Venture Poultry, Inc., Cooks Venture Poultry Jay, Inc., and the Cooks Venture enter-
prise from sometime in or about August 2023 until sometime in or about January 2024.

46.    In this role, Mr. Niemann enjoyed all the duties and powers ordinarily attributed
to the Chief Executive Officer of a business enterprise. These included: (a) formulating and exe-
cuting Cooks Venture's business strategies; (b) directing Cooks Venture's operations and business
activities; (c) controlling all other Cooks Venture officers, including the Executive Vice President
and the Chief Operating Officer, and the enterprise functions within their purviews; (d) shaping
Cooks Venture's organizational culture; and (e) ensuring Cooks Venture's compliance with all
applicable laws and regulations.

47.    At all times material during his tenure with Cooks Venture, Mr. Niemann was a
principal executive officer of Cooks Venture, and was responsible for establishing, maintaining,

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

and enforcing a governance framework that is reasonably designed to ensure Cooks Venture's compliance with its obligations under the Packers and Stockyards Act and regulations promulgated thereunder.

48.    Mr. Niemann perpetrated some or all of the violations of the Packers and Stockyards Act alleged in this Complaint through acts, omissions, or failures that: (a) he directly committed within the scope of his corporate office; and (b) his agents as a corporate officer committed within the scope of their agency.

49.    Mr. Niemann currently resides in or near Wichita, Kansas.

50.    **Defendant Blake Evans** co-founded Cooks Venture with Defendant Matthew Wadiak. Mr. Evans has served as Executive Vice President of Cooks Venture, Inc., Cooks Venture Poultry, Inc., Cooks Venture Poultry Jay, Inc., and the Cooks Venture enterprise since their formation sometime in or about March 2019.

51.    In this role, Mr. Evans has enjoyed all of the duties and powers ordinarily attributed to the Executive Vice President of a business enterprise. These have included, without limitation: (a) managing Cooks Venture's operations and business activities, including the establishment and execution of Cooks Venture's contract-grower program and all activities associated therewith; (b) controlling all other Cooks Venture officers, except the Chief Executive Officer, and the enterprise functions within their purviews; and (c) ensuring that Cooks Venture's operations and activities comply with all applicable laws and regulations.

52.    Since 2019, Mr. Evans has also served as the public face of Cooks Venture in Arkansas and Oklahoma, regularly interacting with poultry growers, material suppliers, public officials, and local communities to shape their perceptions, address their concerns, and induce their cooperation with Cooks Venture.

53.    At all times material during his tenure with Cooks Venture, Mr. Evans has been a principal executive officer of Cooks Venture, and has been responsible for establishing,

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

maintaining, and enforcing a governance framework that is reasonably designed to ensure Cooks Venture's compliance with its obligations under the Packers and Stockyards Act and regulations promulgated thereunder.

54.     Mr. Evans perpetrated some or all of the violations of the Packers and Stockyards Act alleged in this Complaint through acts, omissions, or failures that: (a) he directly committed within the scope of his corporate office; (b) his agents as a corporate officer committed within the scope of their agency; and (c) he directly committed outside the scope of his corporate office.

55.     Mr. Evans resides in or near Fayetteville, Arkansas.

56.     **Defendant Tim Singleton** served as Chief Operations Officer of Cooks Venture, Inc., Cooks Venture Poultry, Inc., Cooks Venture Poultry Jay, Inc., and the Cooks Venture enterprise from sometime in or about April 2022 until sometime in or about December 2023.

57.     In this role, Mr. Singleton had all the duties and powers ordinarily attributed to the Chief Operating Officer of a business enterprise. These included, without limitation: (a) managing the day-to-day operations of Cooks Venture; (b) supervising the managers and employees of Cooks Venture involved in breeding, hatching, growing, live-hauling, and processing its chickens; (c) ensuring the compliance of those operations and activities with all applicable laws and regulations; and (c) interacting with Cooks Venture's contract growers and other trading partners to raise issues, address complaints, and induce cooperation.

58.     At all times material during his tenure with Cooks Venture, Mr. Singleton was a principal executive officer of Cooks Venture, and was responsible for establishing, maintaining, and enforcing a governance framework that is reasonably designed to ensure Cooks Venture's compliance with its obligations under the Packers and Stockyards Act and regulations promulgated thereunder.

59.     Mr. Singleton perpetrated some or all of the violations of the Packers and Stockyards Act alleged in this Complaint through acts, omissions, or failures that: (a) he directly

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

committed within the scope of his corporate office; and (b) his agents as a corporate officer committed within the scope of their agency.

60.    Mr. Singleton resides in or near Fayetteville, Arkansas.

### C. Co-Conspirators

61.    **Patrick Fisk, the Director of the Livestock and Poultry Division of the Arkansas Department of Agriculture,** participated as a co-conspirator in some or all of the violations of the Packers and Stockyards Act alleged in this Complaint, and performed acts and made statements in furtherance thereof.

62.    **Several agents of the State of Arkansas who acted on Mr. Fisk's orders** also participated as co-conspirators in some or all of the violations of the Packers and Stockyards Act alleged in this Complaint, and performed acts and made statements in furtherance thereof.

63.    Defendants are jointly and severally liable for the acts and statements of all of their co-conspirators as alleged in this Complaint, whether those co-conspirators are named or not named as defendants herein.

## III.    JURISDICTION, VENUE, AND COMMERCE

64.    Plaintiffs bring this action pursuant to Section 308(a) of the Packers and Stockyards Act, 7 U.S.C. § 209, to secure direct damages (economic and non-economic), consequential damages (economic and non-economic), reliance damages, nominal damages, punitive damages, pre- and post-judgment interest, costs of suit and attorney's fees arising from Defendants' unlawful conduct.

65.    The Defendants were subject to the prohibitions of Sections 202, 207, and 410 of the Packers and Stockyards Act, 7 U.S.C. §§ 192, 197, 228b-1, in all of their dealings with Growers relevant to this Complaint.

66.    At all times material: (a) each defendant was a "live poultry dealer" within the meaning of Sections 2(a)(10) and 202 of the Packers and Stockyards Act, 7 U.S.C. §§ 182(10), 192;

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

(b) each defendant was engaged, both directly and through his agents, in the business of obtaining live poultry under poultry growing arrangements for the purpose of slaughtering it, including by obtaining live poultry from growers located in multiple states, shipping that poultry for slaughter across state lines, and selling or shipping poultry products derived from said poultry to customers in multiple states; and (c) the average annual value of the live poultry each Defendant obtained by poultry growing arrangement, both directly and through his agents, exceeded $100,000 within the meaning of Section 207(b) of the Packers and Stockyards Act, 7 U.S.C. § 197(b).

67.    At all times material, the Poultry Production Agreements (as defined in Part V below), and all of the actions of Defendants in connection therewith, concerned "live poultry" within the meaning of Sections 2(a)(6) and 202 of the Packers and Stockyards Act, 7 U.S.C. §§ 182(6), 192, because they pertained to the raising of live chickens for slaughter.

68.    The Court has jurisdiction over the subject matter of this action pursuant to Section 308(a) of the Packers and Stockyards Act, 7 U.S.C. §§ 209-210, as well as pursuant to 28 U.S.C. § 1331.

69.    The Court has personal jurisdiction over the Defendants pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and the State of Arkansas's long-arm statute because: (a) the Plaintiffs' claims against each Defendant arose out of business activities of such Defendant, or agents of such Defendant, that were purposefully directed at the State of Arkansas; and (b) all of the Defendants are domiciled in the State of Arkansas, maintain their principal place of business in the State of Arkansas, or transact business in the State of Arkansas on such a substantial, continuous, and systematic basis as to be essentially at home in the State.

70.    Venue is proper in this District pursuant to Section 209 of the Packers and Stockyards Act, 7 U.S.C. § 197b(a), because the principal part of the performance under the poultry growing arrangements between Plaintiffs and Cooks Venture took place in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b-d) because: (a) a substantial part of the

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

events or omissions giving rise to Plaintiffs' claims occurred in this District; (b) some or all of the Defendants reside in this District; and (c) some or all of the Defendants transact, are licensed to do, or are doing business in this District on a substantial, continuous, and systematic basis.

71.     The activities of the Defendants and all Co-conspirators described in this Complaint were within the flow of, were intended to have, and did have, a direct, substantial, and reasonably foreseeable effect on the interstate commerce of the United States, including that current of commerce usual in the livestock and meatpacking industries whereby poultry and poultry products are sent from one state with the expectation that they will end their transit, after purchase, in another state.

72.     All conditions precedent to the filing of this suit have been satisfied.

## IV.   BACKGROUND ON THE POULTRY INDUSTRY

### A. Poultry integrators use contract growers to raise their broiler chickens.

73.     Vertically integrated poultry enterprises like Cooks Venture — known as "integrators" in the industry — control virtually every aspect of broiler chicken production in America. Integrators own or control the breeding and hatching of broiler chickens; the feed, medication, facilities, and techniques used in raising those chickens to maturity; and, ultimately, their processing and distribution as chicken products for consumption in homes, restaurants, and other venues. Generally, however, integrators do not raise the birds themselves; they outsource that step to nominally independent farmers working under restrictive poultry growing contracts. Through these contractual arrangements, integrators are able to secure the facilities and labor to raise as many chickens as they want — while shifting the substantial costs, capital requirements, and risks involved onto farmers.

74.     Integrators typically organize all of the functions involved in producing chicken products into local "complexes" of integrated operations composed of hatcheries, feed mills, transportation systems, processing plants, and storage facilities. To reduce transportation costs for

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

feed and chickens, and to limit injury or death to chickens during transport, integrators generally contract with poultry growers located near their complexes and refuse to contract with growers more than 50 to 60 miles away from them.

75.    In general, a poultry farmer today can only pursue their trade by entering a poultry growing arrangement with an integrator. The poultry processing industry is highly consolidated, with just twenty firms processing over 94 percent of poultry annually, and the four largest of them processing over 60 percent, and almost all conventional poultry processors follow the integrator model, leaving no open market for live poultry ready for slaughter. Accordingly, fully 95 percent of the nation's poultry production occurs under contract for integrators.

76.    Under the typical poultry growing arrangement, the integrator provides birds, feed, medicine, veterinary services, and professional supervision to the grower, while the grower provides the labor, utilities, and up-front investment capital in chicken housing facilities required to raise broilers to processing age. During the terms of their contracts with integrators, growers are typically forbidden from raising broiler chickens for another integrator. They are also forbidden from using chicks, feed, or medicine from any other source, giving the integrator tight control over the inputs into the chicken-rearing process, including the age and breed of flocks, quality of feed, quality of medicine, and timing of delivery for processing. These restrictions apply to growers even if their integrator delays delivery of chicks or fails to deliver chicks at all, and regardless of whether the grower could operate separate grow-out facilities for each integrator.

77.    When a flock of broilers placed with a grower reaches processing age, the integrator typically collects the chickens from the grower's broiler houses and trucks them to the integrator's own facilities, where they are counted and weighed by the integrator's agents using the integrator's equipment, often while the grower is absent. The integrator then calculates the grower's compensation for the flock based on the total live weight of the birds collected, with a final per-pound price typically being set by the integrator based on its own assessment of the

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

grower's performance on various factors — such as how many birds survived the growing process and how much feed they consumed per pound of weight they gained — and how it compares to the performance of other contract growers in a "tournament" system designed by the integrator.[3]

78.     In the course of entering and performing their poultry growing arrangements with integrators, growers are often required to incur enormous costs to build, upgrade, or otherwise prepare chicken houses to satisfy integrators' onerous (and often arbitrary) specifications. To operate at the scale required by integrators, a contract grower typically has to build (or acquire and renovate) two-to-four modern broiler houses. These houses are large, costly, specialized facilities. Designed to hold and grow tens of thousands of chickens at a time, each modern broiler house costs approximately $500,000 to build. Under prevailing arrangements in the industry, poultry growers bear this capital cost, with most taking out loans to fund 90 percent or more of it. On average, beginning poultry growers take on more than a million dollars in debt to finance the construction (or acquisition and renovation) of broiler houses to meet integrators' requirements. Thereafter, growers typically operate as small, highly leveraged family farms, with bank repayment as their largest expense.

79.     The high capital costs and debt loads that farmers incur to enter poultry growing for an integrator make it difficult — often prohibitively so — for growers to exit their contracts with nonperforming or abusive integrators. On the one hand, the specialized nature of broiler houses makes them prohibitively expensive to repurpose for almost any economic use other than large-scale chicken-growing. On the other hand, switching to another integrator is typically a costly and risky endeavor, as it requires the grower to secure and sink even more capital into their broiler houses to bring them into compliance with the new integrator's specifications.

_____

[3] This ranking-based compensation system is referred to as the "tournament system" in the industry.

**VERIFIED COMPLAINT**                                                    **PAGE 25 OF 112**

80.     Taken together, this system of "farming" allows integrators to transfer all of the risk involved in broiler production onto growers and then hold growers captive "in a state of indebted servitude, living like modern-day sharecroppers on the ragged edge of bankruptcy."[4] While growers take on large debts to finance long-term capital investments for the benefit of the integrator, most poultry growing contracts only bind integrators to provide growers with a single flock of chicks — if that. At the same time, the tournament-style and other performance-based compensation systems prevalent in the industry allow integrators to maintain wide discretion over the prices they pay growers for their services — and to keep growers largely in the dark about how those prices are set.

81.     Trapped in this one-sided system, poultry growers are deeply vulnerable to abuse and malfeasance at the hands of integrators. Since growers have little visibility into integrators' choices about poultry inputs and compensation, they are generally powerless to catch, much less police, integrator misconduct. In any event, they must accept whatever treatment they are given — and stay on their integrator's good side — or else risk being cut off from flock placements and losing their only means to repay the heavy debts they have been forced to incur. Indeed, as the Small Business Administration found in 2016, when a grower loses their integrator contract, the value of their broiler houses — their primary asset and collateral for their debts — typically plummets between *62 percent and 94 percent*, leaving them insolvent.

82.     In the words of one prominent commentator: "Once one enters the life of a grower, the trap is closed: high capital costs and large debt to enter the business, no input on product prices, no market in which to sell goods and no way out except bankruptcy[.]"

---

[4] *See* Christopher Leonard, *The Meat Racket: The Secret Takeover of America's Food Business* 3 (2014).

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

**B.  Integrators routinely exploit disparities of power and information to offload risks and costs onto contract growers.**

83.    Against the foregoing background, over the past two decades, the United States Department of Agriculture ("USDA") has received thousands of complaints and comments from poultry growers about the inequality of power and information that has developed between growers and integrators — and about the unfair and deceptive trade practices that integrators use to exploit and exacerbate that inequality.[5]

84.    Based on these complaints and on its own investigations into the nation's poultry markets, the USDA has found that a prevalent deceptive practice among integrators is to hide and misrepresent key information in the course of entering, performing, and terminating poultry growing arrangements with farmers. According to USDA, the widespread use of such omissions and misrepresentations by integrators has caused substantial numbers of growers to believe they were signing up for contractual arrangements that, in practice, they did not end up receiving or providing services under.

85.    In particular, the USDA has noted that omissions of information about the level of discretion reserved to integrators under poultry growing contracts are prevalent and tend to cause acute harm to growers. As described above, under prevailing contracting arrangements in the poultry industry, a grower's annual revenue is heavily dependent on the number of flocks that the integrator decides to place on the grower's farm and the number of birds that the integrator decides to include in each flock.[6] After all, empty poultry houses do not produce revenue. Additionally, flock performance — and therefore flock payments — can be heavily influenced by

---

[5] *See* Transparency in Poultry Grower Contracting and Tournaments, 88 Fed. Reg. 83,210, 83,212-13 (Nov. 28, 2023) (Final Rule).

[6] The total number of birds in a flock is often divided by the total square feet of poultry housing on the grower's farm to come up with a so-called "stocking density" measure, which is a standard measure used to describe a flock's relative size in the industry.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

discretionary integrator decisions regarding the types and quantities of inputs a grower receives, including decisions about the breed, age, and health of the birds placed; the type and quantity of feed delivered; and the type and quantity of veterinary medicines and services provided.

86.    The integrator's discretion over these factors becomes especially pernicious, the USDA has found, when the integrator encounters problems that make performance of their contract obligations to growers burdensome or unprofitable. For example, market conditions may reduce the integrator's incentive to operate a local complex at full capacity, or they may undermine the economic viability of a local complex altogether. A shortage may raise the cost of high-quality feed or medicines, or the integrator may choose not to deliver similar feed and medicine to all of its contract growers because of disruptive events (*e.g.*, natural disasters or labor disputes) affecting its supply and logistics chains. In such circumstances, the USDA has found that integrators tend to use their discretionary authorities under poultry contracts to offload the risks and costs associated with their problems onto growers — often with catastrophic results for growers' incomes. Yet the internal policies and priorities that guide integrators in the use of their discretionary powers are practically never disclosed to growers in advance.

87.    Without adequate information about how integrators intend to exercise, or could exercise, their discretionary authority over these critical factors of poultry production, the USDA has found that contract growers cannot properly estimate the revenue potential of a poultry-growing arrangement offered by an integrator, evaluate the risks it entails, or compare its value against the arrangements offered by competing integrators. This problem is compounded by integrators' reported use of "overly rosy 'pro forma' financial estimates" and "income projections" during the contracting process, and routine failures to disclose information about their financial health and the financial performance of their local complexes to growers.[7] Since "complexes [and

---

[7] *See* Transparency in Poultry Grower Contracting and Tournaments, 88 Fed. Reg. 83,210, 83,213, 83215, 83239 (Nov. 28, 2023) (Final Rule).

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

integrators] that are underperforming financially may be subject to closure or reduced production levels," the USDA has explained in regulatory findings, these omissions deprive growers of "critically useful information" to understand and evaluate their contracting opportunities.[8]

88.      Importantly, the USDA has found that growers cannot obtain the key information withheld by integrators from anyone *but* their integrator. Growers' contracts with integrators typically contain strict nondisclosure terms that prohibit growers from sharing information on contract terms or integrator performance with other growers. Further, although integrators have for decades shared detailed confidential information about grower compensation and contract terms among each other through a consultancy named Agri Stats, they have conspired for just as long to prevent each other (and Agri Stats) from sharing this information with growers.

89.      Taken together, the asymmetry of information between integrators and growers — along with the failure of integrators to disclose the information known to them as described above — have resulted in growers being routinely deceived into entering one-sided contracts under which integrators can subject them to wild swings in compensation, force them to bear the risk of unforeseen costs, extort them for capital investments, and ultimately, trap them in vicious cycles of debt and dependence.[9]

90.      Under these one-sided poultry growing arrangements, the prices that integrators pay to growers for their services have been found to vary significantly from year to year, with harsh impacts on growers' earnings. The average poultry grower now loses money two years out of every three, and nearly three-quarters of growers whose sole source of income is poultry farming live below the poverty line. Importantly, these impoverishing outcomes do not reflect the fair market value of grower's services, but the ability of integrators to capture that value for themselves under prevailing arrangements: Between 1988 and 2016, the inflation-adjusted wholesale

---

[8] *See id.* at 83215.
[9] *See Id.* at 83,212-16.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

price of chicken increased by 17.4 cents a pound for consumers — while the average pay of a poultry grower rose by just 2.5 cents a pound.

91.     With poultry growers' incomes being so depressed, they are rarely, if ever, capable of repaying the debts they take on to enter their poultry growing arrangements within a single contract term. This creates a classic "hold-up" problem, where the grower desperately needs the integrator to renew their contract so they can continue paying off the financing for their original capital investment in broiler houses (which, as noted above, have little salvage or repurpose value absent a poultry growing arrangement with an integrator). In these circumstances, the USDA has found that integrators can — and often do — exploit their leverage over growers by making contract renewal or continued flock placement dependent on further grower investments not disclosed at the time of the original agreement. Indeed, many reports have been made to USDA of growers being harassed, intimidated, and even retaliated against by integrators for refusing to make expensive upgrades to their growing operations.

92.     Additionally, the USDA has found that, in many cases, growers have experienced terminations, suspensions, or reduced flock placements based on pretexts — specifically, based on false or misleading claims that a grower violated contractual or regulatory animal welfare requirements — when other reasons motivated the adverse action, such as retaliation, harassment, discrimination, or some other unjust motive. Such pretextual contract adjustments and terminations put growers at severe risk of heavy economic loss, including not just the loss of production income, but also the loss of the grower's farm or family home to foreclosure if they were mortgaged to finance the grower's broiler houses. Indeed, pretextual cancellation can even make the sale or transfer of a grower's broiler houses impossible, as potential buyers have a hard time defining the value of a broiler house without a production contract in place.

93.     As a result of these dynamics of dependence and exploitation, poultry growers now tend to accumulate more and more debt without reaping much, if any, return on it. In 2011, the

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

USDA found that returns-on-equity for growers were negative for farms with one-to-two poultry houses, and barely increased with the size of the operation to a mere 2.7 percent for farms with six or more houses. Today, even a relatively well-performing grower will often spend 15-to-25 years recouping his or her investment and paying down its debt. For those less fortunate, the possibility of economic independence is simply a fiction.

94.     In the end, as Federal Trade Commission Chair Lina Khan has stated in regulatory comments to the USDA, "Few growers would accept these unfair contract terms, punitive business practices, and substandard economic outcomes if they had meaningful choice." A critical reason that growers do *not* have such choice is that, by withholding or misrepresenting critical information in the ways described above, integrators have deprived growers of the opportunity to understand, evaluate, and compare the contract offers and capital demands of different integrators on the merits — disabling competition in the country's poultry-growing markets, and enabling exploitation in its place.

## C. The USDA has promulgated rules under the Packers and Stockyards Act to protect contract growers from such exploitation.

95.     The Packers and Stockyards Act (the "Act") was passed in 1921 "to promote fairness, reasonableness, and transparency in the livestock marketplace by prohibiting practices that are contrary to these goals."[10]

96.     As a senator explained during the congressional debates on the Act, the "principal cause" that animated Congress in legislating the Packers and Stockyards Act was "the unequal condition under which the man who *sells* in the yard and the man who *buys* face each other." This inequality not only drove livestock growers to "financial ruin and disaster," the Act's sponsors argued, but also threatened "the equal, inalienable rights of the producer and consumer."

---

[10] *See* Transparency in Poultry Grower Contracting and Tournaments, 88 Fed. Reg. 83,210, 83,210 (Nov. 28, 2023) (Final Rule).

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

97.     In describing how the Act would "eliminate the[se] evils," key lawmakers said it would protect the "moral rights" of producers and consumers to participate in "fair and open" markets — and do so specifically by reaching beyond monopolistic and anticompetitive conduct to ban all unfair and deceptive practices "as between the packer and the general public, *the packer and the producer*, or the packer and any other agency connected with the marketing of livestock."

98.     To achieve these ends, Section 202 of the Packers and Stockyards Act, 7 U.S.C. § 192, makes it "unlawful . . . for any live poultry dealer with respect to live poultry" to "engage in or use any unfair, unjustly discriminatory, or deceptive practice or device[.]" Additionally, Section 410 of the Act, 7 U.S.C. § 228b-1, prohibits "live poultry dealer[s]" from failing to pay "the full amount due [to a] poultry grower on account of . . . poultry" raised under a "poultry growing arrangement," and makes "any delay or attempt to delay" such payment "an 'unfair practice' in violation of the Act." Finally, Section 207(b) of the Act, 7 U.S.C. 197(b), requires live poultry dealers to hold "[a]ll poultry obtained . . . by poultry growing arrangement" — together with all proceeds, receivables, and inventories derived therefrom — "in trust for the benefit of all unpaid . . . poultry growers" until "full payment" has been made to them.

99.     Congress delegated the responsibility to implement these broad provisions to the USDA, which has the power and duty to regulate the unfair and deceptive practices of live poultry dealers under the Packers and Stockyards Act.[11] Specifically, in Section 407(a) of the Act, 7 U.S.C. 228(a), Congress delegated to the Secretary of Agriculture the plenary power to "make such rules, regulations, and orders as may be necessary to carry out the provisions of [the] Act." Pursuant to this authority, the USDA has investigated livestock poultry markets and, after examining all the relevant information, promulgated rules identifying specific actions by live poultry dealers that

---

[11] As the House of Representatives report on the Packers and Stockyards Act explained, it was designed to "give the Secretary of Agriculture complete inquisitorial, visitorial, supervisory, and regulatory power over the packers, stockyards, and all activities connected therewith." *See* H.R. Rep. No. 67-77, at 2 (1921).

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

violate the Act's broad prohibition on "deceptive . . . device[s] or practice[s]." Two of these rules are particularly important in this case.

100.    **The Market Integrity Rule**. The first is the USDA's rule on "Market Integrity Under the Packers and Stockyards Act" (the "Market Integrity Rule"). The Market Integrity Rule sets forth the USDA's determination that a "live poultry dealer" violates the Act's ban on "deceptive practice[s] and device[s]" whenever they make, modify, perform under, enforce, or terminate a contract with a grower "by employing a false or misleading statement," or an "omission of material information necessary to make a statement not false or misleading." [12]

101.    More broadly, in its explanatory preamble to the Market Integrity Rule, the USDA affirmed its longstanding determination that all representations, omissions, and other practices or devices that "prevent or mislead sellers or buyers [of livestock or poultry] from making informed decisions concerning their livestock or poultry operations" are unlawful "deceptive practices or devices" within the meaning of Section 202(a) of the Packers and Stockyards Act. [13]

102.    Such deceptions, the USDA has explained, "have no value or place in a competitive market," and operate only to mislead producers and consumers out of making "rational decisions," give an unfair advantage to dishonest live poultry dealers, and dissuade honest ones from competing on the merits — ultimately leading to allocative inefficiencies and loss of social welfare. [14]

103.    **The Transparency Rule.** The second important USDA regulation is a more targeted rule on "Transparency in Poultry Grower Contracting and Tournaments" ("The Transparency Rule"). The Transparency Rule identifies specific information that growers need to receive

---

[12] *See* 9 C.F.R. § 201.306.

[13] *See* Inclusive Competition and Market Integrity under the Packers and Stockyards Act, 89 Fed. Reg. 16,092, 16,128, 16,156-57 (Mar. 6, 2024) (Final Rule).

[14] *See id.* at 16,130, 16,168. *See also* Inclusive Competition and Market Integrity under the Packers and Stockyards Act, 89 Fed. Reg. 60,010, 60,031-32 (Oct. 3, 2022) (Proposed Rule).

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

from live poultry dealers in order to make reasonably informed decisions about entering, renew-ing, or modifying a poultry growing arrangement.

104.    In issuing the Transparency Rule, the USDA made two key findings of fact. First, it found that integrators routinely withhold certain material information from growers in the course of entering and performing poultry-growing contracts.[15] Second, it found that these omis-sions "depriv[e] growers of the ability to [reasonably] make contracting and investment decisions and manage the operation and risks of their farms."[16] Based on these facts, the USDA determined that such omissions necessarily constitute "deceptive practices or devices" in violation of Section 202(a) of the Act.

105.    Specifically, the USDA determined that the following information and documen-tation is "important" for "reasonable poultry growers" to have when making "decisions relat[ed] to contracting and [to] the operation of their contracts," and thus must be affirmatively disclosed to growers "in a clear, concise, and understandable manner" whenever integrators seek to "estab-lish a new broiler growing arrangement," or to "renew, revise, or replace an existing broiler grow-ing arrangement."[17] In relevant part, the Transparency Rule provides that:

     a. The integrator must provide the grower with a true, written copy of the re-newed, revised, replacement, or new broiler growing arrangement.

     b. Where the poultry growing arrangement requires an original or additional cap-ital investment by the grower, the integrator must provide the grower with a letter of intent that can be relied upon to obtain financing for the capital in-vestment.

     c. The integrator must affirmatively disclose to the grower, in a separate disclo-sure document that is clear, concise, and understandable, the following infor-mation:

---

[15] *See Transparency in Poultry Grower Contracting and Tournaments*, 88 Fed. Reg. 83,210, 83,210, 83,212-13 (Nov. 28, 2023) (Final Rule).
[16] *See id.* at 83,216.
[17] *See id.* at 83,237.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

i.     The minimum number of flocks that the integrator will deliver to the grower for grow-out annually under the terms of the poultry growing arrangement.

ii.    The minimum stocking density that each flock placed on the grower's farm will have.

iii.   The fact that income from a grower's poultry farm may be significantly affected by the number of flocks that the integrator chooses to place on their farm every year and the density of each such flock.

iv.    A summary of all lawsuits over the prior five years between the integrator and any grower, including the nature of each lawsuit, its location, the initiating party, a brief description of the controversy, and any resolution.

v.     A summary of all bankruptcy filings in the prior five years by the integrator and by any parent, subsidiary, or related entity thereof.

vi.    A description of the integrator's policies and procedures, including any appeal rights, regarding or arising from the following events: (i) increased lay-out time (*i.e.*, the time between flock placements, when the grower's houses are left empty); (ii) sick, diseased, and high early-mortality flocks; (iii) natural disasters, weather events, or other events adversely affecting the physical infrastructure of the local complex or the grower facility; (iv) other events potentially resulting in massive depopulation of flocks, affecting grower payments; (v) feed outages, including outage times; and (vi) grower complaints relating to feed quality, formulation, or suitability.

vii.   A table showing the average annual rate of grower turnover for the previous calendar year, and the average rate of grower turnover for the five previous calendar years, at both a company level and a local complex level.

viii.  A table showing the average annual gross compensation paid to broiler growers at the local complex for each of the 5 previous years, expressed as the average compensation amount paid out per square foot of broiler housing held by broiler growers in each year, in each housing specification tier, and in each grower performance quintile (or, in the case of a local complex comprising 9 or fewer growers, at the grower performance mean and one standard deviation from the mean).

ix.    Where backward-looking five-year compensation averages do not accurately represent the compensation which the integrator projects it will

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

make annually to the grower, a table providing projections of the average annual gross compensation that will be be paid to growers contracted to raise birds for the same complex under the same housing specifications in each year of the term of the broiler growing arrangement, at five quintile levels or by mean and standard deviation expressed as dollars per broiler-house square foot.

x.   An explanation of why the annual gross payment averages for the previous five years do not provide an accurate representation of projected future payments, including the basic assumptions underlying the financial projections provided by the integrator.

xi.  A summary of the information the live poultry dealer collects or maintains relating to grower variable costs inherent in broiler production. [18]

106.   In the explanatory preamble to the Transparency Rule, the USDA added its finding that "a live poultry dealer's failure to disclose" material information "related to the financial condition of the dealer or complex . . . is deceptive." [19] As an example of such material financial information, the USDA specifically cited financial underperformance by the integrator or its local complex that could lead to "closure or reduced production levels." [20]

107.   Across the board, the USDA found that poultry growers need the above-described information "to understand the market for grower services, to understand and evaluate their performance under the terms of their contracts, and to make decisions regarding their farms that may improve performance or mitigate risks under those contracts." [21] As a result, the USDA further found that the failure of live poultry dealers to disclose this information tends to harm

---

[18] *See* 9 C.F.R. §§ 201.2, 201.100, 201.102.
[19] *See* Transparency in Poultry Grower Contracting and Tournaments, 88 Fed. Reg. 83,210, 83,215 (Nov. 28, 2023) (Final Rule).
[20] *See id.* at 83,239 ("Dealers or complexes that are underperforming financially may be subject to closure or reduced production levels, resulting in negative effects on grower revenue and potential contract termination. For example, numerous grower contracts were terminated as a result of the Pilgrim's Pride bankruptcy in 2008. Had those growers understood the financial state of the company and the risk to their operations, they may have elected to work with a different dealer, not entered the business at all, or taken other measures to protect themselves from the risk of financial loss. In addition, because corporate relationships may not be known to growers, the public nature of filings may be inadequate to effectively communicate this type of risk.").
[21] *See id.* at 83,216.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

competition by impairing growers' ability to "understand, evaluate, and compare contracts of-
fered," and to "bargain efficiently with competing dealers where and to the extent possible" —
undermining the efficient allocation of growers' capital and labor resources across the industry.[22]

108.    In light of these facts, the USDA determined that the failure of an integrator to
provide some or all of the information set forth in the Transparency Rule is "likely to mislead
[reasonable] growers" in "their conduct or decision with regard to [their] poultry growing arrange-
ments," and is therefore a *per se* deceptive practice under Section 202(a) of the Packers and Stock-
yard Act.[23]

## V.    BACKGROUND ON COOKS VENTURE

109.    Until much of its operations were abruptly shut down in November 2023, Cooks
Venture was held out by Defendants as the leading integrator of heirloom-bred, pasture-raised
chicken in the United States. It had attracted over $180 million in debt and equity investment
since its founding in 2019. It had acquired the capacity to slaughter over 700,000 birds a week. It
employed over 500 workers and made tens of millions of dollars a year in revenue. From its cor-
porate outpost in New York City and operating headquarters in Decatur, Arkansas, it oversaw
the breeding and raising of millions of birds at a time by dozens of farmers spread out across
Arkansas, Oklahoma, and Missouri.

110.    Like other major poultry integrators, Cooks Venture was vertically integrated. It
controlled every step in the production of chicken meat. It owned a proprietary breed of chicken,
the Pioneer. It hatched flocks of Pioneer chicks at its own hatcheries in Benton, Arkansas, and
contracted hatcheries elsewhere in the Ozarks region. When those chicks matured, it slaughtered,
deboned, and packaged them at its processing facilities in Decatur, Arkansas, and in Jay and

---

[22] *See id.* at 83,211-12.
[23] *See id.* at 83,237.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

Tahlequah, Oklahoma. The resulting meat products were marketed to grocers, restaurants, and retail customers nationwide.

111.    There was one important exception to Cooks Venture's vertical integration, however: It did not raise most (or any) of the birds it processed. Instead, like other integrators, Cooks Venture outsourced the raising of its chickens to farmers working under purported independent-contractor agreements — shifting the substantial costs, capital requirements, and risks involved onto poultry growers in Northwest Arkansas, Northeast Oklahoma, and Southwest Missouri. Chasing scale without responsibility, Cooks Venture induced dozens of such farmers — Plaintiffs among them — to mortgage their farms and homes, acquire or renovate broiler houses, and raise its birds under restrictive contracts.

112.    From all outward appearances — carefully cultivated as they were by Mr. Evans, Mr. Wadiak, and the other Defendants — Cooks Venture was a large, profitable, fast-growing integrator, producing a premium chicken product using regenerative and ethical practices.

113.    The reality, it turned out, was very different.

## A.   Cooks Venture was founded and directed by Blake Evans and Matthew Wadiak.

114.    Cooks Venture was the brainchild of two men: Blake Evans and Matthew Wadiak. They founded Cooks Venture. They ran Cooks Venture. They led Cooks Venture to bankruptcy. As the Chief Financial Officer of Cooks Venture, Ankur Agrawal, revealed in a 2020 media interview, while he focused on financing the operation, and client managers handled sales, "the operations [were] really . . . run by Matt [Wadiak] and our VP of operations [Blake Evans]." At all times material to this complaint, these two men were intimately involved in the direction, management, or execution of Cooks Venture's genetics, live production, and processing operations, including its relationships with strategic trade partners like contract growers.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

115.     When Cooks Venture launched in March 2019, Mr. Evans was just coming out of a business failure and personal bankruptcy, while Mr. Wadiak had just been pushed out of the role of Chief Operating Officer at another food-tech startup, Blue Apron, which he had led into a bungled public offering that culminated in hundreds of layoffs.

116.     Mr. Evans is the grandson of legendary poultry breeding pioneer Lloyd Peterson, who started a chicken company (Peterson Farms) from humble beginnings in 1939 and grew it into a full-fledged poultry integrator with over 1,900 employees and $150 million in revenue by 2001. Mr. Peterson's success was built around his company's renowned breeding farm, which produced one of the first breeds of chicken tailored for meat production — the Peterson Male — in the 1950s. By 1994, the Peterson Male was commanding around 70 percent of the domestic market for male breeders, and 50 percent of the global market.

117.     In 2004, Peterson — by then in his nineties — appointed Mr. Evans as CEO of Peterson Farms. When Peterson died in 2007, the company still had revenues of just under $130 million a year. Under Mr. Evans' leadership, however, Peterson Farms quickly floundered. Within two years of taking over the company, Mr. Evans was forced to sell the network of feed mills, transport vehicles, and processing plants that Mr. Peterson had spent a lifetime assembling. By 2010, Mr. Evans had even sold the Peterson Male breed to Aviagen, enabling the dominant poultry-genetics firm to make yet another strategic move in its drive to foreclose competitors from developing rival breeds.

118.     Since then, Mr. Evans has been heedlessly trying — and failing — to rebuild the poultry legacy he lost, seemingly without any care for the contract growers, plant workers, and communities he hurts in the process.

119.     In 2013, he used what remained of Peterson Farms' lands and infrastructure to launch Crystal Lake Farms (CLF). Four years later, he sold CLF to West Liberty Farms, an Iowa company, for $13 million, in a deal that West Liberty would later allege was facilitated by broken

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

promises of financial support from Blue Apron CEO Matthew Salzberg and none other than Matthew Wadiak, in his capacity as COO of Blue Apron. As part of the transaction, Mr. Evans was appointed Vice President of Industrial Affairs and Genetic Founder of CLF, which became a subsidiary of West Liberty Farms.

120.    Almost immediately after the deal was closed, things went haywire. Within less than two years, West Liberty was shutting down Crystal Lake Farms and suing Blue Apron, alleging it had sustained nearly $26 million in losses from buying and operating Mr. Evans' company. Hundreds of workers at CLF's processing plant in Jay, Oklahoma, were unceremoniously laid off. Dozens of CLF contract growers — who had sunk large investments into poultry houses for CLF birds that now stopped coming — were left in the lurch.

121.    This is when Mr. Wadiak swooped in, acquiring Crystal Lake Farms for an "undisclosed eight-figure investment," and renaming it "Cooks Venture." [24] The acquisition encompassed 70 structures on more than 800 acres of Northwest Arkansas farmland, including a hatchery, 30 broiler houses, and 27 breeder houses. Also included in the acquisition was CLF's large processing plant in Jay, Oklahoma, and CLF's special breed of chicken, which was a cross between the Peterson Male and two other genetic lines bred to grow more slowly (taking 55 to 62 days from birth to slaughter, compared to the 42-day industry standard), walk around, go outdoors, and digest a more diverse diet. [25] As part of the deal, Mr. Evans was made Executive Vice President of Cooks Venture, and Mr. Wadiak appointed himself President and Chief Executive Officer.

---

[24] Nathan Owens, *Poultry system targeted by firm*, Nw. ARK. DEMOCRAT GAZETTE, Mar. 19, 2019, https://perma.cc/23SW-3DEG (internal quotation marks omitted). The acquisition was upgraded to "a nine-figure deal" in later media statements by Mr. Wadiak and/or Cooks Venture spokespeople without explanation. *See* Nathan Owens, *NW Arkansas firm gets $12M for work in heirloom poultry*, Nw. ARK. DEMOCRAT GAZETTE, Sept. 10, 2019, https://perma.cc/M56J-RYFS.
[25] A smaller processing facility in Tahlequah, Oklahoma, was rolled up into Cooks Venture around the same time as well.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

**B. Cooks Venture cultivated an image as a progressive, farmer-friendly integrator with strong management.**

122.    From its launch in 2019 through its partial shutdown in November 2023, Mr. Wadiak and Mr. Evans made sure Cooks Venture became and remained a highly publicized enterprise. They appeared in or on a wide range of local, national, and trade outlets to market their enterprise, shaping the image of — and public discourse about — Cooks Venture among poultry growers and local communities in the Ozarks region, as well as among investors and tastemakers nationally.

123.    Mr. Wadiak took the lead role in this publicity campaign. He marketed Cooks Venture as a "next generation food company rooted in regenerative agriculture and transparency."[26] He held himself out as a man who had "learned from hundreds of farmers, ranchers, and scientists" how to "buil[d] better communities through progressive agriculture processes," and do it "at scale.".[27] Using its proprietary breed of "heirloom," "slow-growing" chickens, "high-tech" processing facilities, "regenerative" farm practices, and an ethical approach to the poultry supply chain, media statements by Mr. Wadiak and his agents repeatedly declared that Cooks Venture was going to "disrupt" the chicken industry — especially the abusive relationship between integrators and poultry growers.

124.    For example, a 2019 profile in the Northwest Arkansas Democrat Gazette — the leading newspaper in the communities where Plaintiffs' farms are located — reported Mr. Wadiak as stating that "Cooks [Venture] is working to implement better farm practices that curb carbon emissions and regenerate soil, to build a pay system that is more favorable to farmers, and to raise animals differently."

---

[26] *See* Cooks Venture, *Founder and Former COO of Blue Apron Launches Cooks Venture, a Next Generation Food Company*, PR NEWSWIRE, Mar. 19, 2019, https://perma.cc/AT9M-XQLV.
[27] *See id.*; Nathan Owens, *Poultry system targeted by firm*, NW. ARK. DEMOCRAT GAZETTE, Mar. 19, 2019, https://perma.cc/23SW-3DEG.

125.    A key, oft-repeated element of Mr. Wadiak's pitch for Cooks Venture — especially when he spoke to food and agriculture trade outlets — was that Cooks Venture would not exploit contract growers in the ways that other integrators commonly did. For example, this is how a 2019 article in the popular agricultural newswire network FarmProgress described Mr. Wadiak's representations about Cooks Venture:

> Wadiak says the company [Cooks Venture] will not compensate its growers based on broiler performance and turnaround time, referred to as the "tournament" system by some. He says growers will be trained on the company's growing standards and that every single house will be audited to make sure it meets its standards. The base rate, he says, will be 3 cents per pound higher than what conventional growers make, with premiums on top of this. Wadiak says older houses can be upgraded for a few thousand dollars and brought back to production, so long as the houses provide unrestricted access to the outdoors.

126.    This passage is representative of Mr. Wadiak's public statements about Cooks Venture's relationship with contract growers throughout his tenure as CEO. In multiple cases, Mr. Wadiak stated to media outlets that Cooks Venture would pay its contract growers not just 3 cents per pound above what conventional growers make, but "double the average base pay" for contract growers in the industry. Cooks Venture would even use its own capital to help farmers transition to regenerative processes, Mr. Wadiak said in statements to reporters.

127.    Overall, Mr. Wadiak painted an image of Cooks Venture as an integrator that runs with the welfare of poultry farmers as a core part of its operations. In one representative interview from 2019, he described helping farmers "develop a better economy" by "convert[ing] from a conventional growing system" to a regenerative one as a central element of Cooks Venture's business model:

> Working with a farm and seeing a farm convert from a conventional growing system to an organic system for the first time, and seeing the impact on that farm and seeing that family's life change and develop a better economy and seeing life in an enterprise that formerly was struggling economically and had difficulty finding a

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

market … is my greatest customer story[,] and how we can change
the food landscape in America[,] and how we can develop a better
farming system to serve us as Americans in building a better food
anthropology.

128.    To complement this farmer-friendly image, Cooks Venture regularly emphasized

that it was co-founded by a farmer, with Mr. Evans calling himself a "third-generation poultry

farmer," and being regularly billed out as such in Cooks Venture marketing. The Peterson family

legacy — an esteemed one in the poultry industry of Northwest Arkansas — has been a regular

feature in Cooks Venture's storytelling, helping the integrator secure local growers' trust.

**C.  In reality, Cooks Venture was an under-capitalized startup whose principal
officers recklessly chased scale over sustainability — and landed their en-
terprise in bankruptcy.**

129.    What no representative of Cooks Venture ever made clear to any outsider before

November 2023, however, was that Cooks Venture could not fund its operations from current

revenues and depended on repeated infusions of capital and extensions of credit to stay in busi-

ness. The integrator's financial struggles were rooted in Mr. Wadiak and Mr. Evans obsession

with turning Cooks Venture into what they called "a company of scale" practically overnight.

Their reckless pursuit of growth put Cooks Venture on a financial treadmill it could never get off

— until it ran out of steam and collapsed into failure and bankruptcy.

**i.   Mr. Wadiak and Mr. Evans directed Cooks Venture to exploit contract
growers so they could pursue scale without adequate capital.**

130.    When Cooks Venture launched in March 2019, it was producing tens of thousands

of chickens per week and generating $10 to $20 million in revenue per year. At that point, Cooks

Venture could have grown incrementally by operating its smaller poultry processing plant in

Tahlequah, Oklahoma, and delayed use of its large poultry processing plant in Jay, Oklahoma —

which was designed to process over 700,000 birds a week and required a high degree of utilization

to operate efficiently –– until it had secured a large enough market for its output.

---

**VERIFIED COMPLAINT**                                                    **PAGE 43 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

131.     Mr. Wadiak and Mr. Evans, however, did not want to grow incrementally. Right out of the gate, they set a goal for Cooks Venture to slaughter 100,000 birds per week before the summer of 2019 was out — and from there to rapidly scale output up to 700,000 birds per week within two years.

132.     There was one major problem with this bold goal: Cooks Venture did not then have — and, indeed, has never had — enough capital to build out and operate an integrator complex of the scale Mr. Wadiak and Mr. Evans wanted, complete with breeder and broiler houses (owned or contracted), sources of feed (owned or contracted), veterinary services, transportation vehicles (owned or contracted), processing facilities, and storage capacity. As Mr. Wadiak recently admitted to an Axios reporter, "real capital to build … a new complex … you're talking about hundreds of millions of dollars," and Cooks Venture "was very much shoestring" in its capital when compared to the large poultry companies whose scale Mr. Wadiak and Mr. Evans wanted to match. Lacking sufficient investing and operating capital, Cooks Venture could not grow to the desired scale through internal expansion of its own poultry houses, nor could it bear all of the costs and risks involved in raising hundreds of thousands of chickens before slaughter.

133.     As a way out of this predicament, the Cooks Venture principals turned to outsourcing: By outsourcing chicken-growing to contract farmers under integrator-style arrangements, Cooks Venture could avoid many of the capital requirements and risks of loss involved in expanding its broiler production capacity to the scale Mr. Wadiak and Mr. Evans desired. It could also avoid the burden and costs associated with employing farmers. In light of this, starting in 2019, Mr. Wadiak and Mr. Evans directed Cooks Venture to achieve the breakneck pace of capacity expansion they desired by aggressively recruiting contract growers.

134.     Cooks Venture faced tough competition for contract growers in the Ozarks region. Many larger and more established integrators — including Simmons, George's, Tyson, Butterball, and others — were also vying to secure the grow-out services of local poultry farmers. Those

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

integrators "[were] not really supportive of new folks who are joining into the sector," Mr. Wadiak recently told an Axios reporter, making Cooks Venture's expansion an "uphill battle." So intense was the competition that, for some time after it launched, Cooks Venture was offering growers up-front cash bonuses of $10,000 or more just to sign on the dotted line.

135.    To win contract growers over their competitors without having to incur such expenses, Mr. Wadiak and Mr. Evans directed Cooks Venture to deploy a dishonest recruitment program that induced target farmers to make capital investments in broiler houses and sign Cooks Venture's standard-form poultry-growing contract — styled the "Regenerative Agriculture Poultry Production Agreement".[28] — through systematic deception about the material terms of that contract, the economic returns that farmers could receive from entering such a contract with Cooks Venture, and Cooks Venture's financial strength and ability to fulfill its obligations to growers (as more fully alleged in Part VI of this Complaint below).

136.    Within a short time, Cooks Venture's campaign of deception paid off handsomely for Mr. Wadiak and Mr. Evans' goals: By November 2021 — only two-and-a-half years after it was launched — Cooks Venture had expanded its broiler production capacity to around 600,000 birds per week. The pace of Cooks Venture's growth dwarfed that of similar firms in the specialty-breed poultry sector, which were themselves growing at a rapid clip.[29]

137.    While this was impressive on paper, it came with its own problems. Hasty growth made accounting for and controlling production costs more difficult, opening the door to "years of business mismanagement," in the words of a former corporate employee of Cooks Venture who recently spoke to AgricultureDive. Soon, the enterprise's operating costs and capital needs were

---

[28] In this Complaint, all Regenerative Agriculture Poultry Production Agreements entered between Cooks Venture and poultry growers are referred to as the "Poultry Production Agreements," and each such contract individually is referred to as a "Poultry Production Agreement".

[29] For example, Freedom Ranger Hatchery in Pennsylvania increased production by 20 percent in 2020, while D'Artagnan in New Jersey grew sales by nearly 30 percent in the same year.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

regularly outstripping its resources — particularly as, unbeknownst to outsiders, Cooks Venture struggled to sell all of its swelling output at profitable prices.

138.     For example, although Mr. Wadiak's public statements at the time suggested that the COVID-19 pandemic of 2020 and 2021 was a boon to Cooks Venture's business, he recently confirmed to an Axios reporter that, in fact, the pandemic caused a significant "drop" in demand for Cooks Venture chicken, and "drained some operating capital" from Cooks Venture as it dealt with health restrictions on workers and "was pushed to the back of the line for outsourced labor to debone its chickens." The latter problem ultimately forced the firm to invest in opening its own deboning facility, a project that took years to complete and came at significant cost.

### ii. As Cooks Venture's financial condition deteriorated, Mr. Singleton, Mr. Evans, and Mr. Wadiak collaborated to hide the truth from the public.

139.     As Cooks Venture struggled internally, its executives kept up a smooth-sailing façade and pursued their rapid-expansion strategy at full steam — directing Cooks Venture to recruit ever-more contract growers, and secure ever-more broiler production capacity.[30]

140.     In April 2022, Tim Singleton and Bob Davenport were hired as Chief Operating Officer and Chief Sales Officer, respectively, and Mr. Wadiak billed their onboarding as a step that will "serve the company well as we enter into the next phase of growth."[31] "In addition to attracting new customers," Mr. Wadiak said in a press release announcing the two new

---

[30] Maintaining the façade of rapid growth was critical to Defendants for two reasons. First, it was the main selling point they used to secure the repeated infusions of capital from investors that Cooks Venture depended upon to stay in business. As Mr. Wadiak admitted when asked what factors spurred investors to "write the check" to Cooks Venture during a press interview in 2020, the most important factor was "the growth of the business over the past year alongside the potential for growth in the long term[.]" Second, the façade was critical to maintaining the confidence of material and service suppliers to Cooks Venture — including contract growers like Plaintiffs — and preventing them from taking precautionary measures against the prospect of Cooks Venture's failure, such as reducing their exposure to Cooks Venture, asking for additional security from Cooks Venture, or looking for alternative business opportunities than supplying Cooks Venture.
[31] *See* Cooks Venture, *Cooks Venture Expands Executive Team*, BUSINESSWIRE, Apr. 13, 2022, https://bit.ly/3xMHNA7.

executives, Cooks Venture was "growing the pasture-raised chicken category as a whole and lead-ing the way on better, more humane breeding[.]" "Tim and Bob's deep experience leading poultry companies," he continued, "will aid Cooks Venture as we scale the business, expand our genetics program, increase our production capabilities, and grow our retail presence."

141.    Shortly after joining Cooks Venture, Mr. Singleton organized a town-hall meeting and cookout for the integrator's contract growers to meet with him and Mr. Evans. Many Plain-tiffs attended this meeting, where the two men echoed Mr. Wadiak's glowing comments in the Cooks Venture press release announcing Mr. Singleton and Mr. Davenport's appointments. Grow-ers walked away from this town hall with the impression that things were better than good at Cooks Venture. The integrator was moving out of the start-up stage and becoming an established firm, Mr. Evans and Mr. Singleton said. Not only were Cooks Venture sales growing at a rate of more than 50-percent a year, growers were told, but its management was getting stronger, too, with the addition of seasoned poultry leaders like Mr. Singleton and Mr. Davenport. In response to a question from the audience, Mr. Evans personally assured growers that Cooks Venture had a broad investor base, with nearly 25 independent sources of equity capital.

142.    Behind this façade, however, Cooks Venture's financial situation was growing ever more dire. Rather than be up-front with growers about Cooks Venture's struggles, however, Mr. Singleton resorted to abusing Cooks Venture's purported discretion under the Poultry Pro-duction Agreements to slash costs at growers' expense. For example, during Mr. Singleton's ten-ure: Cooks Venture made abrupt changes in the type and quality of feed it provided to growers — changes which caused the birds in growers' care to "flush" and lose weight dramatically — without explanation or consultation. It restricted growers' access to veterinary services and medicines under policies that were never justified to, or even shared with, growers. Whole flocks were deliv-ered to growers with fewer and sicker birds than Cooks Venture promised.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

143.     As growers complained about these unfair and deceptive practices. Mr. Singleton's go-to response became to yell and curse at them, brazenly claim they were to blame for the poor health and short count of flocks they had just received, and try to bully them into backing down from asserting their rights.

### iii. Mr. Niemann was appointed CEO as a last-ditch effort to save Cooks Venture, but his appointment was presented to growers as a vote of confidence in the integrator.

144.     Ultimately, none of Mr. Singleton's high-handed, dishonest strategies worked to turn Cooks Venture's worsening financial condition around. By the Summer of 2023, the board of directors of Cooks Venture, Inc. — which acted as the board of directors for the other CV Companies as well — decided to intervene. In August, the board replaced Mr. Wadiak as CEO of Cooks Venture with Mr. Niemann, who was billed as "an experienced business leader, entrepreneur, and regenerative agriculture farmer who [had] previously held the position of President of Protein Ingredients & International at Cargill, one of the world's leading food and agriculture companies," according to the Cooks Venture press release announcing his appointment as CEO.

145.     Cooks Venture represented this executive change to the public generally — and to its existing and potential contract growers specifically — as another positive step in Cooks Venture's continued growth and development. For example, the Cooks Venture press release announcing the new CEO quoted board member Matt Feldman as saying that Mr. Niemann "has exceptional strategic capabilities, proven operational effectiveness, and an entrepreneurial nature which is exactly what is needed for the company's next stage of growth." In another passage, the press release stated that Mr. Niemann is "exactly what is needed for Cooks Venture to capitalize on its customer demand and continue its growth trajectory." These passages were representative of Cooks Venture's messaging around Mr. Niemann's hiring to the public and to its trading partners, including contract growers.

146.    Mr. Niemann participated in propagating this message to Cooks Venture's existing and potential contract growers himself. For example, at a meeting with Cooks Venture's service technicians — the employees who liaised regularly with contract growers after they began their poultry arrangements with Cooks Venture — Mr. Niemann echoed the optimistic message of the above-mentioned press release and stated he would bring new discipline and professionalism to the organization, all while hiding Cooks Venture's financial struggles. Left in the dark about Cooks Venture's deteriorating finances, the service technicians then conveyed Mr. Niemann's deceptive message down to the integrator's contract growers, including Plaintiffs.

147.    Indeed, one of the service technicians who attended this meeting with Mr. Niemann and became convinced by his speech on the health of Cooks Venture's prospects was none other than one of the Plaintiffs, Ms. Barr, who had just two months prior been induced by the integrator's Live Production and Broiler Managers to enter her own Poultry Production Agreement with Cooks Venture. She was not alone in perceiving — based on Cooks Venture's own communications — Mr. Niemann's acceptance of the CEO position as a vote of confidence in the integrator's future. In the months following August 2023, several Plaintiffs entered poultry growing arrangements with Cooks Venture (like Mr. Tanner), or made additional capital investments in broiler houses under their existing arrangements with Cooks Venture (like Mr. Logan), based in material part on what they had heard from Cooks Venture and its agents about Mr. Niemann and what his appointment as CEO meant for the integrator's future.

### D. Cooks Venture announced its business failure in November 2023 — and exploited growers even in the process of shutting down its operations.

148.    In the end, all of it was a farce. From the jump, Cooks Venture chose rapid growth over running a sustainable business. That choice — affirmed by Mr. Wadiak, Mr. Evans, Mr. Singleton, and Mr. Niemann — made it dependent on continued infusions of capital from investors and accommodations from creditors to pay its bills. In other words, it made Cooks Venture

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

into a *de facto* Ponzi scheme, racing to pay one set of investors (the contract growers and employees who contributed the real estate and labor necessary to run the business) by chasing funds from another set of investors (bankers and venture capitalists). Like all Ponzi schemes, Cooks Venture eventually ran out of steam: As Fall turned to Winter in 2023, one or more key investors refused to pump more money into Cooks Venture — and the enterprise crumbled.

149.    On November 17, 2023, Cooks Venture mailed to each of its contract growers (including Plaintiffs) a letter stating that "the Company is experiencing financial difficulty" (this letter as delivered to each and every recipient, the "Shutdown Notice Letter"). Delivered on "Cooks Venture"-branded letterhead and signed by Mr. Evans in his capacity as "Executive Vice President" of "Cooks Venture, Inc.," the Shutdown Notice Letter went on to state in relevant part:

> The Board of the Company is continuing to work to find a solution to save the company — including speaking with a potential purchaser who may be able to take over the company and prevent a company shutdown.

> Unfortunately, if the potential sale of the Company does not occur, we will need to shut down the company and close its facilities sometime between November 20 and 30, 2023. If this happens, we are committed to winding down the company responsibly. All outstanding fees for services already rendered will be paid as part of this process.

150.    The Shutdown Notice Letter came as a shock to all Cooks Venture contract growers, including Plaintiffs. Many were in the middle of raising flocks placed on their farms by Cooks Venture when they received the Letter. Some growers, like Mr. Maybee, had flocks that were already at processing age or close to processing age. Others had received their flocks from Cooks Venture just days or weeks before. Indeed, one grower, Ms. Harp, received her flock *on November 17*, just hours before getting word of Cooks Venture's imminent closure. All in all, contract growers had around one million Cooks Venture birds on their farms on the date they received the Shutdown Notice Letter.

---

**VERIFIED COMPLAINT**                                    **PAGE 50 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

      **i.   Cooks Venture killed over a million birds on its contract-growers' farms in an attempt to avoid its obligation to feed, process, and pay for them.**

151.    Under its Poultry Production Agreements with growers, Cooks Venture had a duty to furnish adequate feed, medicine, and veterinary care to bring the flocks already on growers' farms to processing age (62 days at most), to collect and process those flocks in an orderly manner as they reached that age, and to render compensation to growers for their services in due course. In the days following the delivery of the Shutdown Notice, however, Cooks Venture made clear it had no intention of honoring its contractual obligations to growers.

152.    Between November 20 and 30, 2023, Cooks Venture abruptly laid off all of the workers from its processing plants and deboning facilities. Hundreds of men and women were thrown out of work without so much as two-weeks' notice. By the end of the month, Cooks Venture had also laid off all of its service technicians, the critical conduits between the integrator and its contract growers. Finally, as November turned to December, Cooks Venture (by and through Mr. Evans specifically) conspired with the Director of the Livestock and Poultry Division of the Arkansas Department of Agriculture, Mr. Fisk, to have agents of his Division enter growers' farms and kill over a million Cooks Venture birds under the false pretense of enforcing humane-treatment laws — all so Cooks Venture would not have to feed, process, and pay for them.

153.    Mr. Fisk had no legal authority to order such an operation. He did so solely at Cooks Venture's request, and in response to a promise from Mr. Evans that Cooks Venture would pay his Division for the cost of its euthanization services. Going further, on December 7, Mr. Fisk invited contract growers to a public meeting — about twenty attended, including many Plaintiffs — and lied to their faces, saying his actions were not just authorized by law, but affirmatively required to comply with animal-welfare laws or regulations. This was unequivocally false.

154.    By the end of January 2024, the deed was done. A handful of the birds that were on growers' farms had been hauled off by Cooks Venture to locations unknown, but the vast

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

majority had been depopulated by so-called "foaming." Without giving growers much, if any, advance notice — or, for that matter, any opportunity to contest Mr. Fisk's groundless orders — state agents entered growers' farms under color of law, flooded their broiler houses with a scalding, suffocating foam to drown the thousands of birds inside, and left the dead animals' wet and seared carcasses on the ground for the growers to clean up.

155.    In carrying out Mr. Fisk and Cooks Venture's dirty work, state agents acted with blatant contempt for growers, their property, and their rights. They rolled onto growers' farms like they owned them and stonewalled growers when they asked questions. They refused to comply with growers' instructions on the most basic biosecurity and material-safety precautions, which are critical to keeping growers' broiler houses free of costly and disruptive contaminations. Growers who tried to put up any resistance were imperiously ordered to "shut up," "stand back," and "cooperate" — with a threat of unsavory consequences being clearly implied.

156.    Throughout this chaotic period, Mr. Evans, Mr. Niemann, and Mr. Singleton were primary contacts for growers looking for answers from Cooks Venture. Each of these men received many phone calls, text messages, and emails from anxious growers, asking about how they should respond to Mr. Fisk's agents, about who would handle or pay for the disposal of the dead birds' carcasses, and about many other matters related to compensation and performance under their Poultry Production Agreements.

157.    Seeking to induce growers' cooperation, the three Cooks Venture executives consistently assured growers that Cooks Venture would: (a) handle the disposal of foamed birds or, if not, reimburse growers for any costs they incurred to dispose of them; and (b) compensate each grower for the last Cooks Venture flock placed on their farm in an amount equal to the average amount they were paid for each of the six preceding flocks placed on their farms (or all preceding flocks, if the grower had not received six yet). Mr. Evans even told a carcass-disposal contractor who handled the flock remains on many growers' farms, Kirk Powell, Jr., that disposal costs would

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

be paid by the "Peterson Family Trust," and that he may charge his bill directly to the "Peterson Family Trust."

158.    Ultimately, however, no Cooks Venture contract grower received the compensation promised by Cooks Venture's principal executive officers during this critical period, either for their services rendered in raising the last Cooks-Venture flock placed on their farms, or for the cost of cleaning up the carnage left behind by Mr. Fisk's agents. Some contract growers received pittances, far shy of the actual amounts owed to them. Many received nothing at all.

> **ii.   These actions were not unavoidable — as Cooks Venture represented —
> but reflected a choice by Cooks Venture to treat its contract growers and
> processing workers as expendable.**

159.    Despite its apparent scramble to shut down the broiler growing and processing side of its operations at the end of 2023, Cooks Venture did not, in fact, shut down *all* of its operations at that time, as the Shutdown Notice Letter suggested it would. Indeed, the CV Companies did not initiate bankruptcy proceedings until nearly half a year later — in May 2024. Throughout that period, and still to this day, the genetics and breeding sides of Cooks Venture's operations have continued to run without much, if any, disruption.

160.    While contract growers were watching their livelihoods drown in foam at the hands of Mr. Fisk's agents, Cooks Venture was providing regular feed, medicine, and veterinary care to its contracted and direct-owned breeding houses and hatcheries, and compensating their operators normally to boot. Indeed, as the months went by, Cooks Venture demonstrated a remarkable ability to secure financing for its genetics and breeding operations, including a $70-million operating line of credit.

161.    None of these facts were ever disclosed by Cooks Venture. They came to be known to its contract broiler growers slowly, over months, through word-of-mouth rumors and, eventually, news reports. Although Cooks Venture may, indeed, have had no choice but to begin winding

---

**VERIFIED COMPLAINT**                                        **PAGE 53 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

down its operations in November 2023, it turned out that Cooks Venture *did* have a choice in *how* it wound them down.

162.    It turned out that Cooks Venture had *chosen* to treat its contract growers and processing workers like they were disposable — and to allocate its resources exclusively to its genetics and breeding programs. It turned out that Cooks Venture had *chosen* to drown millions of healthy chickens rather than process and sell them — even as a nationwide poultry shortage was driving chicken prices to record highs. Indeed, it turned out that, without any shame, Cooks Venture had *chosen* to do these things over the holiday season, when its contract growers and processing workers — along with countless other Americans who struggle to put food on the table — were getting ready to celebrate Thanksgiving and Christmas with their families.

163.    The CV Companies ultimately declared their bankruptcy under Chapter 7 of the U.S. Bankruptcy Code on April 19, 2024. By then, Cooks Venture's moral bankruptcy had been declared repeatedly and long before.

## VI.    DEFENDANTS' UNLAWFUL CONDUCT

164.    When it needed contract growers, Cooks Venture aggressively recruited Plaintiffs into Poultry Production Agreements through systematic deceit regarding the terms of its poultry growing contracts, the returns that growers could expect under those contracts, and its own financial condition and the health of its business.

165.    When Cooks Venture no longer wished to uphold its end of the bargains it had induced Growers to enter, Cooks Venture began breaching the Poultry Production Agreements in material ways — up to and including killing over a million of its own birds on contract-growers' farms — and employing deceptive practices or devices to conceal those breaches from Growers and keep Growers from taking protective action against its abuses.

166.    Finally, after Cooks Venture's status as a going concern came into grave jeopardy at the beginning of 2023, Cooks Venture hid that fact from Growers and further misrepresented

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

its financial condition to them — preventing them from taking precautionary measures in antic-ipation of its potential failure, and leaving them in dire financial straits when it ultimately did begin winding down its operations in November of last year.

### A. Under Defendants' control and direction, Cooks Venture employed deceptive practices and devices to induce Growers to enter poultry growing arrangements.

167. Cooks Venture — with the knowledge, approval, and participation of each of the Defendants — carried out a contract-grower recruitment program from 2019 through 2023 that systematically employed deceptive practices and devices to induce Growers to enter Poultry Production Agreements. Specifically, the deceptions employed by Cooks Venture through this program included, without limitation: (a) misrepresenting, concealing, camouflaging, and failing to disclose the existence, content, and effect of material terms in the Poultry Production Agreements; (b) misrepresenting and failing to disclose material information about the historic and projected economic performance of poultry growers under contracts with Cooks Venture; and (c) misrepresenting and concealing material information about Cooks Venture's financial history, condition and stability.

168. Individually and collectively, these deceptions caused Growers to enter contractual poultry growing arrangements that differed substantially from those which Growers reasonably believed they were entering. They also misled Growers about the financial risks and potential returns involved in entering their Poultry Production Agreements with Cooks Venture, leaving them unable to properly compare offers from different poultry integrators or make reasonably informed decisions about their contracting opportunities. Thus, in perpetrating these deceptive practices against Growers, Cooks Venture undermined the integrity of the market and deprived Growers of the benefits of competition for their services.

169. Each of the material deceptions that Cooks Venture employed to enter its Poultry Production Agreements with Growers — whether it came in the form of misrepresenting,

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

concealing, camouflaging, or failing to disclose material information — is a *per se* violation of the Packers and Stockyards Act's prohibition on the use of "deceptive" practices and devices in the live poultry trade. Cooks Venture's predatory grower recruitment program — which combined these deceptions into an integrated scheme — is a separate and additional violation of that prohibition. The Act makes the Defendants liable to Growers for "the full amount of damages sustained in consequence" of these violations.

### i. Cooks Venture recruited Growers into poultry growing arrangements through an integrated scheme of deceptive practices and devices.

170.    Pursuant to its contract grower recruitment program, Cooks Venture agents took growers that they identified as suitable targets for recruitment (including Plaintiffs) through a methodical multi-stage process for entering into and commencing a poultry growing arrangement. Each stage of this process was characterized by the use of deceptive practices or devices to mislead growers about (a) material aspects of the poultry growing arrangements Cooks Venture was inducing them to enter, (b) material aspects of Cooks Venture's financial condition and business stability, and (c) the economic returns that growers could expect from entering into a poultry growing arrangement with Cooks Venture.

171.    At the beginning of the recruitment process, Cooks Venture agents made a series of false promises to target growers about material terms of the Poultry Production Agreements that Cooks Venture would sign with them if they made certain capital investments in broiler houses for its benefit. These false promises included, without limitation, that these contracts would require Cooks Venture to place four flocks of a particular size on the target grower's farm annually for three years, pay the target grower certain base and bonus compensation for raising each flock, and perform other material obligations. At the same time, Cooks Venture also provided false or misleading information about Cooks Venture's financial stability, the health of Cooks

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

Venture's business, and how much growers could earn from entering a poultry growing arrange-ment with Cooks Venture.

172.   Through these deceptions, Cooks Venture agents sealed what they called a "verbal agreement" with each grower as to the material terms of a poultry growing arrangement. Those material terms included, without limitation: (a) the duration of the arrangement; (b) the number of flocks that Cooks Venture would place on the grower's farm annually under the arrangement; (c) how many birds each flock would have; (d) the rates at which Cooks Venture would compensate the grower for raising each flock; and (e) the capital investments that the grower had to make in broiler houses as a condition-precedent to Cooks Venture's obligation to begin placing flocks on the grower's farm.

173.   Specifically, Cooks Venture conditioned its promise to begin placing flocks on tar-get growers' farms — and its willingness to execute Poultry Production Agreements with them — on the target growers' completion of certain capital investments in acquiring, building or reno-vating broiler houses up to its specifications. When those investments required growers to borrow funds, Cooks Venture encouraged growers to do so by giving them letters of intent to use in ap-plications for credit that expressly "confirm[ed]" their prior "verbal agreement" with Cooks Ven-ture. Ultimately, each grower recruited by Cooks Venture (including each Plaintiff) undertook the capital investments Cooks Venture required in reliance on the representations, promises, and verbal agreements they had earlier received from, and concluded with, Cooks Venture's agents.

174.   After completing the capital improvements required by Cooks Venture, however, growers found themselves stuck between a rock and a hard place. They either had to do whatever Cooks Venture demanded to start placing broiler flocks on their farms, or risk having no means to recoup their investments and repay the debts they had incurred to make them.

175.   Only at that point — when it had growers over an economic barrel — did Cooks Venture offer growers Poultry Production Agreements for execution. These Agreements were

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

standard-form adhesion contracts drafted by Cooks Venture to further its deceptive recruitment program. Their written terms materially contradicted the prior representations, promises, and verbal agreements that Cooks Venture had made to and with growers — and they were purposefully designed and drafted to conceal and camouflage that critical fact (as more fully alleged in Part VI(A)(iv) of this Complaint below).

176.    Yet in offering the Poultry Production Agreements to target growers and encouraging growers to sign them, agents of Cooks Venture piled deception upon deception and falsely represented to growers that the Agreements faithfully reflected their earlier understandings with the integrator.

177.    This deceptive scheme was instituted, directed and managed by Cooks Venture executives Mr. Wadiak, Mr. Niemann, Mr. Evans, and Mr. Singleton during their respective tenures. In many instances, these executives also participated directly in the deceptive conduct involved in this scheme, as more fully alleged below.

### ii.  Cooks Venture made false or misleading promises and representations about material terms of the Poultry Production Agreements.

178.    In its initial recruitment efforts, Cooks Venture promised each Grower that it would enter a contractual poultry growing arrangement with them on certain material terms if they completed specified capital investments in broiler-growing houses for its benefit.

179.    After Growers completed the capital investments required, Cooks Venture offered each Grower an adhesion Poultry Production Agreement and represented to the Grower that its material terms adhered to Cooks Venture's earlier promises.

180.    These promises and representations were false, misleading, and deceptive because: (a) the Poultry Production Agreements that Cooks Venture intended to offer, and ultimately did offer, to each Grower did not contain the material terms promised; and (b) Cooks

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

Venture did not have the ability to fulfill poultry growing arrangements with Growers on the material terms promised even if it wanted to.

181.    Generally, these deceptions were carried out on behalf of Cooks Venture by individuals serving as Live Production Managers and Broiler Managers for Cooks Venture, who were at all times material acting under the direction and control of Cooks Venture executives Mr. Wadiak, Mr. Niemann, Mr. Evans, and Mr. Singleton during their respective tenures. In many instances, Mr. Evans, Mr. Singleton, and Mr. Wadiak also participated directly in the deceptive conduct, and communicated false or misleading information about Cooks Venture's poultry growing arrangements to Growers themselves.

### a.  Cooks Venture promised and represented that the Poultry Production Agreements would contain certain material terms.

182.    As a critical part of its recruitment efforts, Cooks Venture made promises to each Grower that, if the Grower were to acquire or renovate broiler houses of a certain square footage to its specifications, Cooks Venture would commence a contractual poultry-growing arrangement with the Grower on certain material terms. In the case of each Grower, those material terms included, without limitation:

  a.  That Cooks Venture would place at least four flocks of its heirloom chickens on the Grower's farm annually;

  b.  That each Cooks Venture flock placed on the Grower's farm would be composed of a specific number of heirloom chicks, expressed either in the aggregate or in terms of birds-per-square-foot of housing on the Grower's farm;[32]

  c.  That Cooks Venture would supply the Grower with all the feed, vaccines, medication, and veterinary care necessary to grow the birds in each placed flock to an average weight of around 6 pounds within 55-to-62 days;

---

[32] For example, Cooks Venture represented to each of the following Growers that the flocks placed on their farms would contain the following specific number of birds: (a) Mr. Maybee, 0.94 birds per square foot of broiler housing; (b) Mr. Wagoner, 1.04 birds per square foot of broiler housing; (c) Mr. Swofford, 1.1 birds per square foot of broiler housing; (d) Ms. Barr, 57,500 birds aggregate; and (e) Mr. Wilson, 107,100 birds aggregate, or 1.0 birds per square foot of broiler housing.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

d.  That Cooks Venture would collect, transport, and process each placed flock promptly after it reaches the processing age of 55-to-62 days;

e.  That Cooks Venture would pay the Grower for their grow-out services on a per-flock basis at a minimum base rate of ten cents for each pound of live chicken weight produced by the Grower (minus approximately one-half of the total pounds of live chicken weight lost either to condemnation by food inspectors or through transportation to Cooks Venture's facilities);

f.  That Cooks Venture would pay the Grower a heating fuel allowance on account of two flocks each year (*i.e.*, the flocks grown during the Winter and Fall months) equal to 5.5 cents per square foot of active broiler housing on the Grower's farm;

g.  That the poultry growing arrangement would commence on a date certain after the Grower completes the broiler house preparations required by Cooks Venture; and,

h.  That the poultry growing arrangement would continue for a term of three years from that commencement date.

183.    By making these promises to Growers, Cooks Venture created a unilateral verbal contract with each Grower (this contract in the case of each Grower, the "Verbal Contract"). That Verbal Contract was memorialized in the letters of intent that Cooks Venture provided to Growers for use in applications for credit to finance the capital investments it required (all such letters of intent, the "Letters of Intent"; each individually, a "Letter of Intent"), all of which began with the following sentences: "We [Cooks Venture] are excited to have you join our broiler program. This letter is to *confirm our verbal agreement*." The "verbal agreement" referenced in the Letters of Intent is the unilateral Verbal Contract created by Cooks Venture's above-described promises.

184.    After Growers completed the capital investments required by Cooks Venture as a condition-precedent to commencing their poultry growing arrangements, Cooks Venture agents offered each Grower a Poultry Production Agreement on an adhesion basis and represented to the Grower that it contained the material terms they were earlier promised.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

   **b. Cooks Venture's promises and representations were false, mislead-
ing, and deceptive.**

  185. The adhesion Poultry Production Agreements that Cooks Venture intended to offer

to Growers when it made its initial-recruitment promises — and that Cooks Venture eventually

did offer to Growers after they made the required capital investments — did not, in fact, contain

the material terms that Cooks Venture promised and represented they would and did.[33]

  186. **Flock Placement and Density.** Whereas Cooks Venture had earlier promised

and represented to Growers that, after they completed the required broiler-house preparations,

it would commit to placing *four flocks* of an *agreed-upon size or density* on each Grower's farm

*every year* for three years, the Poultry Production Agreements purport to impose no such obliga-

tions on Cooks Venture at all. Instead, the material terms of each Poultry Production Agreement

purport to obligate Cooks Venture to place *only one flock* of definite size on each Grower's farm

over their Agreement's *entire three-year term* — and leave all other flock-placement and flock-size

decisions to Cooks Venture's discretion.

  187. Specifically, in the case of all Growers, the Poultry Production Agreements contain

the following clause regarding flock placement and flock density (this clause in each and every

Poultry Production Agreement, the "Flock Placement Clause"):

    2. CV Promises.

      a. To deliver to Farmer approximately [given numerical fig-
ure] heirloom birds for production (approximately six (6)
pounds average) on or about [given date] as the first flock of

---

[33] For simplicity of exposition, Plaintiffs describe certain terms of the Poultry Production Agreements
in this Section VI(A)(ii)(b) of the Complaint — including the Flock Placement Clause, the Flock Pro-
cessing Clause, the Flock Placement Clause Amendment, the Merger Clause, and the Fuel Allowance
Letter — in accordance with the reasonable constructions that could be ascribed to them, and have
been ascribed to them, by Cooks Venture. This is not intended, and should not be understood, to con-
stitute a waiver by Plaintiffs of any claim or argument regarding the ambiguity and the proper con-
struction of those terms, or any other terms, in the Poultry Production Agreements. The Poultry Pro-
duction Agreements are, in fact, ambiguous in several material ways, including, without limitation,
those set forth in Part VI(A)(iii)(b) *infra*.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

> birds to be raised under the Agreement, and *thereafter to deliver birds, the number and breed of which are to be determined by CV, in its sole discretion, for three (3) years*, subject to the probation and termination provisions contained in the Agreement.

188.   Additionally, in the case of Lakeview Farms LLC and Ms. Harp, the Poultry Production Agreements contain the following amendment to the Flock Placement Clause (this clause in the Poultry Production Agreements signed by Lakeview Farms LLC and Ms. Harp, the "Flock Placement Clause Amendment"):

> 4.   . . . [T]he Parties hereby agree to amend and modify Section 2(a) of the Agreement between the Parties to state as follows:
>
> a.   To deliver to Farmer approximately [contract-specific numerical figure] heirloom birds for production (approximately (6) pound average) on or about [contract-specific date] as the first flock of birds to be raised under the Agreement, and thereafter to deliver for three (3) years approximately twelve (12) flocks of heirloom birds to Farmer; subject, however, to the termination provisions hereinafter contained. *CV, in its sole discretion, shall determine the number and breed of the heirloom birds for each flock.*

189.   **Flock Processing.** Whereas Cooks Venture had earlier promised and represented to Growers that, after they completed the required broiler-house preparations, it would commit to collecting and processing each flock placed on Growers' farms promptly after the flock reached the processing age of 55-to-62 days, the Poultry Production Agreements purport to give Cooks Venture discretion over whether and when to process flocks placed on Growers' farms — and, by extension, whether and when to pay Growers for raising those flocks at all.

190.   Specifically, in the case of all Growers, the Poultry Production Agreements contain the following clause regarding the processing of flocks (this clause in each and every Poultry Production Agreement, the "Flock Processing Clause"):

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

2. CV Promises. . . .

d. To *determine when and where birds will be processed*, and to notify Farmer [the Grower] of the processing arrangements.

e. To pay Farmer [the Grower] on or about the twelfth (12th) day *after birds are processed* via electronic transfer. . . .

191.    **Heating Fuel Allowance.** Whereas Cooks Venture had earlier promised and represented to Growers that, after they completed the required broiler-house preparations, it would commit to paying each Grower a heating fuel allowance on account of two flocks each year for three years in an amount equal to 5.5 cents per square foot of broiler housing on each Grower's farm, none of the Poultry Production Agreements mentions a fuel allowance at all.

192.    After Growers signed their Poultry Production Agreements, however, Cooks Venture provided them with a letter that purported to obligate Cooks Venture to pay each Grower two fuel allowances *only during the upcoming cold-weather season* (each such letter, a "Fuel Allowance Letter"). Specifically, in the case of all Growers, the Fuel Allowance Letter they received from Cooks Venture stated that: (a) "Cooks Venture Poultry, Inc., will pay fuel allowances on two flocks *settled on or after November 1st, [then-current year]*"; and (b) those allowances "will be paid at *0.055 cents per square foot for 2 flocks*."

193.    **Agreement Integration.** Each of the Poultry Production Agreements contains a merger clause that purports to nullify *all* of the prior agreements, statements, and representations that Cooks Venture made with and to Growers — displacing the material terms of the prior Verbal Contract between the parties with the near-opposite material terms of the Poultry Production Agreements.

194.    Specifically, in the case of all Growers, the Poultry Production Agreements offered by Cooks Venture contained the following clause regarding agreements, representations, and

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

statements between the parties (this clause in each and every Poultry Production Agreement, the "Merger Clause"):

> THE AGREEMENT, ALONG WITH ANY SCHEDULES OR AD-DENDA, CONSTITUTES THE ENTIRE AGREEMENT BE-TWEEN THE PARTIES AND *SUPERSEDES ANY PREVIOUS AGREEMENTS*. NO REPRESENTATION OR STATEMENT MADE BY EITHER PARTY NOT IN THIS AGREEMENT OR RE-LATED ADDENDA SHALL BE BINDING ON THE OTHER. FARMER AGREES THAT STATEMENTS MADE BY CV'S FIELD TECHNICIANS OR OTHER REPRESENTATIVES CONTRARY TO THE AGREEMENT ARE NOT ENFORCEABLE AND THE AGREEMENT CAN ONLY BE MODIFIED BY A WRITTEN IN-STRUMENT SIGNED BY FARMER AND AN AUTHORIZED REP-RESENTATIVE OF CV.

195.   **Other Deceptive Terms.** These and other material terms in the Poultry Production Agreements contradicted the promises, representations, and verbal agreements that Growers had received from Cooks Venture regarding the material terms that would govern their poultry growing arrangements with it (all such material terms in the Poultry Production Agreements, the "Deceptive Terms").

### c. Cooks Venture's deceptions were material.

196.   By deceiving Growers as to the material terms of the Poultry Production Agreements it intended to offer them — and ultimately did offer them — Cooks Venture made entering into a poultry growing arrangement with Cooks Venture appear substantially more advantageous to Growers than entering into such an arrangement with any other integrator in the local market for their services.

197.   When they were recruited by Cooks Venture, each Grower had multiple options of integrators to work with (including Simmons, George's, and Tyson, among others), each of which provided actual or potential competition for Cooks Venture in the market for Growers' services.

---

**VERIFIED COMPLAINT**                                                        **PAGE 64 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

198.    Each of these other local integrators were known to reserve the discretion to with-
hold flocks from growers, to reduce the number of birds in each flock, and to pay growers using
the abusive "tournament" system.

199.    Cooks Venture, in contrast, falsely promised and misrepresented that it would *not*
reserve such discretion, and would instead provide Growers with certainty of placement, size/den-
sity, and compensation for at least four flocks each year over the three-year terms of their Poultry
Production Agreements.

200.    By giving Growers this false impression, Cooks Venture's deceptions severely in-
flated Growers' expectations of the returns they could earn from entering a poultry growing ar-
rangement with Cooks Venture, while hiding the most critical risk involved in entering such an
arrangement — that Cooks Venture could simply choose not to place any more flocks (of the prom-
ised size) on Growers' farms after the first one.

201.    After being so misled about the core terms of the poultry growing arrangement
offered by Cooks Venture, it was practically impossible for Growers to reasonably assess and com-
pare the poultry contracting opportunities available to them in the marketplace.

### iii. Cooks Venture concealed and camouflaged the nature and content of material terms in the Poultry Production Agreements.

202.    Cooks Venture designed the Poultry Production Agreements it offered to Growers
— and its communications with Growers about those Agreements — so that they concealed the
existence of the Deceptive Terms, and camouflaged the material differences those Terms created
between the Poultry Production Agreements and the promises, representations, and verbal agree-
ments that Growers had earlier received from Cooks Venture.

203.    In the case of each Grower, the form of the Poultry Production Agreement, and the
form of any related letter of intent, offered by Cooks Venture were approved by executives for use

---

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

in its contract-grower recruitment program sometime between 2019 and 2021, when Cooks Venture was under the plenary direction and day-to-day management of Mr. Wadiak and Mr. Evans.

### a. The Poultry Production Agreements concealed the existence of the Deceptive Terms.

204. Cooks Venture drafted and designed the Poultry Production Agreements to be lengthy, disorganized, complex legal documents that even a trained lawyer would struggle to find and understand the Deceptive Terms within — let alone ordinary readers like the Growers.

205. Written almost entirely in tiny, sans-serif type, the Poultry Production Agreements drag on for twenty-three pages (twenty-four in the case of Ms. Harp and Lakeview Farms LLC). The first six pages of each Agreement — filled as they are with wall-like paragraphs of single-spaced legalese — make up the main body of the contract. The next seventeen pages add five or six addendums (depending on the Agreement), each of which turns around and uses yet more legalese to modify some term, or group of terms, in the main body.

206. To make the presentation of the Poultry Production Agreements even more disjointed and incoherent, Cooks Venture designed and formatted some addendums in one way, other addendums in another way, and all of them in a different way from the main body.

207. Within this clutter and mess, the Deceptive Terms are tucked throughout the Poultry Production Agreements like rat turds in a sausage factory. For example, the Flock Placement Clause is on the second page, while the Merger Clause is on the sixth page, and the Flock Placement Clause Amendment is down in a so-called "FSA Addendum" appended to the Agreements signed by Ms. Harp and Lakeview Farms LLC, after three other addendums and before two more.

### b. The Deceptive Terms were drafted in ambiguous legalese to camouflage their meaning and effect.

208. Even if Growers had found and read the Deceptive Terms of the Poultry Production Agreements before signing on the dotted line, they could not have reasonably understood their actual meaning or practical significance because Cooks Venture drafted them to be ambiguous,

---

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

internally contradictory, and otherwise incomprehensible to the ordinary reader. On top of being written in unclear legalese, the practical meaning of the Deceptive Terms is further contorted by their interactions with each other, with the parties' justified expectations, and with duties implied by law.

209.     **The Flock Placement Terms.** The Flock Placement Clause begins with what looks like a promise. "CV Promises," it says, to deliver a flock containing a particular number of "heirloom birds" at a given date, and "thereafter to deliver birds" to the Grower "for three (3) years[.]" An interjection, however, purports that the *number and breed* of the promised birds "are to be determined by CV, in its *sole discretion*[.]" This phrasing is clearly designed to trick and perplex the ordinary reader. A "promise" to "deliver birds . . . for three (3) years" is not a "promise" in any ordinary sense of the word if the promisor can "determine" the "number and breed" of the birds to be delivered "in its sole discretion."

210.     The Flock Placement Clause Amendment is similarly marked by capricious and contradictory phrasing. "CV Promises," it reads, to deliver a flock containing a particular number of "heirloom birds" at a given date, and "thereafter to deliver for three (3) years approximately twelve (12) flocks of heirloom birds to Farmer[.]" Overall, the presentation of the Flock Placement Clause Amendment in the "FSA Addendum" gives the impression of a provision that materially modifies the Flock Placement Clause. Near the end of the Amendment, however, the drafter — Cooks Venture — snuck this line in: "CV, *in its sole discretion*, shall determine the *number and breed* of the heirloom birds for *each* flock."

211.     These contradictory phrases in the Flock Placement Clause and the Flock Placement Clause Amendment are especially deceptive when considered in light of the justified expectations that Growers had with respect to the scope of any "discretion" Cooks Venture might have given itself under the Poultry Production Agreements. Having borrowed and spent good money (and taken other economically significant actions) in reliance upon Cooks Venture's prior

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

promises and representations, Growers expected (and were justified to expect) that Cooks Venture would only use any "discretion" it gave to itself when it drafted the Poultry Production Agreements in good faith — to keep, not to betray, its word to them.

212.    That, however, is certainly not the *only* way that the phrase "sole discretion" in the Flock Placement Clause and the Flock Placement Clause Amendment could reasonably be interpreted — and the other possible interpretations of the phrase are substantially worse for Growers than the interpretation that they had reasonable justification to expect would apply. In effect, the phrasing of these material terms in the Poultry Production Agreements created an ambiguity which exploited the reasonable expectations of Growers that "discretion" would mean one thing to conceal other potential meanings of "discretion" that would negate those expectations entirely.

213.    **The Merger Clause.** Similarly confusing language characterizes the Merger Clause, which hides the ball from its first sentence: "THE AGREEMENT, ALONG WITH ANY SCHEDULES OR ADDENDA," it says, "CONSTITUTES THE ENTIRE AGREEMENT BE-TWEEN THE PARTIES AND SUPERSEDES ANY PREVIOUS AGREEMENT." To reasonably grasp the practical meaning of this sentence, Growers would have had to first read all the other terms of "THE AGREEMENT" (which, as demonstrated above, are themselves unclear and am-biguous) and fully comprehend their meaning and effect. Then, Growers would have had to com-pare the practical meaning of those terms to that of the terms of "ANY PREVIOUS AGREE-MENT" — in other words, they would have had to conduct precisely the comparison that Cooks Venture's deceptions had been aimed at preventing them from conducting since the start.

214.    After its first sentence, the Merger Clause abruptly switches gears and turns into an ersatz agency-avoidance provision: "NO REPRESENTATION OR STATEMENT MADE BY EITHER PARTY NOT IN THIS AGREEMENT," it says, "SHALL BE BINDING *ON THE OTHER*." Mystifyingly, it does not address whether such representations or statements "SHALL

---

**VERIFIED COMPLAINT**                                    **PAGE 68 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

BE BINDING" on the party that *makes them*, leaving an ordinary reader with the reasonable impression that, indeed, they shall be binding on the party that makes them.

215.    Finally, the Merger Clause makes another abrupt turn and ends with yet another perplexing sentence, stating as follows: "FARMER AGREES THAT *STATEMENTS MADE BY CV'S FIELD TECHNICIANS OR OTHER REPRESENTATIVES* CONTRARY TO THE AGREE-MENT ARE NOT ENFORCEABLE AND THE AGREEMENT CAN ONLY *BE MODIFIED* BY A WRITTEN INSTRUMENT SIGNED BY FARMER AND AN AUTHORIZED REPRESENTATIVE OF CV."

216.    This sentence is ambiguous with respect to a number of material issues, but the most critical is whether it applies to "STATEMENTS MADE BY CV'S FIELD TECHNICIANS OR OTHER REPRESENTATIVES" only *before*, only *after*, or both *before and after* the execution of "THE AGREEMENT." More to the point, the sentence is deceptive because — considering that Growers had no material interactions with "CV'S FIELD TECHNICIANS" before signing their Poultry Production Agreements, and considering that an agreement cannot "*BE* MODIFIED" be-fore it has been executed and entered by the parties in the first place — the impression that the sentence gives to the ordinary reader is that its provisions would, indeed, apply only to "STATE-MENTS MADE" *after* execution.

217.    Overall, neither the Poultry Production Agreements themselves, nor any other document or communication from Cooks Venture, presented the existence and significance of these and other Deceptive Terms to Growers in a clear, concise, and understandable manner. Thus, Growers were kept in the dark about the material differences which the Deceptive Terms created between the Poultry Production Agreements that Growers *actually* received from Cooks Venture, and the poultry-growing contracts that Growers *reasonably expected* to receive from Cooks Venture based on its prior promises, representations, and verbal agreements.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

    **c. The Letters of Intent misled Growers about the contents of the Poultry Production Agreements, dissuading them from further inquiry.**

218.   Finally, Cooks Venture designed and drafted the Letters of Intent — which were often accompanied by *pro forma* samples of the Poultry Production Agreement — to give Growers the false impression that the Poultry Production Agreements honored Cooks Venture's earlier promises regarding the material terms of their poultry growing arrangements. In doing so, the Letters of Intent also served to dissuade Growers from inquiring further into the (otherwise confusing and impenetrable) contents of the Poultry Production Agreements.

219.   Each Letter of Intent began by "confirm[ing]" the "verbal agreement" that Cooks Venture entered with Growers to induce them to make the capital investments in broiler housing it desired, stating: "We are excited to have you join our broiler program. This letter is to *confirm our verbal agreement.*" Since the "verbal agreement[s]" that were "confirmed" in the Letters of Intent referred to Cooks Venture's earlier Verbal Contracts with Growers regarding the material terms of the poultry-growing contracts that Cooks Venture would offer them if they completed the required investments in broiler houses, the Letters of Intent effectively represented to Growers that the Poultry Production Agreements attached to them would honor their earlier Verbal Contracts.

220.   After the first two sentences, the Letters of Intent confirmed that initial representation about the contents of the Poultry Production Agreements by listing the approximate date on which the "First flock" would be delivered to Growers and the "Payment per flock" that Growers would receive. In the case of each Grower who received a Letter of Intent, these two pieces of information in the Letter of Intent aligned with both the Poultry Production Agreement and the Verbal Contract that Cooks Venture entered with the Grower during its initial recruitment process.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

221.    Deceptively, however, the Letters of Intent completely omitted the material fact that the Poultry Production Agreements contain the Deceptive Terms — which, as described above, purport to completely nullify the "verbal agreement[s]" that the Letters of Intent are supposed to "confirm."

222.    Thus, the Letters of Intent gave Growers a false and misleading impression of the contents of the Poultry Production Agreements, omitted material information that was necessary to correct that impression, and ultimately served as fig leaves to dissuade Growers from further inquiry into the morass of the Poultry Production Agreements.

### iv.  Cooks Venture failed to disclose material information about its discretion under the Poultry Production Agreements.

223.    At all times before Growers signed the Poultry Production Agreements, Cooks Venture withheld and failed to disclose to Growers material information about its discretion under the Deceptive Terms of the Poultry Production Agreements. This material information included, without limitation:

      a.  The minimum number of flocks that Cooks Venture would deliver to Growers, and the minimum size or density that those flocks would have, under the Deceptive Terms of the Poultry Production Agreements; and

      b.  The fact that Growers' incomes could vary significantly based on how Cooks Venture decided to exercise whatever discretion it had given itself under the Flock Placement Clause, the Flock Placement Clause Amendment, the Flock Processing Clause, and the Fuel Allowance Letters.

224.    Ultimately, all of the confusion caused by the Deceptive Terms could have been avoided had Cooks Venture chosen to deal honestly with Growers and disclosed to them all of the material information it already knew about the Poultry Production Agreements, its discretion thereunder, and the internal policies or procedures that would guide its exercise of that discretion.

225.    For example, since Cooks Venture drafted each of the Poultry Production Agreements that Growers signed, Cooks Venture always knew just how those Agreements differed from

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

any of the "PREVIOUS AGREEMENTS," "STATEMENTS," and "REPRESENTATIONS" referenced in the Merger Clause, as well as just what it intended the Merger Clause to do about them.

226.    Similarly, as a multi-million-dollar integrator with an experienced executive team, Cooks Venture always knew just how it planned to exercise — and, equally as important, just how it *might have to* exercise — whatever discretion it gave itself under the Flock Placement Clause, the Flock Placement Clause Amendment, and the Flock Processing Clause over the terms of the Poultry Production Agreements.

227.    If it wanted to, Cooks Venture could have disclosed all of this critical information to Growers clearly and affirmatively *before* they signed its deceptive Poultry Production Agreements, and thereby allowed them to properly assess the risks and returns involved. Instead, Cooks Venture chose to hide it all behind lies, half-truths, and legalese.

> **v. Cooks Venture misrepresented and failed to disclose material information about the economic returns of its contract growers.**

228.    In tandem with deceiving Growers about the terms of the Poultry Production Agreements, Cooks Venture also lured Growers into its poultry growing arrangements through grossly inflated projections of the earnings they could expect to earn from entering such arrangements.

229.    For example, many Growers were falsely informed by Cooks Venture agents — including the Defendants — that, under a poultry growing arrangement with Cooks Venture, they would earn double the compensation they either had earned, were earning, or could earn under arrangements with other integrators in the region.

230.    Some Growers — such as Mr. Melbourne — were even given definite projections. Before entering his poultry growing arrangement with Cooks Venture, agents for Cooks Venture told Mr. Melbourne that he would make between $40,000 and $45,000 a flock. In reality, Mr. Melbourne went on to make between $22,500 and $27,500 on each flock he grew for Cooks Venture.

---

**VERIFIED COMPLAINT**                                            **PAGE 72 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

231.    As it was giving Growers these overly rosy income projections, Cooks Venture failed to disclose other material information that Growers needed in order to reasonably assess the potential returns that they might earn from entering a poultry growing arrangement with Cooks Venture. This material information included, without limitation:

    a.  The material assumptions underlying Cooks Venture's projections of grower economic performance under its poultry growing arrangements;

    b.  The average annual gross compensation that contract growers had received from Cooks Venture in prior years, and other material facts about the actual, historic performance of other contract growers under poultry growing arrangements with Cooks Venture; and

    c.  The fact that the actual income Growers derive from their arrangements with Cooks Venture might not track the income represented in any historic or projected economic performance data provided by Cooks Venture.

232.    Generally, these deceptions were carried out on behalf of Cooks Venture by individuals serving as Live Production and Broiler Managers for Cooks Venture, who were at all times material acting under the direction and control of Cooks Venture executives Mr. Wadiak, Mr. Niemann, Mr. Evans, and Mr. Singleton during their respective tenures. In many instances, Mr. Wadiak, Mr. Evans, and Mr. Singleton also participated directly in the deceptive conduct, and communicated false or misleading information about grower economic performance to Growers themselves.

### vi. Cooks Venture misrepresented and failed to disclose material information about its financial history and condition.

233.    Lastly, Cooks Venture recruited Growers into its contract-growing program by providing them with false or misleading information about its financial health and ability to perform its obligations to them — painting a rosy picture for Growers while omitting to disclose material information about its own finances, the finances of its affiliates, and the sustainability of its business.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

234.    Generally, these deceptions were carried out on behalf of Cooks Venture by indi-
viduals serving as Live Production and Broiler Managers for Cooks Venture, who were at all times
material acting under the direction and control of Cooks Venture executives Mr. Wadiak, Mr.
Niemann, Mr. Evans, and Mr. Singleton during their respective tenures. In many instances, each
of these executives also participated directly in the deceptive conduct, and communicated false or
misleading information about Cooks Venture's financial and business condition to Growers them-
selves.

### a.  Cooks Venture misrepresented that it was financially sustainable.

235.    From its launch in 2019 until its partial shutdown in 2023, Cooks Venture's agents
repeatedly and consistently boasted about its growth and stability to its contract growers and to
growers targeted for recruitment, including Plaintiffs, either directly or indirectly.

236.    For example, before agreeing to enter their poultry growing arrangements with
Cooks Venture, many Growers asked either Mr. Evans or Mr. Singleton directly about the health
of Cooks Venture's business, and received various assurances from these men to the effect that
Cooks Venture was a fast-growing and self-sustaining enterprise, that Cooks Venture had a di-
versified investor and creditor base, and that Cooks Venture faced no material risk of business
failure over the three-year terms of their prospective arrangements with it.

237.    Indeed, Cooks Venture agents gave similar assurances to Growers right up until
November 2023 — including, without limitation, to Mr. Maybee, Ms. Barr, Mr. Wilson, and Mr.
Tanner, all of whom were recruited into poultry growing arrangements by Cooks Venture in the
months before it abruptly shut down its broiler growing and processing operations.

238.    These representations by Cooks Venture were false, misleading, and deceptive.
Rather than being a self-sustaining enterprise with a diversified investor and creditor base, Cooks
Venture could not turn a consistent profit, could not reliably fund its obligations out of operating
revenues, and was always dependent upon financial accommodations from lenders and investors

to stay in business and continue operations. Indeed, at least from sometime in the summer of 2023, Cooks Venture's ability to stay in business depended on securing such accommodations from a *single* key financier.

239.    Through these misrepresentations, Cooks Venture gave Growers a false and mis-leading impression of its financial health, risk of business failure, and ability to perform its legal obligations to them. In doing so, Cooks Venture prevented Growers from reasonably assessing the risks involved in entering a poultry growing arrangement with it, including, for example, the risk that Cooks Venture could shut down or reduce production at its Ozarks Region complex during the terms of their Poultry Production Agreements.

### b. Cooks Venture misled Growers by failing to disclose that it was struggling financially.

240.    At the same time as it was making bold claims to Growers about the growth and health of its business, Cooks Venture was hiding from Growers the actual material facts of its financial condition. These material adverse facts included, without limitation:

    a.  That Cooks Venture was losing money, either on a per-unit basis or on an ag-gregate basis;

    b.  That Cooks Venture could not reliably fund its obligations out of its operating revenues;

    c.  That Cooks Venture depended on financial accommodations from investors and lenders to continue operations;

    d.  That, at some point around the beginning of 2023, Cooks Venture's status as a going concern came into substantial jeopardy and that, by sometime in the summer of 2023, its ability to avert failure by the end of the year came to de-pend on accommodations from a single financier; and

    e.  Other facts about Cooks Venture's financial condition that materially in-creased the risk that it might experience a business failure or otherwise fail to perform its obligations under its poultry growing arrangements with Growers.

241.    By failing to disclose these material adverse facts about Cooks Venture's financial condition to Growers while boasting about its growth and other aspects of its business, Cooks

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

Venture left Growers with a false and misleading impression of its financial health, risk of business failure, and ability to perform its legal obligations to them. By the same token, Cooks Venture also deprived Growers of material information they needed to reasonably assess the risks involved in entering a poultry growing arrangement with Cooks Venture, including, for example, the high risk that Cooks Venture could shut down or reduce production at its Ozarks Region complex during the terms of their Poultry Production Agreements.

242.    Thus, Cooks Venture's failure to disclose the truth about its financial condition impaired Growers' ability to properly compare the poultry growing arrangement offered by Cooks Venture to those offered by competing integrators in the local market, and left Growers unable to make informed decisions regarding their contracting opportunities.

### c. Cooks Venture misled Growers by omitting to disclose Mr. Evans' 2018 bankruptcy and its connection to the failure of Crystal Lake Farms.

243.    In various direct and indirect communications with Growers in the course of their recruitment, Cooks Venture often touted Mr. Evans' connection to Peterson Farms and Lloyd Peterson's renowned legacy to gain Growers' trust in the relatively new integrator.

244.    In making these statements about Mr. Evans, however, Cooks Venture carefully omitted to disclose Mr. Evans' 2018 bankruptcy and the circumstances surrounding it, including the fact that it derived directly from the failure of Mr. Evans' previous poultry enterprise, Crystal Lake Farms, which was also Cooks Venture's direct corporate predecessor.

245.    In the absence of this information, Cooks Venture's communications with Growers regarding Mr. Evans left Growers with a false and misleading impression of the enterprise's trustworthiness, including the strength of its management and its ability to fulfill its obligations.

246.    At the same time, Cooks Venture's failure to disclose the material facts surrounding Mr. Evans' bankruptcy filing in 2018 deprived Growers of critical information to understand Cooks Venture's financial state, including, without limitation, whether its principals were a

**VERIFIED COMPLAINT**    **PAGE 76 OF 112**

source of financial strength or weakness, and whether the business it inherited from Crystal Lake Farms was profitable or distressed.

> ### vii. Growers relied on the false and misleading information they received from Cooks Venture to make substantial, debt-financed investments and to enter Poultry Production Agreements.

247.    Reasonably and in good faith, Growers relied on the false promises, misrepresentations of material information, and other deceptions of Cooks Venture described above to take significant economic actions to their detriment. For example, Growers forwent contract-growing opportunities with other integrators to enter exclusive three-year arrangements with Cooks Venture. To satisfy Cooks Venture's requirements for commencing these arrangements, they also took on debts, liquidated retirement savings, and expended money and effort to acquire, renovate, and otherwise prepare poultry houses in accordance with Cooks Venture's instructions.

248.    Specifically, in material reliance on the deceptive information they received from Defendants or their agents as described in this Complaint, Growers took at least the following actions:

> a.  **Mr. Maybee** quit his job as an operating engineer in the construction industry, entered a poultry growing arrangement with Cooks Venture, and borrowed around $450,000 to acquire and prepare broiler housing facilities to Cooks Venture specifications. To raise this money, Mr. Maybee liquidated his savings and mortgaged his residence and his family's ancestral farm.

> b.  **Ms. Barr** entered a poultry growing arrangement with Cooks Venture, and borrowed or spent over $400,000 to acquire, renovate, and otherwise prepare broiler housing facilities to Cooks Venture specifications. To raise this money, Ms. Barr mortgaged her residence and farm.

> c.  **Lakeview Farms** entered a poultry growing arrangement with Cooks Venture, and borrowed or spent over $150,000 to renovate and otherwise prepare broiler housing facilities to Cooks Venture specifications. Lakeview Farms raised this money by mortgaging its members' family farm.

> d.  **Ms. Bunch** entered a poultry growing arrangement with Cooks Venture, and borrowed or spent $130,000 to renovate and otherwise prepare broiler houses

to Cooks Venture specifications. To raise this money, Ms. Bunch had to mortgage her farm and liquidate her retirement savings.

e. **Mr. Wilson** agreed to enter a poultry growing arrangement with Cooks Venture, and borrowed or spent over $125,000 to build, renovate, or otherwise prepare broiler houses to Cooks Venture specifications.

f. **Ms. Sparks** entered a poultry growing arrangement with Cooks Venture, and borrowed or spent approximately $100,000 to renovate and otherwise prepare broiler houses to Cooks Venture specifications. To raise this money, Ms. Sparks had to sell her cattle and liquidate much of her retirement savings.

g. **Mr. Swofford** entered a poultry growing arrangement with Cooks Venture, and borrowed or spent approximately $100,000 to renovate or otherwise prepare broiler houses to Cooks Venture specifications. To raise this money, Mr. Swofford had to mortgage his family farm.

h. **Mr. Melbourne** entered a poultry growing arrangement with Cooks Venture, and spent nearly $30,000 to renovate and otherwise prepare broiler houses to Cooks Venture specifications.

i. **Ms. Harp** entered a poultry growing arrangement with Cooks Venture, and borrowed or spent over $20,000 to acquire, renovate, or otherwise prepare broiler housing facilities to Cooks Venture specifications.

j. **Mr. Wagoner** entered a poultry growing arrangement with Cooks Venture, and borrowed or spent between $1,500 and $5,000 to renovate or otherwise prepare broiler houses to Cooks Venture specifications.

k. **Mr. Tanner** borrowed or spent over $110,000 to build, renovate or otherwise prepare broiler houses to Cooks Venture specifications in the Fall of 2023 to commence a poultry growing arrangement.

249.    In the case of Growers who renovated pre-owned broiler houses to suit Cooks Venture specifications, the renovations required by Cooks Venture did not only cost Growers money to perform; they also reduced the value of Growers' broiler houses and made them more difficult to re-purpose for use with other integrators. For example, Cooks Venture required Growers to cut multiple large doors into the perimeters of their broiler houses, which clashed with the specifications of other integrators.

---

**VERIFIED COMPLAINT**                                    **PAGE 78 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

250.    Cooks Venture engaged in its deceptive conduct with the intent to induce Growers to take these actions, which provided Cooks Venture with captive production capacity to use in its efforts to attract investors, compete for larger customers, and meet excess demand. At all times material, each of the Defendants knew that Cooks Venture was inducing Growers to take the above-described actions for its benefit through deception — and either approved that deception or participated in it, or both.

**B. Under Defendants' control and direction, Cooks Venture employed deceptive practices and devices to hide material contract breaches from Growers and to keep Growers from taking protective action.**

251.    Cooks Venture never possessed the capital, facilities, and other resources necessary to fulfill all of the obligations it undertook to all of the contract growers it recruited, particularly its obligations to place, support, and process four flocks of birds annually — and provide all of the feed, medicines, and veterinary care necessary to raise them to slaughter age — for three years with each recruited grower.

252.    As a result, after inducing Growers to sign its Poultry Production Agreements, Cooks Venture struggled to perform its obligations thereunder in accordance with the deceptive promises, representations, and verbal agreements it had made to recruit Growers into its contract-growing program. Cooks Venture also struggled to comply with the written terms of the Poultry Production Agreements regarding base and bonus compensation and other payments owed to Growers.

253.    To prevent Growers from taking protective action in response to its recurrent material breaches of its legal obligations to them, from 2019 through 2023 Cooks Venture — with the knowledge, approval, and participation of each of the Defendants — employed a series of deceptive practices and devices to conceal those breaches from Growers, and generally to make it impossible for Growers to determine whether Cooks Venture was complying with its obligations or not. Then, after announcing its partial shutdown in November of last year, Cooks Venture went

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

further than ever before in its efforts to swindle Growers — conspiring with Arkansas state officials to misuse the power of government to deprive Growers of owed compensation, and to force Growers to bear the cost of disposing of a million or more of its own birds under false color of law.

254.    Individually and collectively, these deceptions made Growers unable to properly assess and manage the risks involved in performing and renewing their poultry growing arrangements with Cooks Venture, including the risks involved in making additional capital investments in broiler housing capacity. These deceptions also prevented Growers from protecting their rights under the Packers and Stockyards Act to promptly obtain "the full amount due on account" of the poultry they raised — amounts which Cooks Venture had promised to pay to Growers because of competition in the marketplace. Thus, in perpetrating these deceptive practices, Cooks Venture undermined the integrity of the market, deprived Growers of the benefits of competition, and prevented Growers from obtaining the true market value for their services.

255.    Each of the material deceptions that Cooks Venture employed in performing or breaching its Poultry Production Agreements with Growers — whether it came in the form of misrepresenting, concealing, camouflaging, or failing to disclose material information — is a *per se* violation of the Packers and Stockyards Act's prohibition on the use of "deceptive practices and devices" in the live poultry trade. Cooks Venture's combination of these deceptions into an integrated scheme to conceal material breaches of its obligations from Growers is a separate and additional violation of that prohibition. The Act makes Defendants liable to Growers for "the full amount of damages sustained in consequence" of these violations.

   i.    **Cooks Venture is obligated to place, support, and process four flocks of heirloom birds with Growers annually until the termination of their Poultry Production Agreements.**

256.    By virtue of both its promises and representations to Growers as well as its duties under the written terms of the Poultry Production Agreements, Cooks Venture is obligated to place at least four flocks of heirloom birds, each with a specific number or density of birds (as

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

alleged in Paragraph 182 and Footnote 32 above), on each Grower's farm annually for three years starting from the date when the first flock was placed thereon.

257.    Under the written terms of Section 2 of each Grower's Poultry Production Agreement, Cooks Venture is also obligated to: (a) "supply Farmer [the Grower] with feed, vaccines, and medication, as necessary, to raise birds to processing age"; (b) "provide veterinary services and technical advice, as needed, to assist with Farmer's [the Grower's] production"; (c) "determine when and where birds will be processed," and make "processing arrangements"; and then (d) "pay Farmer [the Grower] on or about the twelfth (12th) day after birds are processed" in accordance with the compensation terms alleged in Paragraph 256 below.

258.    To the extent that Cooks Venture has any discretion as to "when and where birds will be processed" after they have been placed on Growers' farms under the terms of the Poultry Production Agreements, the relevant contract terms are ambiguous, and their proper construction would obligate Cooks Venture to exercise its discretion under those terms fairly and in good faith to ensure that birds placed on Growers' farms are processed promptly within the processing-age window of 55-to-62 days.

259.    After a flock has been collected from a Grower's farm and processed, the Poultry Production Agreements obligate Cooks Venture to pay the Grower the following amounts with respect to such flock:

> a.   **Base Compensation:** Base compensation at a rate of 10 cents per pound of live chicken produced, to be calculated in accordance with Addendum A to each Poultry Production Agreement (all such compensation, "Base Compensation"); and
>
> b.   **Livability Bonus:** Bonus compensation at a rate of 1 cent per pound of live chicken produced, to be calculated in accordance with Addendum B-1 to each Poultry Production Agreement, if: (i) the Grower "is not in default of any provision of the Agreement"; (ii) the Grower has raised at least five flocks; and (b) on average, at least 96-percent of the birds in any five of the last six flocks raised by the Grower have survived the grow-out process until collection by Cooks Venture (all such compensation, "Livability Bonus Compensation").

    c.   **Regenerative Bonus:** Bonus compensation at a rate of 1 cent per pound of live chicken produced, to be calculated in accordance with Addendum B-2 to each Poultry Production Agreement, if the Grower: (i) "is not in default of any provision of the Agreement"; (ii) has "achieve[d] 'green' status under the regenerative index as outlined in Addendum C" to the Agreement; and (iii) has "permit[ted] CV to make certain improvements to the Farmer's property, as needed, to assist with the regenerative program as outlined in Addendum C" (all such bonus compensation, "<u>Regenerative Bonus Compensation</u>").

260.    In connection with two of the flocks placed on each Grower's farm annually, the Poultry Production Agreements, as modified by the Fuel Allowance Letters, also obligate Cooks Venture to pay the Grower a heating fuel allowance in an amount equal to 5.5 cents per square foot of poultry housing on the Grower's farm.

261.    To the extent any Fuel Allowance Letter may be construed to obligate Cooks Venture to pay such allowances for only one year (*i.e.*, the year during which the Letter was issued to the Grower), the relevant terms of the Fuel Allowance Letter are ambiguous, and their proper construction would obligate Cooks Venture to honor its earlier promises and representations to the effect that it would pay the Grower a heating fuel allowance in connection with at least two of the flocks placed on the Grower's farm every year, at a rate of 5.5 cents per square foot of poultry housing on the Grower's farm.

262.    All of Cooks Venture's obligations to Growers under the Poultry Production Agreements remain in full force and effect. The Poultry Production Agreements have not been terminated by Cooks Venture or by any Grower.

    ii.  **Cooks Venture concealed material breaches of its obligations regarding flock size, bonus compensation, fuel allowances, and other matters.**

263.    Cooks Venture concealed material breaches of its contract obligations regarding flock size, livability and regenerative bonus compensation, fuel allowances, and other matters from Growers through a variety of deceptive practices and devices. These included, without limitation: (a) providing Growers with flock-delivery tickets that misrepresented how many chicks a

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

flock contained at placement; (b) seizing Growers' flock-mortality cards at flock collection and providing false or misleading flock-settlement documents after flocks were transported, counted, and weighed; and (c) having Cooks Venture agents otherwise misrepresent material facts about flock size, mortality, weight, and related matters.

264.    Generally, these deceptions were carried out on behalf of Cooks Venture by employees acting under the direction and control of Cooks Venture officers Mr. Wadiak, Mr. Niemann, Mr. Evans, and Mr. Singleton during their tenures. In many instances, Mr. Evans, Mr. Niemann, and Mr. Singleton also participated directly in the deceptive conduct, and communicated false or misleading information about contract performance to Growers themselves.

### a.  Cooks Venture provided false or misleading flock-delivery tickets to conceal deficiencies in flock size and density.

265.    For each flock placed on a Grower's farm, Cooks Venture provided the Grower with a written document — called a "flock delivery ticket" — stating the size or density of the flock, the breed composition of the flock, and other material information about the placed flock. Cooks Venture did not allow Growers to retain flock delivery tickets or copies thereof.

266.    Cooks Venture routinely provided Growers with flock delivery tickets that materially misrepresented the size or density of the flocks placed on their farms. Specifically, all or almost all of the delivery tickets that Cooks Venture provided to Growers stated that placed flocks contained the number or density of chicks required for Cooks Venture to comply with its obligations under the Poultry Production Agreements (as those obligations are alleged in Part VI(B)(i) of the Complaint above). For numerous flocks placed on Growers' farms, this statement was materially and unequivocally false.

267.    Between its launch in 2019 and its partial shutdown in 2023, Cooks Venture repeatedly delivered flocks to Growers that had substantially fewer chicks than required to satisfy the flock size or density requirements of their Poultry Production Agreements. For example:

---

    a. **In the case of Lakeview Farms LLC**, Cooks Venture delivered at least six materially deficient flocks, each with an estimated 2,000–to–4,000 fewer chicks than required under their Poultry Production Agreement.

    b. **In the case of Mr. Logan,** Cooks Venture delivered at least one materially deficient flock, with an estimated 7,000 fewer chicks than required under his Poultry Production Agreement.

    c. **In the case of Mr. Melbourne**, Cooks Venture delivered at least two materially deficient flocks, with one flock containing an estimated 5,000 fewer chicks, and the other flock containing an estimated 17,000 fewer chicks, than required under his Poultry Production Agreement.

    d. **In the case of Ms. Harp**, Cooks Venture routinely delivered flocks with an estimated 2,000 fewer chicks than required under her Poultry Production Agreement.

268.  Once chicks are placed in broiler houses — each of which holds tens of thousands of birds — it is impossible to count them with any accuracy except by hiring poultry catchers to manually grab and count them, a step that: (a) Growers could not take without authorization from Cooks Venture;[34] (b) would have been prohibitively expensive; and (c) would have created a prohibitive risk of injury and infection to the birds. For all practical purposes, Growers could only learn exactly how many birds were placed on their farms with each flock from Cooks Venture.

269.  Thus, by providing Growers with delivery tickets that misrepresented the actual number of chicks in the flocks placed on their farms, Cooks Venture deprived Growers of material information they needed to: (a) make informed business decisions in the course of raising the misrepresented flocks, including decisions related to operating costs and risk management; and (b) otherwise protect their contractual and statutory rights from material breach or infringement by Cooks Venture. For example, it made it practically impossible for Growers to determine

---

[34] Section 3(n) of each Grower's Poultry Production Agreement requires the Grower "[t]o allow only persons authorized by CV [Cooks Venture] to enter the poultry housing" on the Grower's farm.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

whether Cooks Venture was properly determining their eligibility for Livability Bonus Compensation or not.

### b. Cooks Venture used the false flock-size information stated in flock-delivery tickets to fraudulently deny Growers' livability bonuses.

270.   Under the Poultry Production Agreements, a Grower is entitled to Livability Bonus Compensation if, among other things: (a) the Grower has raised at least five flocks; and (b) on average, at least 96-percent of the birds in any five of the last six flocks placed on the Grower's farm have survived the grow-out process until collection by Cooks Venture.

271.   Cooks Venture systematically miscalculated and misrepresented the bird-survival percentages for flocks placed on and collected from Growers' farms to fraudulently conceal and impede Growers' eligibility — or progress toward eligibility — for Livability Bonus Compensation under the Poultry Production Agreements.

272.   Cooks Venture did so by calculating the bird-survival percentage for each collected flock using (a) the accurate number of birds collected from the Grower's farm as the numerator, and (b) the often false and inflated number of placed birds stated in the delivery ticket for each flock as the denominator. Since the flock-delivery tickets provided by Cooks Venture routinely overstated the number of chicks in the flocks delivered to Growers, the systematic use of that number as the denominator in the calculation of bird-survival percentages necessarily resulted in false — and falsely depressed — bird-survival percentages for some or all of the flocks raised by Growers to slaughter.

273.   Using its fraudulent miscalculations of the bird-survival percentages for numerous flocks as a pretext, Cooks Venture denied Growers substantial amounts of Livability Bonus Compensation to which they were entitled. Since Growers had no reasonable way to count the birds delivered with each flock, Cooks Venture's intentional misrepresentation of the number of birds

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

delivered and the percentage of those birds which survived until collection made it practically impossible for Growers to know whether its denial of such compensation was lawful or not.

274.    Indeed, Cooks Venture required Growers to hand over the "mortality card" — the form provided by Cooks Venture wherein Growers recorded the death or culling of birds during the grow-out process — for each flock collected, leaving them without any continuing record of how many birds they actually lost from each flock.

### c. Cooks Venture provided false and misleading flock-settlement statements to conceal its failure to pay owed base compensation, bonus compensation, and fuel allowances.

275.    After collecting flocks from Growers' farms, transporting them to its own facilities, and counting and weighing each flock on its equipment, Cooks Venture provided Growers with written settlement statements that purported to present the compensation owed to the Grower on account of the flock, and to provide other material information related to settling the obligations arising from the flock between Cooks Venture and the Grower.

276.    The flock settlement statements that Cooks Venture provided to Growers were false, misleading, or deceptive. Not only did they misrepresent and fail to disclose material information that Growers needed to make informed decisions, but they were designed to be inscrutable — with minuscule type, confusing layout, cluttered presentation, and other deceptive features making it impossible for Growers to discern and evaluate the information they presented. These deceptions did not only serve to hide specific breaches of Cooks Venture's payment obligations to Growers; they made it practically impossible for Growers to determine whether Cooks Venture was complying with its payment obligations at all.

277.    For example, Cooks Venture routinely provided Growers with flock-settlement statements that misrepresented the payments Growers were owed on account of subject flocks, leading Growers to believe that Cooks Venture owed them less than it actually did. In particular, the payment amounts listed on Cooks Venture's flock-settlement statements routinely excluded

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

Livability Bonus Compensation, Regenerative Bonus Compensation, fuel allowance, and other payments to which Growers were entitled.

278.    To conceal these misrepresentations — and the underlying breaches of its payment obligations to Growers — Cooks Venture designed its flock-settlement statement to present the amounts that Cooks Venture owed to Growers on account of subject flocks as a single lump sum, and did not disaggregate such sums into subsidiary amounts attributable to base compensation, bonus compensation, and fuel allowance payments. The flock-settlement statements also gave no information to Growers about whether Cooks Venture determined them to be eligible or ineligible for bonus compensation or fuel allowance payments on subject flocks. Since Cooks Venture's settlement statements also typically failed to disclose the live weight of the subject flock or presented the same in an inscrutable manner, Growers had no reasonable way to reverse-calculate their effective compensation rates — leaving them simply to hope that Cooks Venture was treating them honestly.

### iii. Cooks Venture carried out a deceptive conspiracy with Arkansas state officials to deprive Growers of owed compensation and offload its own costs onto Growers under false color of law.

279.    After announcing its partial shutdown in November 2023, Cooks Venture desperately wanted to dodge its legal and contractual obligations to support, process, and ultimately pay Growers for raising the hundreds of thousands of birds it had already placed on their farms.

280.    Under the Poultry Production Agreements, however, there is only one circumstance in which Cooks Venture may lawfully discharge those obligations — namely, a "catastrophic loss of birds[.]"

281.    Section 4(e) of each Grower's Poultry Production Agreement provides that, "in the event of catastrophic loss of birds any time prior to the time they are picked up from [the Grower's] premises," the Grower would "assum[e] any losses due to the expenditure of labor, use of land, facilities, and equipment, and the cost of any fuel." Considering the expenditure of labor, the use

---

**VERIFIED COMPLAINT**                                                              **PAGE 87 OF 112**

of land, facilities, and equipment, and the cost of fuel are precisely the consideration for which Growers are compensated under the Poultry Production Agreements, Section 4(e) effectively divests Growers of the right to compensation when — and only when — a "catastrophic loss of birds" occurs.[35] Furthermore, Section 3(j) of each Poultry Production Agreement provides that, after such a catastrophic loss of birds, it would be the Grower's responsibility "to remove all dead birds and manage them in accordance with good poultry husbandry and all applicable laws."[36]

282.    But Cooks Venture could not take advantage of these clauses simply by going onto Growers' farms, killing all the birds it had to support, process, and pay for, and then claiming — red-hands and all — that a "catastrophic loss" had befallen its flocks. That would have constituted a material breach of the Poultry Production Agreements all on its own.[37] No, Cooks Venture

---

[35] Section 4(e) of each Grower's Poultry Production Agreement provides the following:

    4.  Mutual Promises. The Parties both agree: . . .

        e.  That in the event of catastrophic loss of birds any time prior to the time they are picked up from Farmer's premises, Farmer [the Grower] assumes any losses due to the expenditure of labor, use of land, facilities, and equipment, and the cost of any fuel. CV [Cooks Venture] assumes the loss of the full commercial value of the birds, feed, medication, and other supplies furnished by CV to the date of loss.

[36] Section 3(j) of each Grower's Poultry Production Agreement states the following:

    3.  Farmer Promises. . . .

        j.  To remove all dead birds and manage them in accordance with good poultry husbandry and all applicable laws.

[37] Nothing in the Poultry Production Agreements permits Cooks Venture to murder chickens after placing them on Growers' farms. Although Sections 4(a) and 4(c) of the Poultry Production Agreements provide that "all birds . . . furnished by CV will remain the sole and exclusive property of CV," and that "CV shall have the right of removal and title to all birds . . . furnished to Farmer," these provisions do not grant Cooks Venture the discretion to subvert its own material obligations under the Agreements or to otherwise unfairly deprive Growers of the benefit of the bargain. To the extent these two provisions of the Poultry Production Agreements may reasonably be read to give Cooks Venture such discretion, they are ambiguous, and their proper construction would prohibit Cooks Venture from carrying out its illegal conspiracy with Mr. Fisk as alleged in this Complaint.

---

**VERIFIED COMPLAINT**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

needed to find some other party — some accomplice — to do the deed under some legitimate-seeming pretext.

283.    Remarkably, Cooks Venture found that accomplice in none other than the Director of the Livestock and Poultry Division of the Arkansas Department of Agriculture — the Honorable Mr. Patrick Fisk.

> **a.  Mr. Fisk agreed to deceive Growers by ordering Arkansas state agents to kill the birds on Growers' farms under false color of law in exchange for a promise of reimbursement from Cooks Venture.**

284.    Sometime in late November 2023, Cooks Venture — through Mr. Evans and with the approval and knowledge of Mr. Niemann and Mr. Singleton — entered an agreement with Mr. Fisk providing that Cooks Venture would pay the Livestock and Poultry Division to euthanize all of the Cooks Venture birds on Growers' farms under false color of law.

285.    Specifically, this agreement contemplated that Mr. Fisk would order employees and contractors of the Livestock and Poultry Division to enter Growers' farms and euthanize all of the Cooks Venture birds thereon under the false pretext of carrying out state or federal laws related to animal health or welfare. In exchange for Mr. Fisk's illegal favor, Cooks Venture promised to reimburse the Division for costs incurred in carrying out this mass bird-killing operation.[38]

> **b.  The intent of the agreement between Mr. Fisk and Cooks Venture was to deceive Growers out of protecting their contract rights against Cooks Venture's willful breach and subterfuge.**

286.    Mr. Fisk and Cooks Venture entered the above-described agreement knowingly, voluntarily, and with the intent to: (a) conceal from Growers the material fact that Cooks Venture was willfully instigating the mass-killing of the birds on their farms in breach of its material obligations under the Poultry Production Agreements; (b) misrepresent to Growers that the

---

[38] Mr. Fisk admitted this fact at the public grower meeting held on December 7, 2023, where he stated that, over one or more then-recent phone calls, Mr. Evans had promised him that Cooks Venture would reimburse the Division for its costs.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

Arkansas Department of Agriculture had independently decided to depopulate the birds on their farms and was legally authorized to do so; and (c) thereby deceive and coerce Growers out of taking protective action against Cooks Venture's attempt to illegally evade its obligation to support, process, and pay for the flocks on their farms.

287.    No law, regulation, or court authorized Mr. Fisk — or any other agent of the State of Arkansas — to order, or execute, such a mass-euthanization operation for the birds on Growers' farms. Neither was such an operation justified or required by any established public policy of the State of Arkansas or the federal government.

288.    Indeed, there was no reasonable basis for the cruel and self-serving carnage that Mr. Fisk and Cooks Venture perpetrated at all: The chickens on Growers' farms were healthy and adequately cared for. Growers were properly feeding and managing them, and no disease outbreaks had been identified or suspected on Growers' farms. All of that was ignored. With disdain for Growers' vocation and malice for Growers' rights, Mr. Fisk and Cooks Venture carried out their deceptive and unlawful euthanization campaign without conducting a single test or inspection to gauge the actual state of the birds in Growers' care.

### c.  Mr. Fisk and Cooks Venture engaged in overt acts to advance and carry out their deceptive conspiracy against Growers.

289.    Between November and December of 2023, Cooks Venture, Mr. Fisk, and agents of the Arkansas Department of Agriculture under Mr. Fisk's direction collaborated in carrying out a rapid-fire euthanization campaign that left over a million birds dead and rotting on contract-growers' farms in less than a month's time.

290.    In quick succession, state agents under the direction of Mr. Fisk — always accompanied by a representative of Cooks Venture — entered the farm of almost every Grower who was raising a flock of Cooks Venture birds, set up foam-generating machines on the Grower's own water utilities, and used them to pump an unknown foaming substance into the Grower's broiler

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

houses and drown the birds inside. The Growers who were subjected to these illegal actions in-
clude, without limitation:

> a.  **Mr. Melbourne:** Agents of Mr. Fisk and Cooks Venture entered Mr. Mel-
> bourne's farm on December 11, 2023, and killed around 58,500 birds in his
> broiler house(s) by foaming. The birds were at processing age when they were
> foamed.
>
> b.  **Mr. Logan:** Agents of Mr. Fisk and Cooks Venture entered Mr. Logan's farm
> on December 12, 2023, and killed around 102,000 birds in his broiler house(s)
> by foaming. The birds were at processing age when they were foamed.
>
> c.  **Ms. Sparks:** Agents of Mr. Fisk and Cooks Venture entered Ms. Sparks farm
> on November 30, 2023, and killed around 74,000 birds in her broiler house(s)
> by foaming. The birds were at processing age when they were foamed.
>
> d.  **Ms. Harp:** Agents of Mr. Fisk and Cooks Venture entered Ms. Harp's farm on
> November 29, 2023, and killed around 72,000 birds in her broiler house(s) by
> foaming.
>
> e.  **Ms. Bunch**: Agents of Mr. Fisk and Cooks Venture entered Ms. Bunch's farm
> on December 5, 2023, and killed around 30,000 birds in her broiler house(s) by
> foaming.
>
> f.  **Mr. Swofford**: Agents of Mr. Fisk and Cooks Venture entered Mr. Swofford's
> farm on November 29, 2023, and killed around 41,700 birds in his broiler
> house(s) by foaming.

291.    In the case of each Grower affected by this conspiracy, the agents of Mr. Fisk and

Cooks Venture gained entry onto the Grower's farm — and seized and killed the birds in the

Grower's broiler houses — by misrepresenting to the Grower that they were acting with legal

authority. Indeed, because of false statements from the Defendants, Mr. Fisk, and state agents

under Mr. Fisk's direction over the course of the weeks during which the euthanization operation

was completed, Growers were led to believe that impeding or failing to cooperate in the seizure

and euthanization of the chickens on their farms would violate state or federal law and subject

them to civil or criminal liability.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

292.    Meanwhile, Cooks Venture's role in instigating the actions of Mr. Fisk and the state agents under his direction was kept hidden from Growers — depriving them of information they could have used to protect their interests from Cooks Venture's deceptive weaponization of government against them.

### d. Growers suffered substantial injuries as a result of Cooks Venture's deceptive conspiracy with Mr. Fisk.

293.    One by one, Growers were forced to witness as tens of thousands of hens and roosters in their care struggled, suffocated, and died under a flood of caustic chemical foam. After drowning the birds, Mr. Fisk's and Cooks Venture's agents simply left. The gruesome task of cleaning up the bird's wet and corroded carcasses — piled in mounds because the birds climbed over each other to try to escape the foam — then fell to Growers. In most cases, Growers had to dispose of them by composting with mulch and litter, a process that took weeks on end. As the birds' bodies rotted, the stench of decay blanketed Growers' farms, and at one point the entirety of Carrol County, for days or weeks on end.

294.    **Economic Damages.** As a result of Cooks Venture's conspiracy with Mr. Fisk and the state agents under his direction, Growers were forced to suffer sundry economic damages, including, without limitation: (a) lost profits and fuel allowances on the flocks that were foamed, (b) uncompensated labor and costs incurred in caring for those flocks before they were foamed, and in disposing of their carcasses after; and (c) physical damage to Growers' broiler houses, farms, and homes. For example:

   a.   **Ms. Bunch** incurred thousands of dollars in utility, material, and labor costs in caring for the flock on her farm before it was foamed, spent approximately $13,000 to dispose of the flock's remains after it was foamed, and was deprived of profits she would have earned had the flock not been foamed (among other damages).

   b.   **Mr. Swofford** incurred at least $9,200 in utility, material, and labor costs in caring for the flock on his farm before it was foamed, spent thousands of dollars to dispose of the flock's remains after it was foamed, and was deprived of profits

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

that he would have earned had the flock not been foamed (among other damages).

   c.  **Mr. Melbourne** incurred at least $12,500 in utility, material, and other costs in caring for the flock on his farm before it was foamed and was deprived of profits that he would have earned had the flock not been foamed (among other damages).

   d.  **Ms. Harp** incurred at least $6,750 in utility, material, and other costs in caring for the flock on her farm before it was foamed, spent thousands of dollars to dispose of the flock's remains after it was foamed, and was deprived of profits that she would have earned had the flock not been foamed (among other damages).

   e.  **Ms. Sparks** incurred at least $10,000 in utility, material, and other costs in caring for the flock on her farm before it was foamed, spent thousands of dollars to dispose of the flock's remains after it was foamed, and was deprived of profits that she would have earned had the flock not been foamed (among other damages).

295.   **Non-Economic Damages.** Beyond mere dollars and cents, Cooks Venture's conspiracy with Mr. Fisk subjected Growers to the indignity of having their constitutional rights trampled upon, forced them to endure abuse and humiliation at the hands of agents of the state, and caused them to bear the personal anguish and distress of losing their livelihoods, witnessing their flocks being drowned, and dealing with the gruesome aftermath. For example:

   a.  **Mr. Swofford** was there with his wife, Heather, when Mr. Fisk and Cooks Venture's agents came onto his farm. When he questioned their right to foam the flocks in his broiler houses, they ignored him. When he asked why they did not wear standard biosecurity equipment or provide a Material Safety Data sheet for the chemicals they were using, they rudely dismissed his pleas and told him to "stand back and shut up" and "let us do our job." Powerless, he could do nothing but stand by with his wife and watch while the state's agents shunted his birds to the front of each house, piled them on top of each other, and covered them in foam. The birds — just two-weeks-old at the time, barely bigger than chicks — squirmed and squealed and jumped for air, trying frantically to escape. For more than a day after the state's agents left, Mr. Swofford and his wife could still hear chicks chirping from under the mounds of the dead and dying birds, but could do nothing to help.

---

**VERIFIED COMPLAINT**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

b. **Mr. Melbourne's** chickens were fully grown when they were euthanized by Mr. Fisk and Cooks Venture's agents. Seeing those mature birds struggling and suffocating under the deluge of foam made him sick to his stomach. It was a devastating experience, made even worse by the fact that the chickens he had raised for months were being snuffed out, not to make food or guard against disease or any other legitimate reason, but for complete waste.

c. **Mr. Bunch** had just lost her husband of fifty-six years when she got the news that Cooks Venture was shutting down. She was in the middle of organizing his funeral when Mr. Fisk and Cook's Venture's agents showed up at her farm. She was given less than a day's notice, and felt she could do nothing to stop them from foaming her birds. When they left, she was distraught — having lost her sole source of income and been left with nothing but mounds of dead birds in her broiler houses.

d. **Ms. Sparks** witnessed her flock being foamed along with her brother and brother-in-law, both of whom worked the farm with her. She cried at the sight. This was not just her livelihood being smothered; it was her family's, too. They had all poured their blood, sweat, and tears into raising those birds — only to watch them drown and not be able to do anything about it.

296.    In the case of Mr. Maybee, the conduct of Cooks Venture and Mr. Fisk's agents was even more egregious. Mr. Maybee's turn to get foamed came last — on December 13, 2023. By that time, the state's mass bird-killing campaign had triggered mass outrage in local communities and attracted the attention of local journalists. When the agents showed up at Mr. Maybee's farm at 8 a.m. on the appointed date, reporter Michael Hoffman from the local ABC affiliate (KSPR ABC 33) was on the scene to cover the situation. Using threats of legal prosecution or other consequences, the agents intimidated Mr. Hoffman into leaving the premises and then ordered Mr. Maybee to remove the equipment from his poultry houses so they could foam the birds inside. After Mr. Maybee complied, however, the agents just stood around. At approximately 11:48 a.m., they got up and left without explanation. Not knowing whether they would return, Mr. Maybee began to return his equipment into the chicken houses so the birds could have water.

297.    Around noon that day, Mr. Evans called Mr. Maybee and brazenly lied to him, saying that his agents had left Mr. Maybee's farm because of "an unsafe environment." After

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

Mr. Maybee categorically denied this fabricated story, Mr. Evans ended the call. Approximately an hour and a half later, the agents returned to Mr. Maybee's farm without any advance notice. Wary of being framed after his disturbing call with Mr. Evans, and having no independent witnesses to corroborate his version of events after the agents intimidated Mr. Hoffman into leaving the farm, Mr. Maybee went out to meet the agents wearing a GoPro camera.

298.     Immediately after stepping out of his vehicle, the state agent in charge, Loren Teague, chastised Mr. Maybee for having his equipment still in the poultry houses, ordered him to remove the equipment, and told him to "go get that [GoPro] camera off," too. After Mr. Maybee replied that he will roll up his equipment, but that he was leaving the camera on, Mr. Teague got even more high-handed. "You *are* going to take that camera off," he said, implying consequences if Mr. Maybee failed to "cooperate." To avoid inflaming tensions further, Mr. Maybee just walked away at this point, keeping his camera on while complying with Mr. Teague's directive to remove his equipment from the broiler houses.

299.     Mr. Teague and his agents then just stood around in front of one of Mr. Maybee's broiler houses. After Mr. Maybee finished rolling up the equipment in another broiler house and walked outside, he saw Mr. Teague furtively enter and exit the first broiler house. Mr. Teague then approached Mr. Maybee and tried to browbeat him into a signing a document to the effect of a (false) acknowledgment that his farm must be placed on "quarantine." Mr. Maybee stood his ground, however. He refused to accept or sign the document that Mr. Teague was suspiciously pushing him to execute, and went back to rolling up his equipment.

300.     Around 2 p.m. that day, Mr. Teague and the rest of the conspirators' agents left Mr. Maybee's farm, never to return. From this point, Cooks Venture left its flock of nearly 70,000 birds on Mr. Maybee's farm for more than a month, purposefully failing to provide Mr. Maybee with adequate — or, depending on the week, any — feed to keep the chickens healthy, even while it kept providing feed regularly to birds in many of its other owned or contracted poultry houses.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

As a result of Cooks Venture's malfeasance, thousands of mature birds ultimately resorted to eating their own and each other's flesh out of hunger — in many cases pecking down to bones and internal organs — on Mr. Maybee's farm. The sight of starving birds and their carnage tormented Mr. Maybee and his family, who had entered their arrangement with Cooks Venture hoping to raise chickens in a humane and ethical manner.

301.    Through it all, Mr. Maybee kept caring for the birds as best he could, giving them water and heat, and trying to source feed for them within his budget. When Cooks Venture finally collected and processed this flock on January 19, 2024, it had been in Mr. Maybee's care for over 114 days — or approximately the time it should have taken Mr. Maybee to raise two flocks, not one. Since then, Mr. Maybee has not received one penny of compensation from Cooks Venture for his labors, let alone any reimbursement for the tens of thousands of dollars in out-of-pocket costs he incurred to keep Cooks Venture's birds alive when Cooks Venture could not be bothered.

### e. Cooks Venture's conspiracy with Mr. Fisk harmed competition and undermined the integrity of the market.

302.    The conspiracy to deceive Growers undertaken by Mr. Fisk and Cooks Venture had no value or place in a competitive market, and operated solely to deprive Growers of the benefits of competition for their services and prevent them from obtaining the true market value of those services. By allowing Cooks Venture — through dishonesty and bad faith — to offload costs and delay fulfilling responsibilities it had originally undertaken to induce Growers to enter its own poultry growing arrangements instead of those of its competitors, the conspiracy did not harm Growers alone. Indeed, it victimized all the honest integrators who once tried to compete against Cooks Venture for Growers' services on the merits and on the level.

303.    Beyond the market for farmers' services, Cooks Venture's corrupt bargain with Mr. Fisk also operated to lessen competition in the niche consumer market for heirloom, pasture-raised chicken. By allowing Cooks Venture to evade compliance with its legal obligations to

support and process over a million of its already-hatched and -placed chickens, the conspiracy eliminated substantial competitive activity from the relevant market that otherwise would have existed — exacerbating a shortage of supply that was already driving chicken prices higher for consumers nationwide.

### C. Under Defendants' control and direction, Cooks Venture employed deceptive practices or devices to conceal its financial condition in 2023 and to keep Growers from taking precautionary measures against its prospect of failure.

304.    Around the beginning of 2023, it became clear that Cooks Venture would likely not have the liquidity to pay its obligations as they came due over the next twelve months. At that time, Defendants knew or should have known that Cooks Venture would run out of money and shut down operations by the end of the year absent an infusion of capital. By or before the summer of 2023, Defendants also knew or should have known that whether Cooks Venture received such an infusion of capital turned on the decision of a single financier.

305.    Continuing its years-long scheme to mislead Growers about its financial condition, Cooks Venture misrepresented, concealed, and failed to disclose these material changes in its stability as a going concern. Instead of promptly apprising Growers of its imminent likelihood of insolvency so they could take precautionary measures, Cooks Venture actively misled Growers about it (as more fully alleged in Part V of this Complaint above). In doing so, Cooks Venture inflicted new and accumulating injuries upon Growers, above and beyond those which they sustained in consequence of the financial-condition deceptions that Cooks Venture had previously employed to recruit and retain them.

306.    Had Cooks Venture disclosed those material facts about its 2023 financial condition to Growers in a clear, understandable, and timely manner, Growers could have taken a variety of actions to prepare for a potential Cooks Venture shut down and mitigate its attendant financial harms. For example, Growers could have reduced their expenditures and saved more of their revenues; pursued an additional source of income, like part-time work; or pursued

alternative jobs or business opportunities to poultry-growing for Cooks Venture altogether. By extension, Growers could have arranged financing — while they still had a source of revenue and birds to give their broiler houses value — to renovate their facilities for alternative integrators in case Cooks Venture went under, or to pursue any other economic or business use for said facilities.

307.    Indeed, had Cooks Venture been honest with Growers, they might even have taken steps to help Cooks Venture *avert* failure and bankruptcy altogether. Growers could have offered to invest or lend their own money to Cooks Venture, or organized a farmers' cooperative to invest the capital of many growers into the enterprise. If sacrifices were truly necessary, Growers might even have agreed to give Cooks Venture and its principals some grace.

308.    Cooks Venture, however, decided to be emphatically *dis*honest with Growers. While hiding its perilous financial state from Growers throughout 2023, Cooks Venture encouraged Growers to continue performing normally under their Poultry Production Agreements until the very day when Cooks Venture announced its failure — and even to build entirely new broiler houses for Cooks Venture's benefit. On its own, this deceptive maneuver by Cooks Venture caused Growers to expend hundreds of thousands of dollars they would otherwise have retained.

309.    For example, multiple Growers spent thousands of dollars in October and November of 2023 — for example, Ms. Barr spent approximately $7,000 — preparing their broiler houses to receive flocks from Cooks Venture that either never arrived, or arrived and were foamed shortly thereafter. Had these Growers known of the high likelihood of failure facing Cooks Venture in those months, they could have economized on broiler-house preparations and kept thousands of dollars in their pockets.

310.    Going further, at least one Grower, Mr. Logan, relied on the misrepresentations of financial health from Cooks Venture's agents in August and September of 2023 — based, specifically, on the message articulated by Mr. Niemann at his initial meeting with Cooks Venture's live-production managers and technicians — to renovate and prepare an entirely new broiler

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

house to Cooks Venture specifications, at a cost of over $85,000. To raise this money, Mr. Logan had to take on additional debt against his farm and put up the proceeds of his cattle as security for repayment.

311.    More broadly, by depriving Growers of the opportunity to reasonably prepare themselves for its potential failure, Cooks Venture's concealment and misrepresentation of its grave financial condition in 2023 caused Growers to endure acute financial dislocation in the aftermath of its November shutdown that they otherwise would have avoided.

312.    As a result — and only as a result — of these special dislocations, Growers have been forced to (a) forgo business or work opportunities, and lose profits or income that those opportunities would have otherwise generated; (b) forgo insurance policies, and suffer uncompensated losses that otherwise would have been insured; and (c) incur other consequential economic damages traceable to Cooks Venture's deceptive conduct. Growers have also struggled to put food on the table, to keep a roof over their families' heads, and to care for their elderly parents — with all the personal anguish those things entail. For example:

    a.  **Ms. Harp** has had to forgo the farm insurance policy that covered her broiler houses against natural disasters. Before Cooks Venture's surprise closure in November 2023, Ms. Harp's lender required her to maintain that insurance policy as a condition of her mortgage. Because of — and only because of — the special financial difficulties that Ms. Harp experienced as a result of Cooks Venture's deception, Ms. Harp's lender waived that requirement. A short while later, a tornado struck her farm and destroyed her broiler houses beyond repair — causing Ms. Harp to suffer a catastrophic loss that, but for the Defendant's illegal conduct, would have been fully insured.

    b.  **Mr. Maybee** has come up with an innovative plan to repurpose his broiler houses for raising leased, shared, and direct-to-consumer cattle, but has struggled to implement it (and lost profits on it) because of the dire financial straits in which Cooks Venture's deception has left him. Mr. Maybee is a veteran cattle producer, with more than a decade of experience in the trade. Had Cooks Venture informed Mr. Maybee of its true financial condition while it was still placing flocks on his farm, he could have used his then-existing income and financing to properly establish and develop his cattle business.

  c. **Ms. Barr** is a proud mother who has worked in the poultry industry for over 17 years. Since Cooks Venture's sudden closure, however, she has struggled to make ends meet, pay her mortgage, and care for her young daughter and elderly mother. She has had to leave her farm behind and take a job at a casino in Branson — driving an hour each way — to pay the bills. At a particularly dire point in the immediate aftermath of Cooks Venture's shut down, she even had to resort to a GoFundMe campaign just to keep her farm out of foreclosure.

313. In light of these facts, Cooks Venture's self-serving actions to conceal and misrepresent its financial condition in 2023 were deceptive practices that had no place or value in a competitive market. Indeed, by preventing Growers from seeking alternative contract-growing opportunities before November 2023, these deceptive practices served only to shield Cooks Venture from competing on the merits to retain Growers' services during its final year of operation.

314. Generally, these deceptions were carried out on behalf of Cooks Venture by individuals serving as Live Production and Broiler Managers for Cooks Venture, who were at all times material acting under the direction and control of Cooks Venture executives Mr. Wadiak, Mr. Niemann, Mr. Evans, and Mr. Singleton during their respective tenures. In many instances, these executives also participated directly in the deceptive conduct, and themselves communicated false or misleading information to Growers about Cooks Venture's financial stability in 2023.

## VII. <u>CAUSES OF ACTION</u>

315. Plaintiffs incorporate by reference all of the fact allegations above into each of the following counts. To the extent there is any perceived inconsistency, Plaintiffs expressly plead each count and claim for relief in this Complaint in the alternative.

316. All claims alleged against the Defendants in this complaint are outstanding and unsatisfied. Neither Defendants nor the CV Companies have offered to pay Growers any amount in accord and satisfaction of any claims alleged in this Complaint. Growers have not consented to accept any amounts from Defendants or the CV Companies in accord and satisfaction, or settlement, of any claims alleged in this Complaint.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

317.   There has been no agreement between any Grower and any Defendants or CV Companies to the effect that the Grower would accept from any of them a different performance in full satisfaction of the performance required by the Grower's Poultry Production Agreement. To the extent any amounts have exchanged hands between Growers and any of these parties, Growers did not understand that their rights and obligations in connection with the Poultry Production Agreements would be cancelled, settled, or compromised by the exchange.

318.   To the extent that Growers have received any negotiable instruments from Defendants or the CV Companies, no such instruments have contained a conspicuous statement to the effect that the instrument was tendered in full satisfaction of any claim alleged in this Complaint. Additionally, any checks tendered by Defendants or the CV Companies in connection with, or in furtherance of, their deceptive or otherwise unlawful conduct were tendered in bad faith, and cannot support an affirmative defense of settlement or accord and satisfaction.

319.   Some or all of the accounts, records, and memoranda necessary to determine the exact injuries sustained by, and amounts owed to, Growers are in the exclusive possession, custody, or control of Defendants, and Growers intend to demand them at discovery. Each Defendant is under a duty, imposed by Section 401 of the Packers and Stockyards Act, 7 U.S.C. § 221, to maintain and preserve such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business as a live poultry dealer.

## COUNT ONE
### Violation of Section 202(a) of the Packers and Stockyards Act
### Engaging in or Using Deceptive Practices or Devices
### (7 U.S.C. § 192(a))

320.   Plaintiffs repeat and reallege paragraphs 1–319 as if set forth herein.

321.   Defendants, both directly and through their agents, have violated Section 202(a) of the Packers and Stockyards Act, 7 U.S.C. § 192(a), and implementing regulations thereunder, by engaging in or using deceptive practices or devices with respect to live poultry.

---

**VERIFIED COMPLAINT**                                                 **PAGE 101 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

322.    Defendants have made, modified, performed under, or enforced poultry growing arrangements (as defined in 7 U.S.C. § 182(9)) with Growers by employing, among other things, false or misleading statements about material information, omissions of material information necessary to make statements not false or misleading, failures to disclose material information, and other practices or devices designed to conceal, camouflage, or otherwise fail to present material information in a manner that is clear, concise, and understandable to a reasonable poultry grower (as defined in 7 U.S.C. § 182(8)).

323.    These deceptions were material. Individually and collectively, they were likely to affect — and did affect — the conduct or decision of Growers acting reasonably with respect to their poultry growing arrangements to their detriment.

324.    In consequence of Defendants' violations of the Packers and Stockyards Act, Plaintiffs have sustained damages for which they are entitled to compensation under Section 308(a) of the Packers and Stockyards Act, 7 U.S.C. § 209, in amounts to be determined at trial.

325.    The deceptions perpetrated by Defendants are of the kind the Packers and Stockyards Act was meant to punish and prevent. They have harmed and injured competition for Growers' poultry grow-out services, deprived Growers of the benefits of such competition, prevented Growers from obtaining the true market value of their services, and undermined the integrity of the market at large.

326.    The reprehensibility of the Defendants' conduct demands the award of punitive damages. In deceiving Growers, Defendants' conduct was malicious, oppressive, and in reckless disregard of Growers' rights. Among other things, Defendant's deceptions were intended to injure Growers; exploited Growers' dependence upon Defendants for information; and caused unjustifiably severe harm to Growers. Defendants knew that their deceptive conduct violated Growers' legal rights, and perpetrated their deceptions in complete disregard of those rights.

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

## COUNT TWO
### Violation of Section 202(g) of the Packers and Stockyards Act
### Conspiracy to Engage In or Use Deceptive Practices or Devices
### (7 U.S.C. § 192(g))

327.    Plaintiffs repeat and reallege paragraphs 1–319 as if set forth herein.

328.    Defendants, both directly and through their agents, have violated Section 202(g) of the Packers and Stockyards Act, 7 U.S.C. § 192(g), by conspiring, combining, agreeing, or arranging with other persons to engage in or use deceptive practices or devices with respect to live poultry in violation of Section 202(a) of the Act, 7 U.S.C. § 192(a), or to aid and abet the same.

329.    Defendants entered a conspiracy with Co-Conspirators to engage in or use deceptive practices or devices with respect to Cooks Venture's poultry growing arrangements with Growers, or to aid and abet Cooks Venture in the same.

330.    The intent and effect of this conspiracy between Defendants and Co-Conspirators was to deceive Growers with respect to Cooks Venture's performance of its poultry growing arrangements with Growers, or to aid and abet Cooks Venture in deceiving Growers with respect to the same.

331.    Defendants and Co-Conspirators have engaged in overt acts in furtherance of this conspiracy.

332.    In consequence of Defendants' violations of the Packers and Stockyards Act, Plaintiff have sustained damages for which they are entitled to compensation under Section 308(a) of the Packers and Stockyards Act, 7 U.S.C. § 209, in amounts to be determined at trial.

333.    The deceptive conspiracy perpetrated by Defendants and Co-Conspirators is of the kind the Packers and Stockyards Act was meant to punish and prevent. It harmed and injured competition for Growers' poultry grow-out services, deprived Growers of the benefits of such competition, prevented Growers from obtaining the true market value of their services, and

undermined the integrity of the market at large. It also lessened competition in the consumer market for heirloom-bred, pasture-raised chicken.

334.     The reprehensibility of the Defendants' conduct demands the award of punitive damages. In conspiring with Mr. Fisk and the state agents under his control to deceive Growers, Defendants' conduct was malicious, oppressive, and in reckless disregard of Growers' rights. Among other things, the Defendants' conduct was intended to injure Growers; exploited Growers' dependence upon Defendants for information, and their powerlessness in the face of state officials; and caused unjustifiably severe harm to Growers. Defendants knew that their deceptive conspiracy would violate Growers' legal rights, and perpetrated that conspiracy in complete disregard of those rights.

**COUNT THREE**
**Violation of Section 410 of the Packers and Stockyards Act**
**Deprivation of Right to Prompt And Full Payment for Live Poultry**
**(7 U.S.C. § 228b-1)**

335.     Plaintiffs repeat and reallege paragraphs 1–319 as if fully set forth herein.

336.     Defendants, both directly and through their agents, have violated Section 410(a) of the Packers and Stockyards Act, 7 U.S.C. § 228b-1(a), by failing to deliver to poultry growers, from whom Defendants had obtained live poultry under poultry growing arrangements, the full amounts due to such growers on account of such poultry before the close of the 15th day following the week in which the poultry was slaughtered.

337.     Defendants, both directly and through their agents, have violated Section 410(b) of the Packers and Stockyards Act, 7 U.S.C. § 228b-1(b), by delaying, or attempting to delay, the collection of funds by poultry growers as provided in Section 410(a) of the Packers and Stockyards Act, 7 U.S.C. § 228b-1(a), for the purpose of, or resulting in, extending the normal period of payment for poultry obtained by poultry growing arrangement.

338.     Defendants obtained live poultry from Growers under poultry growing arrange-
ments.

339.     Defendants slaughtered this live poultry.

340.     Defendants did not deliver to Growers the full amounts due on account of said
poultry before the close of the 15th day following the week in which Defendants slaughtered it.

341.     Defendants delayed, or attempted to delay, the collection of such amounts by
Growers for the purpose, and with the result, of extending the normal period of payment for live
poultry obtained under their poultry growing arrangements with Growers.

342.     In consequence of Defendants' violations of the Packers and Stockyards Act, Plain-
tiffs have sustained damages for which they are entitled to compensation under Section 308(a) of
the Packers and Stockyards Act, 7 U.S.C. § 209, in amounts to be determined at trial.

343.     Defendants' failure to deliver prompt and full payment to Growers — and their
attempts to delay the collection of such payment by Growers — are violations of the law that the
Packers and Stockyards Act was meant to punish and prevent. They have harmed and injured
competition for Growers' poultry grow-out services, deprived Growers of the benefits of such com-
petition, prevented Growers from obtaining the true market value of their services, and under-
mined the integrity of the market at large. As the USDA found in promulgating its Market Integ-
rity Rule, a live poultry dealer "that fails to pay for meat promptly is not only deceiving the seller
— by financing their operations using the seller's goods — but is also forcing honest [live poultry
dealers] to compete without financing their operations in this deceptive manner."[39]

344.     The reprehensibility of the Defendants' conduct demands the award of punitive
damages. In depriving Growers of prompt and full payment and attempting to delay the collection
of such payment by Growers, Defendants' conduct was malicious, oppressive, and in reckless

---

[39] *See* Inclusive Competition and Market Integrity under the Packers and Stockyards Act, 89 Fed. Reg.
60,010, 60,031-32 (Oct. 3, 2022) (Proposed Rule).

disregard of Growers' rights. Among other things, the Defendants' conduct was intended to injure Growers; exploited Growers' dependence upon Defendants for information, and their powerlessness in the face of state officials; and caused unjustifiably severe harm to Growers. Defendants knew that their conduct would violate Growers' legal rights, and acted in complete disregard of those rights.

**COUNT FOUR**
**Violation of Section 207(b) of the Packers and Stockyards Act**
**Deprivation of Statutory Poultry Trust Benefits**
**(7 U.S.C. § 197(b))**

345.    Plaintiffs repeat and reallege paragraphs 1–319 as if fully set forth herein.

346.    Defendants, both directly and through their agents, have violated Section 207(b) of the Packers and Stockyards Act, 7 U.S.C. § 197(b), by failing to hold in trust for the benefit of unpaid poultry growers all poultry obtained from them by poultry growing arrangement, and all inventories of, or proceeds from, such poultry and poultry products derived therefrom.

347.    Defendants have obtained poultry from Growers by poultry growing arrangement.

348.    Growers remain unpaid for some or all of that poultry.

349.    Growers have preserved their statutory trust rights over the poultry for which they remain unpaid (and all inventories and proceeds derived therefrom) as required under Section 207(d) of the Packers and Stockyards Act, 7 U.S.C. § 197(d). Within 30 days after payment for such poultry was due, Growers gave Defendants written notice of their failure to pay for it, and filed that notice with the Packers and Stockyards Division of the USDA.

350.    Defendants have encumbered, given lenders security interests in, placed liens or allowed liens to be placed on, surrendered to third-party creditors, destroyed, or otherwise failed to hold in trust for the benefit of Growers some or all such poultry and some or all inventories and proceeds derived therefrom.

---

VERIFIED COMPLAINT                                                    PAGE 106 OF 112

351.    In consequence of Defendants' violations of the Packers and Stockyards Act, Plain-

tiffs have sustained damages for which they are entitled to compensation under Section 308(a) of

the Packers and Stockyards Act, 7 U.S.C. § 209, in amounts to be determined at trial.

**COUNT FIVE**
**Violation of Section 202(a) of the Packers and Stockyards Act and 9 C.F.R. 201.100(d)**
**Failure to Provide True and Accurate Flock Settlement Sheets**
**(7 U.S.C. § 192(a))**

352.    Plaintiffs repeat and reallege paragraphs 1–319 as if fully set forth herein.

353.    Defendants, both directly and through their agents, have violated Section 202(a)

of the Packers and Stockyards Act, 7 U.S.C. § 192(a), and its implementing regulation codified at

9 C.F.R. § 201.100(d), by failing to prepare true and accurate settlement sheets (*i.e.*, final ac-

countings) with respect to poultry acquired pursuant to contracts with poultry growers, and by

failing to furnish copies of such settlement sheets to such poultry growers at time of settlement

with respect to such poultry.

354.    Defendants acquired poultry pursuant to contracts with Growers. The weight of

the poultry so obtained affected the payment owed to Growers under said contracts.

355.    Defendants did not prepare and furnish to Growers true and accurate settlement

sheets with respect to some or all of this poultry.

356.    The settlement sheets prepared and furnished by Defendants with respect to some

or all of said poultry did not contain all the information necessary to compute the payment due to

Growers. Nor did they contain the number of live birds marketed, the total weight and the average

weight of the birds, and the payment per pound.

357.    In consequence of Defendants' violations of the Packers and Stockyards Act, Plain-

tiffs have sustained damages for which they are entitled to compensation under Section 308(a) of

the Packers and Stockyards Act, 7 U.S.C. § 209, in amounts to be determined at trial.

VERIFIED COMPLAINT                                          PAGE 107 OF 112

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

<u>COUNT SIX</u>
### Violation of Section 202(a) of the Packers and Stockyards Act and 9 C.F.R. 201.82(b)
### Failure to Promptly Weigh Live Poultry
### (7 U.S.C. § 192(a))

358.    Plaintiffs repeat and reallege paragraphs 1–319 as if fully set forth herein.

359.    Defendants, both directly and through their agents, have violated Section 202(a) of the Packers and Stockyards Act, 7 U.S.C. § 192(a), and its implementing regulation codified at 9 C.F.R. § 201.82(b), by failing to complete the process of obtaining the gross weight of live poultry obtained under poultry growing arrangements within thirty minutes after the arrival of such poultry at the processing plant, holding yard, or other scale normally used by the Defendants for such purposes.

360.    Defendants obtained live poultry from Growers under poultry growing arrangements. The weight of the live poultry so obtained was a factor in calculating payment to Growers under said poultry growing arrangements.

361.    In the case of some or all of this live poultry, the process of obtaining the gross weight of the live poultry was not completed within thirty minutes of the live poultry's arrival at the processing plant, holding yard, or other scale normally used by Defendants for the purpose of weighing live poultry obtained under their poultry growing arrangements with Growers.

362.    In consequence of Defendants' violations of the Packers and Stockyards Act, Plaintiffs have sustained damages for which they are entitled to compensation under Section 308(a) of the Packers and Stockyards Act, 7 U.S.C. § 209, in amounts to be determined at trial.

## VIII.  <u>PETITION FOR RELIEF</u>

363.    WHEREFORE, Plaintiffs respectfully petition the Court to:

a.      Enter judgment against Defendants and in favor of Plaintiffs for all violations of the Packers and Stockyards Act alleged in this Complaint;

b.    Rule that Defendants have engaged in or used deceptive practices or devices with respect to live poultry against Plaintiffs, in violation of Section 202(a) of the Packers and Stockyards Act, 7 U.S.C. § 192(a);

c.    Rule that Defendants have conspired with Co-Conspirators to engage in or use deceptive practices or devices with respect to live poultry against Plaintiffs, or to aid and abet the same, in violation of Section 202(g) of the Packers and Stockyards Act, 7 U.S.C. § 192(g);

d.    Rule that Defendants have failed to deliver full and timely payments for live poultry to Plaintiffs, and wrongfully delayed or attempted to delay the collection of such payments by Plaintiffs, in violation of Section 410 of the Packers and Stockyards Act, 7 U.S.C. § 228b-1;

e.    Rule that Defendants have deprived Plaintiffs of the benefit of statutory trusts on live poultry, poultry products derived therefrom, and all proceeds, receivables, and inventories of both, in violation of Section 207(b) of the Packers and Stockyards Act, 7 U.S.C. § 197(b);

f.    Rule that Defendants have failed to prepare and furnish to Plaintiffs true and accurate settlement sheets with respect to live poultry, in violation of Section 202(a) of the Packers and Stockyards Act and 9 C.F.R. § 201.100(d);

g.    Rule that Defendants have failed to promptly weigh live poultry obtained from Plaintiffs under poultry growing arrangements, in violation of Section 202(a) of the Packers and Stockyards Act and 9 C.F.R. § 201.82(b);

h.    Award each Plaintiff, to the maximum extent permitted by law, compensatory damages for all of the injuries they sustained in consequence of the Defendants' unlawful conduct;

i.    Award each Plaintiff, to the maximum extent permitted by law, punitive damages in an amount sufficient to punish the Defendants and deter similar violations of the law;

j.    Award each Plaintiff an amount equal to their costs incurred in bringing this action, including reasonable attorney's fees;

k.    Award each Plaintiff, to the maximum extent permitted by law, pre- and post-judgment interest on all amounts awarded; and,

l.    Award such other and further relief to each Plaintiff as the Court may deem just or equitable.

[SIGNATURE PAGE FOLLOWS]

---

**VERIFIED COMPLAINT**                                           PAGE 109 OF 112

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

DATED: ___September 25___, 2024

ATTORNEYS FOR PLAINTIFFS

* Motion to Appear *Pro Hac Vice* filed
pursuant to Local Rule 83.5

Respectfully submitted,

/s/Lloyd "Tre" Kitchens
Lloyd "Tre" Kitchens
Arkansas Bar No. 99075
**THE BRAD HENDRICKS LAW FIRM**
500C Pleasant Valley Drive
Little Rock, AR 72227
Phone: (501) 221-0444
Email: tkitchens@bradhendricks.com
         amurray@bradhendricks.com

/s/Basel J. Musharbash
Basel J. Musharbash*
Texas Bar No. 24111402
**ANTIMONOPOLY COUNSEL**
2910 Clarksville Street
Paris, Texas 75460
Phone: (903) 205-8422
Email: basel@antimonopoly.us

/s/David Muraskin
David Muraskin*
New York Bar No. 4773958
Washington DC Bar No. 1012451
**FARMSTAND**
712 H Street NE, Suite 2534
Washington, DC 20002
Phone: (202) 630-3095
Email: david@farmstand.org

/s/Talcott "Tal" Franklin
Talcott "Tal" Franklin*
Maine Bar No. 006505
**TFPC**
181 Western Promenade
Portland, ME 04102
Phone: (214) 642-9191
Email: tal@tfpc.me

**VERIFIED COMPLAINT**                                    **PAGE 110 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

VERIFICATION

I have read the above and foregoing *Complaint,* and it is true and correct to the best of my knowledge and belief.  Wherein I set my hand and seal this day _Sep 21, 2024_____.

Signed by:
_____
8D13B47E42E8436...
Melisa Barr

STATE OF ARKANSAS

COUNTY OF  _Pulaski_

Sworn and subscribed before me, a Notary Public, on this 21 day of September 2024.

_____
Notary Public

My Commission Expires: _____

> AUDRA L. MURRAY
> MY COMMISSION # 12367826
> EXPIRES: October 2, 2028
> Pulaski County

**VERIFIED COMPLAINT**                                **PAGE 111 OF 112**

Docusign Envelope ID: F177CF2E-16C8-4F58-A9A4-994C8EF3BE7D

VERIFICATION

I have read the above and foregoing *Complaint,* and it is true and correct to the best of my knowledge and belief. Wherein I set my hand and seal this day _Sep 22, 2024_ .

Dustin Maybee

STATE OF ARKANSAS

COUNTY OF _Pulaski_

Sworn and subscribed before me, a Notary Public, on this _22_ day of September 2024.

Notary Public

My Commission Expires: _____

AUDRA L. MURRAY
MY COMMISSION # 12367826
EXPIRES: October 2, 2028
Pulaski County

**VERIFIED COMPLAINT** **PAGE 112 OF 112**

**DocuSign**

**Certificate Of Completion**

Envelope Id: F177CF2E16C84F58A9A4994C8EF3BE7D
Subject: Complete with Docusign: FOR FILING ON 09.25.2024 Verified Complaint.pdf
Source Envelope:
Document Pages: 112                    Signatures: 2
Certificate Pages: 5                   Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Envelope Originator:
Audra Murray
500 C Pleasant Valley Drive
Suite C
Little Rock, AR  72227
amurray@bradhendricks.com
IP Address: 12.38.162.162

**Record Tracking**

Status: Original
    9/20/2024 1:06:15 PM

Holder: Audra Murray
    amurray@bradhendricks.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Dustin Maybee<br>dustinmaybee22@gmail.com<br>Security Level: Email, Account Authentication (None) | *Signed by:*<br>4514C1320CFA4C8...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 172.59.77.223<br>Signed using mobile | Sent: 9/20/2024 1:09:04 PM<br>Viewed: 9/22/2024 5:59:02 AM<br>Signed: 9/22/2024 5:59:13 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 1/31/2024 12:52:32 PM<br>  ID: 55684b26-a68f-440e-925d-da4bf34dfcad | | |
| Melisa Barr<br>bocephus1619@gmail.com<br>Security Level: Email, Account Authentication (None) | *Signed by:*<br>8D13847E42E8436...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 174.224.139.42<br>Signed using mobile | Sent: 9/20/2024 1:09:03 PM<br>Viewed: 9/21/2024 1:12:17 PM<br>Signed: 9/21/2024 1:12:33 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 9/21/2024 1:12:17 PM<br>  ID: 6c9d2737-0b95-4073-a71e-6d982c7addd2 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/20/2024 1:09:04 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Certified Delivered | Security Checked | 9/21/2024 1:12:17 PM |
| Signing Complete | Security Checked | 9/21/2024 1:12:33 PM |
| Completed | Security Checked | 9/22/2024 5:59:13 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**