**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| (1) MELISA BARR;<br>(2) JOHNNIE BUNCH;<br>(3) LESLIE HARP;<br>(4) LANCE LOGAN;<br>(5) DUSTIN MAYBEE;<br>(6) BILL MELBOURNE;<br>(7) CHARLES SMITH;<br>(8) LINDA SPARKS;<br>(9) DARREN SWOFFORD;<br>(10) STUART TANNER;<br>(11) TONY WAGONER;<br>(12) GREGORY WILSON; and<br>(13) LAKEVIEW FARMS LLC,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>(1) MATTHEW WADIAK;<br>(2) JOHN NIEMANN;<br>(3) BLAKE EVANS; and<br>(4) TIM SINGLETON,<br><br>*Defendants.* | CASE NO. 3:24-cv-03041-TLB |

**PLAINTIFFS' MOTION FOR EVIDENTIARY SANCTIONS DUE TO SPOLIATION OF EVIDENCE BY DEFENDANT MATTHEW WADIAK**

Since the beginning of this case, Defendant Matthew Wadiak's discovery strategy has remained the same: produce nothing in hopes that Plaintiffs give up and move on. And for some time, this strategy proved to be successful. For over one year, Wadiak did not produce a single document to Plaintiffs and directed them to send their requests to the defunct Cooks

Venture entities and other third parties. Despite Wadiak's evasiveness, in April 2026 Plaintiffs finally confirmed that Wadiak used personal devices to conduct Cooks Venture business through a deposition of Cooks Venture's former chief financial officer, Ankur Agrawal, and by reviewing documents provided by other parties. Yet, when Plaintiffs confronted Wadiak with incontrovertible evidence that he was withholding responsive communications in May 2026, Wadiak responded by producing a limited production of his text messages only with Agrawal and Ken Collins, another Cooks Venture former chief financial officer.

Fortunately, the Court allowed Plaintiffs the opportunity to put Wadiak under oath and test the veracity of his representations regarding the responsive communications in his possession. In deposing Wadiak on July 28, 2026, however, Plaintiffs uncovered far more than additional withheld text messages. For the first time, Plaintiffs learned that not only did Wadiak use his personal cellphone during his time at Cooks Venture, but he also extensively used his personal laptop. Plaintiffs further learned that, soon after Wadiak left Cooks Venture, this laptop was damaged under suspicious circumstances that indicate bad faith — and that Wadiak made no efforts to retrieve the Cooks Venture data on that laptop.

Wadiak's failure to preserve that data requires sanctions under Federal Rule 37(e) in the form of a permissive adverse jury instruction that the information on his damaged laptop was favorable to Plaintiffs. Wadiak had a duty to preserve the data on his laptop because he knew that Cooks Venture was unlikely to continue as a going concern when he left the company and therefore knew or should have known that litigation over its unfulfilled obligations was probable in the near future. Nevertheless, Wadiak did not take reasonable steps to preserve this data, which now cannot be restored or replaced. Accordingly, the Court has the authority to impose sanctions under Rule 37(e), and because the evidence indicates that Wadiak acted with the intent to deprive Plaintiffs of this data, those sanctions should include a permissive adverse jury instruction to the effect that jurors may assume that the

information on Wadiak's laptop would have been favorable to Plaintiffs under Rule 37(e)(2). Lastly, because this is the second time that Plaintiffs have been forced to prepare a sanctions motion against Wadiak, Plaintiffs should be awarded reasonable attorney's fees and costs related to this motion.

## STATEMENT OF FACTS

### Plaintiffs' Discovery of Wadiak's Spoliation of Evidence

On June 18, 2026, Plaintiffs moved to continue trial and reset case deadlines; to compel depositions of Defendants Blake Evans and Defendant Matthew Wadiak, as well as Jennifer Perkins, a technology specialist at the law firm representing Mr. Evans; and for sanctions against Wadiak and his counsel, Alan Rupe, as well as Evans' counsel, Don McKinney. (Dkt. 188.) After the Court denied Wadiak and Evans' motions to quash their notices of depositions, Plaintiffs took limited scope depositions of Evans and Wadiak on July 22 and 28, 2026, respectively. (Dkt. 200, 202.) During Wadiak's deposition, Plaintiffs learned that Wadiak had not only wrongfully withheld large quantities of relevant text messages from Plaintiffs, but also that he had wrongfully concealed from Plaintiffs the fact that he *only* used personal devices to perform his duties as Chief Executive Office ("CEO") of Cooks Venture — including, most importantly, a personal laptop that was suspiciously damaged shortly after Wadiak left his position with Cooks Venture.

As detailed below, Wadiak exclusively used his personal devices to conduct official Cooks Venture business. Importantly, he downloaded extensive electronically stored information (ESI) from Cooks Venture's Google Drive shortly before leaving his position onto his personal laptop, but did not provide that ESI or any other relevant data from his personal devices to anyone at Cooks Venture after his departure. Shortly thereafter, he proceeded to (conveniently) damage his personal laptop through extreme rain exposure (on a date and at a location he cannot remember) and fail to retrieve any of the lost data from it — mishap

which he remarkably never notified anyone at Cooks Venture about when it happened, but that he insists occurred just as he tells it.

**Cooks Venture's Failure to Establish a Document Retention Policy**

To say that Cooks Venture did not take document retention seriously would be an understatement. Every former Cooks Venture executive deposed thus far — including former CEO Wadiak, former Executive Vice President (EVP) Evans, for Chief Sales Officer Robert Davenport, and former Chief Financial Officer Ankur Agrawal — has testified that Cooks Venture did not have a document retention policy to speak of. (Sandhu Decl. ¶ 3-6; Ex. 1 at 12:17-25; Ex. 2 at 37:20-38:5; Ex. 3 at 18:2-15; Ex. 4 at 45:10-13.) They provided differing narratives, however, as to how digital documents were stored at Cooks Venture. While Wadiak and Evans testified that digital documents were mainly stored on either Cooks Venture's Dropbox or Google Drive accounts, Agrawal and Davenport testified that they saved documents locally on their company laptops. (Sandhu Decl. ¶ 3-6; Ex. 1 at 13:1-6; Ex. 2 at 15:1-10; Ex. 3 at 18:2-15; Ex. 4 at 44:18-45:5.) In fact, later in his deposition, Wadiak admitted that he *also* saved documents locally on his laptop, such as sales materials. (Sandhu Decl. ¶ 4; Ex. 2 at 101:19-23.)

Conveniently, Wadiak testified that any documents related to Cooks Venture's growers, including Plaintiffs, were kept in paper form, but he could not recall where they were physically stored, or whether those paper documents were ever scanned and saved digitally (Sandhu Decl. ¶ 4; Ex. 2 at 12:19-22, 13:3-18, 14:1-11.) Evans, however, testified that he recalled scanning and digitally saving documents related to growers on at least one occasion. (Sandhu Decl. ¶ 3; Ex. 1 at 90:21-24.)

Not only did these Cooks Venture executives provide inconsistent narratives as to how documents were stored, but they also differed in their recollections of whether Cooks Venture had an information technology department, which presumably would have had some role in

document retention. Wadiak and Evans affirmatively testified that Cooks Venture never had an information technology ("IT") department. (Sandhu Decl. ¶ 3-4; Ex. 1 at 12:8-16; Ex. 2 at 10:13-11:2; Ex. 3 at 134:7-11; Ex. 4 at 46:5-25.) But Agrawal and Davenport both recalled in their depositions that there was an IT department at least for a period of time at Cooks Venture, which included one employee. (Sandhu Decl. ¶ 5-6; Ex. 3 at 134:7-11; Ex. 4 at 46:5-25.) Davenport stated that this IT employee was fired, but Agrawal could only recall that he left his role after a short time. (Sandhu Decl. ¶ 5-6; Ex. 3 at 134:7-11; Ex. 4 at 46:5-25.)

In the absence of any kind of document retention efforts, Cooks Venture employees were storing documents locally on their laptops and not just in the Cooks Venture Dropbox and Google Drive accounts. For example, although Evans, Agrawal, and Davenport testified that they were issued laptops by Cooks Venture, Wadiak testified that only some people were issued laptops and that others — including Wadiak himself — used their personal laptops to perform their work at Cooks Venture. (Sandhu Decl. ¶ 3-6; Ex. 1 at 13:11-14; Ex. 2 at 9:9-25; Ex. 3 at 132:17-23; Ex. 4 at 44:18-45:1.) So, even if all company issued laptops were collected from former Cooks Venture employees after they left their positions, an unknown amount of company data may still exist on the personal laptops of former Cooks Venture employees, if it had not been deleted.

The testimony of Evans, Agrawal, and Davenport, establishes that no such systematic collection of company laptops ever took place at Cooks Venture. All three officers testified that no one at Cooks Venture instructed them on what to do with their company hardware after leaving their positions. (Sandhu Decl. ¶ 3, 5-6; Ex. 1 at 87:7-88:8; Ex. 2 at 86:5-13; Ex. 3 at 132:17-24-133:1; Ex. 4 at 47:14-20.) While some employees, such as Davenport, voluntarily returned their laptops to Cooks Venture after leaving their positions, others, such as Agrawal, disposed of their laptops as they saw fit, including by destroying their laptop. (Sandhu Decl. ¶ 5-6, 6; Ex. 3 at 132:17-133:1; Ex. 4 at 47:14-20.) For Cooks Venture employees

who were never issued a company laptop, there was of course nothing to return, but they also received no guidance on what to do with the Cooks Venture data on their own personal devices. As noted above, these individuals may still have company data on their personal laptops, or they could have chosen to delete some or all of this data. In Wadiak's case, he preserved the personal laptop he used as CEO of Cooks Venture until approximately two weeks after he left the company — when it was damaged under suspicious circumstances. (Sandhu Decl. ¶ 4; Ex. 2 at 110:2-12.)

**Wadiak's Google Takeout Prior to his Departure from Cooks Venture**

Prior to Wadiak's departure from Cooks Venture, a copy of his Google Data was requested through his Cooks Venture email address, matt@cooksventure.com, on June 30, 2023, through a process called Google Takeout. (Sandhu Decl. ¶ 7; Ex. 5.) Google Takeout is a tool developed by Google which allows users to export and download copies of their data stored in a Google Account, such as Gmail or Google Drive. (Sandhu Decl. ¶ 4; Ex. 2 at 24:10-14.) The data copied from the Google Takeout initiated through Wadiak's Cooks Venture email account included data from his calendar, contacts, and email. (Sandhu Decl. ¶ 7; Ex. 5.) After the files were ready for download, an email notification was sent to matt@cooksventure.com. (Sandhu Decl. ¶ 7; Ex. 5.) The files were available for download until July 7, 2023. (Sandhu Decl. ¶ 7; Ex. 5.) The email confirming the data was ready for download did not, however, note the size of the download. (Sandhu Decl. ¶ 7; Ex. 5.)

During his July 22 deposition, Evans testified that, as an administrator of the Cooks Venture Google Drive account, Wadiak had the ability to perform a Google Takeout from the Google Drive while he was employed by Cooks Venture. (Sandhu Decl. ¶ 3; Ex. 1 at 61:1-14.) Evans further testified that he himself performed a Google Takeout to export documents from Cooks Venture's Google Drive account. (Sandhu Decl. ¶ 3; Ex. 1 at 63:6-19.)

Yet, Wadiak testified at his July 28 limited scope deposition that he did not know what a Google Takeout was and did not recall ever performing one. (Sandhu Decl. ¶ 4; Ex. 2 at 22:13-17, 23:14-17.) He further testified that he did not recall downloading the data from that Google Takeout. (Sandhu Decl. ¶ 4; Ex. 2 at 23:21-23.) This was despite the fact that the Takeout request was clearly made using Wadiak's Cooks Venture email account. (Sandhu Decl. ¶ 7; Ex. 5.) When asked if Wadiak still had access to his Cooks Venture email account between June and July 2023, Wadiak testified that he could not recall his last day, but that he had access to his email account until his last day. (Sandhu Decl. ¶ 4; Ex. 2 at 25:6-10.) Considering Wadiak's last day of employment with Cooks Venture was August 7, 2023, (Sandhu Decl. ¶ 8; Ex. 6.), he certainly had access to his Cooks Venture email account on June 30 when the above-referenced Google Takeout request was made, when a link to the data from that Takeout request was sent to his Cooks Venture e-mail address, and throughout the seven-day period for which that link remained live. Although Wadiak testified that others *may* have had access to his Cooks Venture email account while he was there, he could not confirm that fact nor could he name a single individual at Cooks Venture who had access to his Cooks Venture email account. (Sandhu Decl. ¶ 4; Ex. 2 at 24:19-25:4.)

**Damage to Wadiak's Personal Laptop under Suspicious Circumstances**

When asked what he did with the laptop that he conducted Cooks Venture business on after leaving his position, Wadiak first testified that his laptop "fried itself." (Sandhu Decl. ¶ 4; Ex. 2 at 27:14-20.) When asked to explain what he meant by that phrase, he testified that "water spilled on it and it stopped working – or it got rained on." (Sandhu Decl. ¶ 4; Ex. 4 at 28:5-8.). When asked to clarify whether water spilled on his laptop or whether it was rained on, Wadiak testified that "[he] had a backpack and water spilled into my backpack from the rain." (Sandhu Decl. ¶ 4; Ex. 2 at 28:9-11.)

Not only was Wadiak unable to provide a coherent narrative as to how his laptop was damaged, but he also could not provide consistent testimony as to when his laptop was damaged. First, he testified that the damage occurred, "maybe the same year [of leaving Cooks Venture]" or "early the next year, maybe." (Sandhu Decl. ¶ 4; Ex. 2 at 29:3-12.) Later, he could not recall if his laptop was damaged before or after Cooks Venture worked with the Arkansas Department of Agriculture to chemically foam the birds on growers' properties. (Sandhu Decl. ¶ 4; Ex. 2 at 108:19-24.) Pressed for a more definitive timeline, Wadiak finally testified that his laptop was damaged around the time he started his next position, which was about two weeks after he left Cooks Venture. (Sandhu Decl. ¶ 4; Ex. 2 at 110:2-12.)

When asked to explain what efforts he took to preserve Cooks Venture data on his damaged laptop, Wadiak rebuffed the implication that he had any responsibility to do so. (Sandhu Decl. ¶ 4; Ex. 2 at 172:1-4.) He testified that he took his laptop, a MacBook, to an Apple store after it was damaged and was told to get a new computer, which he did a few months later. (Sandhu Decl. ¶ 4; Ex. 2 at 29:13-24, 30:2-5.) But when asked if he attempted to retrieve any data from his damaged laptop using iCloud, Wadiak testified that he was not sure. (Sandhu Decl. ¶ 4; Ex. 2 at 30:21-31:4.) He further could not confirm which email address was associated with his Apple ID. (Sandhu Decl. ¶ 4; Ex. 2 at 32:4-12.) He testified that either matt@cooksventure.com, his Cooks Venture email address which he did not have access to after leaving his position, or cooksventure@me.com, his personal email address with apparently no connection to Cooks Venture, could have been associated with the Apple ID for his damaged laptop. (Sandhu Decl. ¶ 4; Ex. 2 at 32:4-12.) Later on, Wadiak contradicted himself by testifying that he was unsure if he *ever* made an Apple ID for his matt@cooksventure.com email address at all. (Sandhu Decl. ¶ 4; Ex. 2 at 105:6-14.) Then, Wadiak contradicted himself again: When asked whether he made any efforts to obtain Cooks Venture documents from his damaged laptop through his iCloud account in response to Plaintiffs'

discovery requests, Wadiak testified, "Through my iCloud? I didn't have access to email address." (Sandhu Decl. ¶ 4; Ex. 2 at 171:1-8.) Curiously, Wadiak seemingly forgot his earlier testimony and implied that *his Cooks Venture email address*, matt@cooksventure.com, was the one associated with the Apple ID for his damaged laptop and that he therefore could not access anything on his iCloud after leaving Cooks Venture. When Plaintiffs' counsel reminded Wadiak of his prior testimony, he changed his tune yet again and testified that he did not believe any documents in the iCloud account connected to the damaged laptop were relevant to this case. (Sandhu Decl. ¶ 4; Ex. 2 at 171:9-172:4.)

Importantly, Wadiak never notified anyone at Cooks Venture of the damage to his laptop or the resulting loss of Cooks venture data. (Sandhu Decl. ¶ 4; Ex. 2 at 100:18-21.) Wadiak testified that because he did not keep in touch with anyone at Cooks Venture after leaving his position, there was no reason for him to notify anyone of the damage to his laptop. (Sandhu Decl. ¶ 4; Ex. 2 at 101:18-21.) But when asked whether there were documents related to Cooks Venture on his damaged laptop, he testified, "I mean, I don't know. Maybe, maybe not. Probably not, because I think everything was stored in the cloud." (Sandhu Decl. ¶ 4; Ex. 2 at 100:22-101:11.) But as noted above, Wadiak, Agrawal, and Davenport testified that documents were not always saved on Cooks Venture's Dropbox and Google Drive accounts. (Sandhu Decl. ¶ 3-6; Ex. 1 at 13:1-6; Ex. 2 at 15:1-10, 101:3-11; Ex. 3 at 18:2-15; Ex. 4 at 44:18-45:5.) Indeed, without a document retention policy in place, Cooks Venture employees were free to save documents however they wanted, as Wadiak did. Moreover, despite Wadiak's testimony to the contrary, there is the above-referenced record of a request for a copy of Wadiak's Google data made from his Cooks Venture email account, which Wadiak may well have used to download this data onto his own personal laptop. (Sandhu Decl. ¶ 7; Ex. 5.)

When asked where the damaged laptop is today, Wadiak testified, "I don't even know where that is. I think I had a bin of electronics that I donated or scrapped it or donated to recycling, something like that." (Sandhu Decl. ¶ 4; Ex. 2 at 108:5-11.) And when asked if that laptop might have remained functional after it was donated, Wadiak testified, "Probably. It probably got scrapped, yeah." (Sandhu Decl. ¶ 4; Ex. 2 at 108:12-14.)

In short, Wadiak could not provide a single consistent narrative regarding what was stored on his laptop, how it was damaged, when it was damaged, which Apple ID was associated with it, or why he did not make an effort to recover the data on it.

**Wadiak's Knowledge of Potential and Ongoing Litigation**

Though Wadiak could not provide a consistent narrative about the damage to his laptop, he was aware of the potential for litigation related to his time at Cooks Venture at the time when the damage occurred. When Wadiak was first asked if he was aware of any actions initiated by the United States Department of Agriculture ("USDA") related to Cooks Venture, Wadiak first testified he was unaware because he did not deal with the USDA directly. (Sandhu Decl. ¶ 4; Ex. 79:13-19.) He doubled down and testified, "I cannot stress this enough. I didn't work with the USDA." (Sandhu Decl. ¶ 4; Ex. 2 at 82:11-20.)

But when he was later asked if he was aware of any action by the USDA regarding the weighing process of birds by Cooks Venture, Wadiak testified that Evans did inform him of this issue. (Sandhu Decl. ¶ 4; Ex. 2 at 83:9-25.) He further testified that Evans informed him that growers were subsequently compensated due to the weighing issue. (Sandhu Decl. ¶ 4; Ex. 2 at 84:1-17.) Notably, Cooks Venture's routine delays in weighing Plaintiffs' flocks are an integral component of at least one of Plaintiffs' claims against Wadiak and the other Defendants. (Dkt. 73 at 105-106.)

Further, before leaving his position as CEO, Wadiak had complete knowledge of Cooks Venture's grave financial condition and the attendant risks of litigation over tort and contract

liabilities. Although Wadiak testified that he had no reason to suspect that either Cooks Venture or himself could be sued, Wadiak also admitted that Cooks Venture was in substantial debt before he left his position. (Sandhu Decl. ¶ 4; Ex. 2 at 87:9-12.) Dubiously, Wadiak followed that up by testifying that, "There is no correlation between debt and litigation." (Sandhu Decl. ¶ 4; Ex. 2 at 87:17-88:1.) And when asked about Cooks Venture's risk of bankruptcy before he left his position, Wadiak testified, "All companies, at all times, have risks of bankruptcy." (Sandhu Decl. ¶ 4; Ex. 2 at 87:17-19.) Cooks Venture, however, was uniquely at risk of shutting down and going into liquidation when Wadiak left the company — and Wadiak was aware of this fact. An independent auditor's report prepared for Cooks Venture's management for the years ending on December 31, 2020 and 2021, warned that there was "substantial doubt" that Cooks Venture would continue as a going concern for the foreseeable future. (Sandhu Decl. ¶ 9; Ex. 7 at 2, 23.) Specifically, the report noted Cooks Venture and its affiliates had "suffered recurring losses from operations, [were] out of compliance with debt covenants, [had] not been issued waivers, and [had] stated that substantial doubt exist[ed] about their ability to continue as a going concern." (Sandhu Decl. ¶ 9; Ex. 7 at 2.) The independent auditor's report prepared for Cooks Venture for the years ending on December 31, 2021 and 2022, likewise warned that there was "substantial doubt" that Cooks Venture could continue as a going concern. (Sandhu Decl. ¶ 10; Ex. 8 at 24.)

Interestingly, Evans testified to the opposite of Wadiak — affirming that he did, in fact, apprehend a risk of litigation in Cooks Venture's final months. At his July 22 deposition, Evans testified that he saved documents in the waning days of Cooks Venture because he was worried about how quickly Cooks Venture shut down. (Sandhu Decl. ¶ 3; Ex. 1 at 27:4-12.) He testified, "Well, it was a pretty abrupt shutdown and there were obviously a lot of outstanding payables and things of that nature. So, obviously making sure documents were preserved seemed like it was in the best interest of you know, the company or the people."

(Sandhu Decl. ¶ 3; Ex. 1 at 27:4-12.) Later, he testified that he knew litigation was "possible for sure" due to outstanding payments to vendors. (Sandhu Decl. ¶ 3; Ex. 1 at 27:13-17.) Again, later he testified, "when a business shuts abruptly, I mean, I think you should anticipate that something, you know, could come," regarding the possibility of litigation against Cooks Venture or himself. (Sandhu Decl. ¶ 3; Ex. 1 at 89:3-9.) Although Evans, unlike Wadiak, remained with Cooks Venture until it shut down, the risks of litigation arising from the Defendants' management of Cooks Venture did not manifest overnight. As the independent auditor's reports cited above highlighted, at any given point in Wadiak's tenure as CEO there was substantial risk that Cooks Venture would fail as a going concern. If Evans knew to anticipate that litigation might arise from such a failure, Wadiak certainly should have as well.

Therefore, contrary to Wadiak's testimony that he had no reason to suspect that either Cooks Venture or himself could be subject to future litigation, these independent auditor's reports were more than enough to alert him to the possibility that Cooks Venture and its executives could be embroiled in litigation in the foreseeable future as a result of a business failure — just as Evans anticipated. And contrary to Wadiak's testimony that he had nothing to do with the USDA's oversight of Cooks Venture, he had knowledge of the numerous complaints that growers, such as Plaintiff Tony Wagoner, made regarding Cooks Venture's failure to comply with USDA regulations to promptly weigh live poultry. (Dkt. 73 at 106.) Thus, despite Wadiak's attempts to feign ignorance regarding the possibility of litigation related to his time at Cooks Venture, Wadiak and Evans' testimony — together with the independent auditor's reports — confirm that Wadiak was, indeed, aware of the likelihood of litigation when he damaged his laptop.

**Wadiak's Lack of Credibility**

Throughout Wadiak's July 28 limited scope deposition, he proved himself to be an unreliable witness with dubious credibility. As explained above, he provided inconsistent narratives regarding every topic he was questioned on. In fact, on numerous occasions, Wadiak was inconsistent to such a degree that he had to be reminded of his prior testimony by Plaintiffs' counsel.

For example, when Wadiak was asked about the possibility of failure and bankruptcy for Cooks Venture, he testified that rather than worrying about that possibility, he instead focused on the company's success. (Sandhu Decl. ¶ 4; Ex. 2 at 90:11-25.) Moreover, he testified that he "invested [his] life savings, personally, into Cooks Venture, and put every *single penny [he] had into the company* . . . because [he] believed in the business." (Sandhu Decl. ¶ 4; Ex. 2 at 91:1-16.) (emphasis added). And yet, repeatedly, he could not recall how long he was CEO of Cooks Venture or when he left his position. (Sandhu Decl. ¶ 4; Ex. 2 at 8:16-9:8,149:3-20.) When Plaintiffs' counsel questioned Wadiak's inability to recall even a rough timeframe of when he was CEO of Cooks Venture given his investment of his life savings into the company, Wadiak retorted, "can you remember from when to when you, you know, bought your last car . . . I mean, I've been CEO of a couple companies and I've been executive in others." (Sandhu Decl. ¶ 4; Ex. 2 at 143:3-20.)

In another example, when asked to describe when and how he learned that Cooks Venture was shutting down, Wadiak testified that he "heard some rumblings" that Cooks Venture was up for sale through something like an Instagram or Facebook post. (Sandhu Decl. ¶ 4; Ex. 2 at 96:6-20.) Then, Wadiak testified that he "didn't have a dog in the fight anymore" and that he was done with Cooks Venture. (Sandhu Decl. ¶ 4; Ex. 2 at 94:14-21, 96:9-20.) Yet, when pressed for more definite answer as to when he first heard of Cooks Venture's shutdown, Wadiak contradicted himself completely and testified that he "heard Dave

Pitman was buying it." (Sandhu Decl. ¶ 4; Ex. 2 at 97:2-14.) Asked to clarify how he heard that, Wadiak testified that David Pitman called him to inform him he was buying Cooks Venture. (Sandhu Decl. ¶ 4; Ex. 2 at 97:12-21.) So, while Wadiak initially claimed that he came across a social media post about Cooks Venture's shutdown by chance, in reality, the purchaser of Cooks Venture called him directly to inform him of the transaction.

But in perhaps the most concerning example, Wadiak could not keep his story straight regarding his knowledge of Plaintiffs' claims against him. Wadiak initially testified that he had reviewed the operative complaint in this case and concluded that he did not have anything in his possession that pertained to the complaint. (Sandhu Decl. ¶ 4; Ex. 2 at 114:20-24, 115:13-17, 116:7-14.) Then, however, he testified, "I don't pretend to understand what [Plaintiffs'] claims are exactly . . . none of them took place during my time." (Sandhu Decl. ¶ 4; Ex. 2 at 119:2-4.) At an even later point in his deposition, however, he changed his tune yet again and decided to claim that he understood Plaintiffs' claims but did not believe they had merit: "I understand the claims," he said, "I think they're not true, but I do understand them." (Sandhu Decl. ¶ 4; Ex. 2 at 121:13-121:11.) And yet, Wadiak could not even recall the number of claims Plaintiffs had asserted against him. (Sandhu Decl. ¶ 123:7-10.) He claimed most of Plaintiffs' claims "related to the USDA and the shutdown," which was a complete mischaracterization of Plaintiffs' claims. (Sandhu Decl. ¶ 4; Ex. 2 at 149:21-150:1.) In fact, Wadiak repeatedly testified to believing that Plaintiffs' claims related exclusively to conduct that occurred after he left Cooks Venture, a fundamental misunderstanding which even a cursory review of Plaintiffs' complaint would have disabused Wadiak of. (Sandhu Decl. ¶ 4; Ex. 2 at 114:25-115:4, 121:21-22, 151:13-15.)

Nevertheless, toward the end of the deposition, Wadiak was so confident in his assessment of the merits of Plaintiffs' claims that he testified to telling Agrawal they were meritless before Agrawal's deposition. (Sandhu Decl. ¶ 4; Ex. 2 at 205:6-12.) When Plaintiffs' counsel

reminded Wadiak of his prior statements that he did not "pretend to understand" Plaintiffs' claims, however, Wadiak recanted this statement — and claimed he never told Agrawal that Plaintiffs' lawsuit was without merit. (Sandhu Decl. ¶ 4; Ex. 2 at 205:24-206:1.)

Overall, Wadiak's testimony was characterized by tall tales that he could not keep straight and extreme claims of memory loss that strained credulity. At one point, he claimed he could "barely remember what [he] had for breakfast two days ago." (Sandhu Decl. ¶ 4; Ex. 2 at 128:8-11.) He also claimed, repeatedly, that he could "barely remember his wife's phone numbers." (Sandhu Decl. ¶ 4; Ex. 2 at 18:7-8, 51:14-16.) Throughout his testimony, Wadiak seemed to proceed on the assumption that he could not be forced to answer for much as long as he struggled to remember so little. Whatever motivations Wadiak may have had in presenting himself as such an unreliable witness, the only conclusion that can be drawn is that Wadiak believed he had more to gain from spinning yarns and feigning forgetfulness than he did from telling the truth.

## ARGUMENT

In Plaintiffs' previous motion for sanctions against Wadiak, Plaintiffs expressed their concern that spoliation may have already occurred. (Dkt. 188 at 38.) Unfortunately, that concern was proven well-founded during Wadiak's July 28 deposition, where Wadiak testified that he extensively used his personal laptop in conducting his official duties as CEO of Cooks Venture and suspiciously disposed of this laptop soon after he left his position.

Under Rule 37(e), the Court has the authority to impose sanctions because each of the threshold elements is met here. First, the Cooks Venture data on Wadiak's laptop should have been preserved because Cooks Venture's grave financial condition alerted Wadiak to the possibility of litigation at the time he left his position with the company. Second, Wadiak failed to take any steps to preserve that data — let alone reasonable steps — and it was lost as a result of his failure. Finally, that data cannot be restored or replaced through additional

discovery, as Wadiak himself has testified that the data cannot be retrieved and as his contradictory and evasive testimony cannot serve as a substitute for it. Thus, the court may impose sanctions on Wadiak for spoliation of evidence pursuant to Rule 37(e).

Because the evidence indicates that Wadiak acted with the intent to deprive Plaintiffs of this information, a permissive adverse jury instruction is the appropriate sanction for the Court to impose under Rule 37(e)(2). The Court should also award Plaintiffs' reasonable attorney's fees and costs related to this motion, as Plaintiffs have repeatedly had to bring Wadiak's discovery abuse to the court's attention — wasting time and resources.

**I. Rule 37(e) Standard**

"Spoliation of evidence refers to the intentional destruction, mutilation, alteration, or concealment of evidence." *Sys. Spray-Cooled v. Fch Tech*, No. 1:16-cv-01085, 2017 U.S. Dist. LEXIS 231587, *8 (W.D. Ark. Feb. 22, 2017). Rule 37(e) governs sanctions based on the spoliation of electronically stored information ("ESI"). A court may impose sanctions under Rule 37(e) for spoliation of ESI only "(1) if the electronically stored information should have been preserved in the anticipation or conduct of litigation; (2) a party failed to take reasonable steps to preserve it, (3) and it cannot be restored or replaced through additional discovery." *Id*. at *9-10. Once a court determines that these threshold elements are met, "the [c]ourt must next determine which sanctions are warranted." *Id.* at at *13.

"Rule 37(e) makes two types of sanctions available to the Court." *Paisley Park Enters. v. Boxill*, 330 F.R.D. 226, 232 (D. Minn. 2019). "Under Rule 37(e)(1), if the adverse party has suffered prejudice from the spoliation of evidence, the Court may order whatever sanctions are necessary to cure the prejudice." *Id*. Pursuant to Rule 37(e)(2), however, the court may also enter a default judgment or require an adverse-inference jury instruction at trial against the spoliating party if the court finds that "the party acted with the intent to deprive another party of the information's use in litigation." *Sandoval v. Dustar Express, Inc.*, No. 24-cv-

02601, 2026 U.S. Dist. LEXIS 68727, *13 (D. Minn. March 31, 2026). If such bad-faith intent is demonstrated, the court may impose these sanctions on the spoliating party pursuant to Rule 37(e)(2) without an independent showing of actual prejudice. *Id.* This is "because the finding of intent required by [Rule 37(e)(2)] can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *Id.*

Courts may also award attorney's fees and costs in connection with a motion for sanctions. "A court may assess attorneys' fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Sys. Spray-Cooled*, 2017 U.S. Dist. LEXIS 231587, at *18-19.

## II. The Court may impose evidentiary sanctions on Wadiak under Rule 37(e) because he had a duty to preserve the Cooks Venture ESI on his personal laptop and failed to do so, causing critical evidence to be irreparably spoiled.

As the CEO of a company that received multiple "going concern" warnings from its auditors during his tenure, at all times material to this motion Wadiak knew or should have known that Cooks Venture faced a substantial risk of shutting down within the foreseeable future and that litigation against him and other principals was likely to follow any such business failure. Given those risks of litigation, Wadiak should have taken reasonable steps to preserve the Cooks Venture data in his possession, including all such data that he had saved locally on his personal laptop, for use in future litigation. Because he did not, that data is — by his own admission — now wholly irretrievable. There is no means to restore or replace this data through alternate discovery: the laptop has been recycled and Wadiak's duplicitous conduct at his July deposition makes clear that he cannot be trusted to accurately recall the contents of his damaged laptop. In light of these factors, all the threshold conditions are met for the Court to impose sanctions for spoliation of ESI against Wadiak pursuant to Rule 37(e).

### A. Wadiak had a duty to preserve the Cooks Venture ESI on his laptop.

"The obligation to preserve evidence begins when a party knows or should [know] that the evidence is relevant to future or current litigations." *E*Trade Sec. LLC v. Deutsche Bank AG*, Nos. 02-3711, 02-3682, 2005 U.S. Dist. LEXIS 3021, *588 (D. Minn. Feb. 17, 2005), *report and recommendation adopted by* 2005 U.S. Dist. LEXIS 36001 (D. Minn. April 18, 2005). This obligation requires a party to preserve evidence that is relevant to any future litigation that the party anticipates or reasonably should anticipate. *E*Trade Sec. LLC*, 2005 U.S. Dist. LEXIS 3021, at *591. In the corporate context, "[a] reasonable anticipation of litigation arises when an organization is on notice of a credible probability that it will become involved in litigation." 11 Sedona Conf. J. 265. When an organization has such notice of probable litigation, its duty to preserve evidence extends to all "key players in its employ likely to have relevant information that could prove useful to an adversary" in litigation. *Swindle v. Jack Lee Aaron Christy & Cal. Overland*, No. 20-cv-06013, 2021 U.S. Dist. LEXIS 222136, *11 (W.D. Mo. March 4, 2021); *see also Great Am. Ins. Co. v. Twin Cities Dance & Ent. Co. LLC*, No. 23-cv-767, 2025 U.S. Dist. LEXIS 123956, *9 (D. Minn. March 5, 2025) ("The duty to preserve evidence extends to those persons likely to have relevant information — the key players in the case."); *Jones v. Hirschbach Motor Lines, Inc.*, No. 1:21-cv-01004, 2022 U.S. Dist. LEXIS 171549, *6 (D.S.D. Sept. 20, 2022) (same).

In all contexts, "anyone who [reasonably] anticipates being a party … to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary" in that lawsuit. *E*Trade Sec. LLC*, 2005 U.S. Dist. LEXIS 3021, at *591. Whether litigation is reasonably foreseeable is "a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Lifescience Techs., LLC v. Mercy Health*, No. 4:21-cv-01279, 2025 U.S. Dist. LEXIS 62788, *7 (E.D. Mo. March 31, 2025). Although a party's receipt of a settlement-demand,

evidence-preservation, or litigation-hold letter often makes the party's awareness of probable litigation and attendant duty to preserve relevant evidence incontrovertible, "the absence of these things does not vitiate the independent obligation of an adverse party to preserve information if that party [otherwise] knows or should know of impending litigation." *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 327 F.R.D. 96, 106 (E.D. Va. 2018) (citation modified).

**1. Wadiak had reason to anticipate future litigation.**

Here, Wadiak certainly knew or should have known there was a credible probability of future litigation against Cooks Venture and its principals — including Wadiak himself — when he left his position as CEO in August 2023. At his July 28 deposition, Wadiak tried to paint Cooks Venture's risk of bankruptcy as a distant possibility. (Sandhu Decl. ¶ 4; Ex. 2 at 87:17-88:1, 88:12-24.) Contrary to Wadiak's testimony, however, Cooks Venture's shutdown and the subsequent actions against the company and its principals — by Plaintiffs and by Cooks Venture's creditors — were well-nigh inevitable by the time he left the company. *See Cooks CA LLC v. UMB Bank, N.A. (In re Cooks Venture, Inc.)*, 669 B.R. 500 (Bankr. D. Del. 2025). In reports prepared based on financial statements spanning 2020, 2021, and 2022, independent auditors repeatedly warned Cooks Venture's management — including Wadiak — of their "substantial doubt" that Cooks Venture could continue as a going concern for the foreseeable future. (Sandhu Decl. ¶ 9-10; Ex. 7 at 2; Ex. 8 at 24.) In other words, for nearly Wadiak's entire tenure as CEO of Cooks Venture, the company was so financially unstable that it faced a significant threat of business failure, liquidation, and attendant litigation against itself and its principals. (Dkt. 73 at 17.)

Significantly, Evans' testimony regarding the possibility of litigation against Cooks Venture and its executives contradicts Wadiak's testimony. In his July 22 deposition, Evans testified that he knew litigation was "possible for sure" due to Cooks Venture's outstanding obligations to third parties. (Sandhu Decl. ¶ 3; Ex. 1 at 27:13-17.) He also testified that, given

how abruptly Cooks Venture shut down, he anticipated litigation against himself and Cooks Venture. (Sandhu Decl. ¶ 3; Ex. 1 at 89:3-9.) It makes little sense that Wadiak did not expect the same given he was CEO until just a few months before Cooks Venture shutdown. Cooks Venture did not suddenly accrue the obligations that caused its catastrophic failure overnight after Wadiak left. As explained above, the independent auditors' reports prepared during Wadiak's tenure as CEO demonstrate that Cooks Venture's risk of business failure was metastasizing each year that it operated. And as Evans admitted, the fact that such a failure would be followed by litigation was inevitable. Wadiak's refusal to admit to the same is disingenuous and highlights his lack of credibility.

Essentially, when Wadiak resigned in August 2023, he walked away from a ticking time bomb; his decision to do so, however, did not free him of his duty to preserve relevant evidence knowing that litigation was reasonably foreseeable. *See Lifescience Techs.*, 2025 U.S. Dist. LEXIS 62788, at *7. By virtue of the auditors' reports and his knowledge of the company's financial condition more broadly,[1] Wadiak knew that Cooks Venture was at substantial risk of shutdown and bankruptcy when he left his position — and therefore knew or should have known of the potential for litigation by creditors, vendors, and growers against Cooks Venture and principals of Cooks Venture like him. (Sandhu Decl. ¶ 9-10; Ex. 7 at 2; Ex. 8 at 24.)

Separately, Wadiak also had reason to anticipate litigation by Cooks Venture's poultry growers for violations of the Packers and Stockyards Act specifically. During his tenure as CEO, Cooks Venture faced action by the USDA regarding its bird-weighing process.

---

[1] A corporate officer is presumed to know the financial condition of his company as well as what is in its books and records. *See Albert Lea Foundry Co. v. Iowa Sav. Bank of Marshalltown, Iowa*, 21 F.2d 515, 518 (8th Cir. 1927); 31A C.J.S. Evidence § 275 ("It is presumed that the directors or officers have knowledge of the corporation's financial condition and other matters which it is their duty to know."); 19 C.J.S. Corporations § 557 (citing Helton v. AT&T Inc., 709 F.3d 343 (4th Cir. 2013) (citing 5A Fletcher Cyclopedia of Corporations § 2203)).

(Sandhu Decl. ¶ 4; Ex. 2 at 83:9-84:17.) While Wadiak initially stated in his July 28 deposition that he had nothing to do with the USDA while at Cooks Venture, he later conceded that he was indeed aware of growers being compensated for unlawful weighing practices during his tenure as CEO. (Sandhu Decl. ¶ 4; Ex. 2 at 83:9-84:17.) Although Wadiak claimed this was "resolved in a satisfactory fashion," that is a dubious claim coming from someone who could barely recall the dates when he served as CEO. (Sandhu Decl. ¶ 4; Ex. 2 at 83:9-84:17.)

**2. Wadiak had reason to know that he would be a "key player" in, and that the Cooks Venture ESI on his laptop would be relevant to, anticipated future litigation.**

Wadiak was bound to be a key player in any litigation flowing from Cooks Venture's shutdown and bankruptcy, and the data on the laptop he used to transact Cooks Venture's business throughout his tenure as CEO was bound to be relevant to any such litigation.

As the CEO and "guiding spirit"[2] of Cooks Venture for nearly four years, Wadiak was at the center of the decisionmaking that ultimately caused Cooks Venture's abrupt shutdown and attendant injuries to third parties. Per his own testimony, he made a significant financial investment in Cooks Venture when it was founded. (Sandhu Decl. ¶ 4; Ex. 2 at 91:1-16.) And as CEO, his responsibilities included ensuring Cooks Venture's profitability and stability as a going concern. (Sandhu Decl. 4; Ex. 2 at 90:22-25.) Since the company never made a profit and was at substantial risk of catastrophic business failure for nearly his entire tenure as CEO according to independent auditors, however, Wadiak clearly failed in that responsibility (Sandhu Decl. ¶ 9-10; Ex. 7 at 23; Ex. 8 at 24.) As such, by the time Wadiak left Cooks Venture, Wadiak was bound to be "key player" in any foreseeable litigation that might arise from Cooks Venture's potential failure, and he had a duty to preserve all relevant information in

[2] *Wellston Tr. Co. of St. Louis v. Snyder*, 87 F.2d 44, 44 (8th Cir. 1937).

his control that could be useful to an adversary in such litigation. *Cf. Swindle*, 2021 U.S. Dist. LEXIS 222136, at *11.

And the Cooks Venture ESI on Wadiak's laptop was certainly "relevant information" covered by this duty. Over the course of the four years during which Wadiak led Cooks Venture to its ruin, Wadiak irresponsibly used his personal laptop to conduct official Cooks Venture business. (Sandhu Decl. ¶ 4; Ex. 2 at 110:2-12.) He made an affirmative decision to use his personal laptop in this way even though others in the company elected to use company-issued laptops (Sandhu Decl. ¶ 4; Ex. 2 at 9:9-25.). By his own admission, he routinely saved Cooks Venture documents locally on this laptop. (Sandhu Decl. ¶ 4; Ex. 2 at 101:19-23.) Further, the e-mail confirmation of the Google Takeout on June 30, 2023, suggests that the amount of Cooks Venture data Wadiak saved locally could be far greater than he has testified to. (Sandhu Decl. ¶ 7; Ex. 5.) Given the degree to which Wadiak utilized his personal laptop as CEO, no argument can be maintained that the Cooks Venture data on Wadiak's laptop is not relevant to this litigation, or that Wadiak could reasonably have believed as much when he failed to preserve that data.

This situation is similar to the one confronted by the court in *Paisley Park*, 330 F.R.D. at 234. In that case, the defendants were company principals who maintained that, although they occasionally used their personal phones for official company business, they had no duty to preserve text messages on those phones because they did not know that the contents of devices that are "personal" in "nature" could be discovered in future business litigation. *Id.* The Court not only rejected this argument, but was "baffled" that defendants would even make it. *Id.* Since it was "obvious" from text messages produced by other parties in the litigation that defendants had "used their personal cell phones to conduct [company] business," the *Paisley* court reasoned, defendants could not "reasonably claim to believe that their text messages [on those phones] would be immune from discovery." *Id.* To the contrary, since the

defendants "were the *only ones* who [knew] the extent that they used their personal cell phones for [corporate] business at the time" when litigation was anticipated, the *Paisley* court continued, they had a duty to preserve the litigation-relevant communications on those phones regardless of their predominant use. *Id.* at 234-235.

In short, as CEO of Cooks Venture for nearly four years, Wadiak was at the center of the decisionmaking that gave rise to Plaintiffs claims and this litigation. During that time, Wadiak exclusively used his personal devices to perform his duties. Because there was no document retention policy in place at Cooks Venture, only Wadiak knows what he stored locally on his laptop, in paper form, or in the company's Dropbox and Google Drive Accounts. He therefore had a responsibility to preserve the Cooks Venture data he knew was on his laptop when it was damaged, considering no one else could replace it. Yet, as detailed below, he did nothing to preserve that data.

**B. Wadiak failed to take reasonable steps to preserve the Cooks Venture data on his personal laptop.**

Although Wadiak was not required "to take every conceivable step to preserve potentially relevant data," 11 Sedona Conf. J. 265, Wadiak did nothing at all to uphold his duty to preserve the Cooks Venture data on his personal laptop. To begin with, Wadiak made no effort to transfer any Cooks Venture data on his laptop to anyone at Cooks Venture, either before or after leaving his position. Then, if Wadiak's story is to be believed, he left this laptop out in the rain for so long that, even though it was in a backpack, so much water soaked through to the laptop that it was "fried." (Sandhu Decl. ¶ 4; Ex. 2 at 27:14-20; 28:5-8; 28:9-11) He did not notify anyone at Cooks Venture of this damage to his laptop, even though it (supposedly) happened just two weeks after his departure, or of the resulting loss of Cooks Venture data. (Sandhu Decl. ¶ 4; Ex. 2 at 100:18-21.) And he ultimately made no effort to retrieve any lost Cooks Venture data from his damaged laptop. (Sandhu Decl. ¶ 4; Ex. 2 at

30:24-31:4, 86:6-13, 100:17-21, 172:14-173:12.) In short, Wadiak failed to take any step to preserve the four-years' worth of Cooks Venture ESI on his laptop — let alone the steps that any reasonable person acting in good-faith might have taken.

"The reasonableness of preservation efforts is assessed based on the blameworthy party's sophistication, resources, control over the ESI, and its data retention practices." *Chappell v. SRT Express, Inc.*, No. 5:24-cv-05068, 2026 U.S. Dist. LEXIS 112349, *5 (D.S.D. May 19, 2026). Here, all four of these factors indicate that Wadiak failed to take reasonable steps to preserve the relevant information.

Taking the "control" factor up first, Wadiak's exclusive control over the Cooks Venture ESI on his laptop weighs heavily in the favor of sanctions. *See Chappell*, 2026 U.S. Dist. LEXIS 112349, at *5. Given Cooks Venture did not have a document retention policy, only Wadiak knew which documents were stored locally on his personal laptop. (Sandhu Decl. ¶ 3-6; Ex. 1 at 12:13-16; Ex. 2 at 37:24-38:5; Ex. 3 at 18:2-15; Ex. 4 at 45:10-13.) Further, he was the only one who knew the laptop was damaged and which documents were lost when it was damaged. (Sandhu Decl. ¶ 4; Ex. 2 at 101:19-102:7.) Yet, he did not notify anyone at Cooks Venture about the damage or attempt to retrieve any lost data. (Sandhu Decl. ¶ 4; Ex. 2 at 101:19-102:7.)

What is especially dubious about Wadiak's preservation efforts (or lack thereof), however, is his contradictory narratives regarding which email address was associated with the Apple ID for his damaged laptop. If it was Wadiak's intent to confuse Plaintiffs' counsel and the Court regarding this information, he was successful. Wadiak first testified that either matt@cooksventure.com or cooksventure.me could have been associated with the Apple ID for the damaged laptop, but that he could not recall if he ever made an Apple ID for his matt@cooksventure.com email address; later, however, he testified that he could not access data from iCloud for his damaged laptop after his departure from Cooks Venture because he

no longer had access to his *matt@cooksventure.com* email address — *i.e.*, the same address that he earlier testified that he could not recall ever using to create an Apple ID. (Sandhu Decl. ¶ 4; Ex. 2 at 32:4-12, 105:5-14, 171:2-172:4.) Since Wadiak could not provide a consistent narrative regarding his Apple ID, the only conclusion that Plaintiffs can draw is that the Cooks Venture data on Wadiak's personal laptop is irretrievable. Perhaps it was Wadiak's hope that upon realizing Plaintiffs could not access this data, they would not inquire further. That was, of course, Wadiak's rationale in providing Plaintiffs with a limited production of his text messages — "to quiet the requisitions," as he put it. (Sandhu Decl. ¶ 4; Ex. 2 at 164:9-11.) Unfortunately for Wadiak, his testimony only confirmed what Plaintiffs have suspected all along: Wadiak has purposely engaged in discovery in bad faith and obfuscated the process to such a degree that he almost got away with producing no documents at all.

As for Wadiak's sophistication and the resources available to him in connection with preserving the Cooks Venture data on his personal laptop, those factors also weigh heavily against the reasonableness of Wadiak’s (nonexistent) efforts to preserve the same. To begin with, Wadiak’s testimony indicates his technical sophistication. On his own, Wadiak was able to extract his text messages from his cellphone onto a hard drive, compress the files, and sent them to his attorneys. (Sandhu Decl. ¶ 4; Ex. 2 at 192:9-19.) Notably, Wadiak was not instructed by his attorneys on how to do this extraction. (Sandhu Decl. ¶ 4; Ex. 2 at 193:2-24.) Typically, cellphone extractions are handled by external vendors for law firms, such as the one Defendant John Niemann utilized. (Dkt. 176 at 5.) Here, Wadiak conducted the extraction himself. (Sandhu Decl. ¶ 4; Ex. 2 at 193:2-14.) Considering that other Defendants in this case have relied on an external vendor to conduct such extractions, Wadiak appears more than comfortable in handling his data on his own. It is then puzzling why Wadiak failed to put the same effort into preserving the Cooks Venture data from his damaged laptop.

With respect to resources, the data preservation efforts that Wadiak could have undertaken — from transferring any Cooks Venture data on his laptop to a Cooks Venture representative before leaving his position to retrieving that data through his iCloud when his laptop was damaged — would have cost Wadiak little or nothing in resources. But the data that might have been on Wadiak's laptop — including the Google data that was copied via his Cooks Venture email account — may well have been critical to the merits of Plaintiffs' claims. As the court explained in *Paisley Park*, where the cost of data preservation is so little "in comparison to the importance of the issues at stake and the amount in controversy," failure to carry out the simplest of steps in document preservation is sufficient to show that Wadiak acted unreasonably. 330 F.R.D. at 233.

The last factor for the Court's consideration — data preservation policies or practices — focuses on Cooks Venture's companywide document retention policies, rather than Wadiak's personal practices. Usually, individuals rely on their employer's document retention policy to justify the deletion of data. *See E*Trade Secs. LLC*, 2005 U.S. Dist. LEXIS 3021, *588-89. But the absence of a document retention policy does not absolve Wadiak of his own responsibility. In fact, "[t]he absence of a coherent document retention policy" is *itself* a "pertinent factor" that often indicates a corporation's lack of reasonable preservation efforts. *Phillip M. Adams & Assocs., LLC v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1194 (D. Utah 2009). After all, "[i]nformation management policies are not a dark or novel art" by this point. *Id.*

In *Adams*, the court admonished the defendant for its irresponsible data retention practices which resulted in the loss of significant data. *Id.* The court noted that the defendant's "practices place[ed] operations-level employees in the position of deciding which information [was] relevant to the enterprise and its data retention needs." *Id.* Here too, Cooks Venture employees, including Wadiak, made their own determination as to what was saved where, for how long, in what form, and so forth. And since there was no document retention

policy against which to compare Wadiak's testimony, Wadiak could give whatever testimony he wanted regarding Cooks Venture's data preservation practices. For example, Wadiak claimed that documents related to growers were typically kept in paper form. (Sandhu Decl. ¶ 4; Ex. 2 at 13:11-14.) But Wadiak also testified that Cooks Venture employees mostly saved documents either in Cooks Venture's Dropbox or Google Drive accounts. (Sandhu Decl. ¶ 4-6; Ex. 2 at 15:1-10) Meanwhile, Agrawal and Davenport testified that they saved documents locally. (Sandhu Decl. ¶ 5-6; Ex. 3 at 18:2-15; Ex. 4 at 44:18-45:5.)

Indeed, if there were documents saved locally on Wadiak's laptop that he did not want to produce in discovery, then there was nothing stopping Wadiak from simply testifying (falsely) that those documents did not exist, knowing that there was no Cooks Venture document retention policy to examine his testimony against. In this way, Cooks Venture's lack of a document retention policy actually provides cover for any Defendants, including Wadiak, to misrepresent how documents were stored — because, again, there is nothing to contradict them. However, just as "a party cannot blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy," a party should not be allowed to rely on its employer's lack of retention policy to evade responsibility for spoliation. *See Great Am. Ins. Co.*, 2025 U.S. Dist. LEXIS 123956, at *17.

In conclusion, each factor considered by the courts in assessing the adequacy of data preservation efforts weighs against Wadiak and shows that his failure to preserve the Cooks Venture data on his personal laptop was wholly unreasonable. Wadiak had exclusive control over the Cooks Venture data on his personal laptop. He had the sophistication and resources to preserve this data. Finally, Cooks Venture's lack of established document retention policies indicates that neither Wadiak nor the organization he oversaw took their evidence-preservation responsibilities seriously; it also means that Wadiak cannot excuse his conduct as

regular corporate practice indicates. Accordingly, Wadiak failed to take reasonable steps to preserve the critical data on his laptop.

### C. The Cooks Venture data lost from Wadiak's laptop cannot be restored or replaced through additional discovery.

The final threshold element for the Court to consider before it can impose sanctions is any "alternative discovery which could satisfactorily replace the lost ESI." *Jones*, 2022 U.S. Dist. LEXIS 171549, at *8. Here, according to Wadiak's own testimony, there is no such alternative discovery that could replace the Cooks Venture data on his laptop. Wadiak's laptop was damaged about three years ago. (Sandhu Decl. ¶ 4; Ex. 2 at 110:2-12.) He cannot recall which email address is associated with the Apple ID for that laptop. (Sandhu Decl. ¶ 4; Ex. 2 at 32:4-12.) If it happened to be his Cooks Venture email address, matt@cooksventure.com, he no longer has access to that email account. (Sandhu Decl. ¶ 4; Ex. 2 at 170:15-20.) But most importantly, Wadiak testified that he recycled the laptop and it was no longer functional when he did so. (Sandhu Decl. ¶ 4; Ex. 2 at 108:1-10.) Plaintiffs, therefore, cannot request a forensic search of the laptop, nor can they request that Wadiak retrieve the data using iCloud.

Furthermore, Wadiak's testimony is no substitute for the Cooks Venture data on his laptop. According to Wadiak's testimony, Wadiak has seemingly little to no recollection of his time at Cooks Venture and, to make matters worse, he contradicted himself repeatedly in his deposition. For example, he denied that he knew what a Google Takeout was, even when presented with an email confirmation *from his own* Cooks Venture email account showing a request for a Google Takeout. (Sandhu Decl. ¶ 4; Ex. 2 at 22:13-17, 23:14-17.) His contradictory narratives make him an unreliable witness whose testimony cannot replace the important data that was on his laptop. *Cf. Sandoval*, 2026 U.S. Dist. 68727, at *26 (agreeing with plaintiffs that defendant's shifting explanations demonstrated an intent to deprive plaintiffs of the spoliated evidence); *see also Kelley v. BMO Harris Bank N.A.*, 657 B.R. 475,

489 (Bankr. D. Minn. 2022) (finding that the record supported the bankruptcy court's finding that the defendant's ever changing testimony and frequent misrepresentations allowed the court to infer that the defendant's actions in discovery were in bad faith).

Even if Wadiak's good faith is assumed, "[r]ecollections fade and can change," as the court noted in *Jones*. 2022 U.S. Dist. LEXIS 171549, at *9. Like Wadiak noted many times in his July 28 deposition, it has been three years since he left his position with Cooks Venture and since his laptop was damaged. In addition to his unreliability as a witness, the passage of time has substantially degraded the quality of any testimony he could provide regarding the contents of his damaged laptop — a factor which alone makes such testimony an inadequate substitute for the laptop data itself.

Wadiak may argue that the documents that Evans produced are likely cumulative of anything that could have been on his laptop. That argument is unavailing, as the court held in *Paisley Park*. Specifically, the court reasoned that:

> [I]t will never be known whether [the lost ESI] would or would not have been cumulative [of the emails that the defendants already produced] because it is impossible to know what it was or to whom it may have been communicated. Second, even when the information is lost is cumulative to some extent, the loss of the information still has an impact because Plaintiffs cannot present the overwhelming quantity of evidence they otherwise would have to support their case. At most, Plaintiffs now can obtain only a scattershot of texts and emails, rather than a complete record of defendants' written communications from defendants themselves.

*Paisley Park Enters.*, 330 F.R.D. at 235-36 (citation modified). Similarly, regardless of what Evans has produced, Plaintiffs will never know which documents they are missing from Wadiak and how much more evidence they could have presented in support of their case to the jury with those documents.

Because Wadiak testified that there is no way to restore the lost Cooks Venture data from his laptop and because his testimony is not a reliable substitute for that data, the final threshold element for imposing sanctions has been met.

## III. The Court should impose a permissive adverse jury instruction on Wadiak because he acted with intent to deprive Plaintiffs of the Cooks Venture ESI on his personal laptop.

"If destruction of relevant information occurs before any litigation has begun, in order to justify sanctions [under Rule 37(e)(2)], the requesting party must show that the destruction was the result of bad faith." *E*Trade Secs. LLC*, 2005 U.S. Dist. LEXIS 3021, *588-89. Bad faith, however, can be implied from circumstantial evidence, including a party's conduct in litigation, and need not be shown directly. *Id*. "[T]he Eighth Circuit has instructed that, for the purpose of spoliation-of-evidence sanction, intent is rarely proved by direct evidence and a district court has substantial leeway to determine through consideration of circumstantial evidence, witness credibility, motives of the witness in a particular case, and other factors." *Sys. Spray-Cooled*, 2017 U.S. Dist. LEXIS 231587, at *13-14 (collecting cases). The Court's discretion to infer bad-faith from the circumstances is important because parties rarely leave a paper trail of spoliation. *See Morris v. Union Pac. R. R.*, 373 F.3d 896, 901 (8th Cir. 2004).

Here, the circumstantial evidence — including, without limitation, how quickly Wadiak's laptop was damaged after he left his position, his inability to provide a coherent (let alone convincing) narrative as to how it was damaged, his contradictory testimony throughout his July 28 limited scope deposition, and his serial bad-faith conduct in discovery — overwhelmingly indicates that Wadiak's self-serving failure to preserve the Cooks Venture ESI on his personal laptop was motivated by a bad-faith intent to deprive Plaintiffs and other adversaries in litigation of relevant information.

First, in *Great American Insurance Company*, the Court found that the defendant acted with intent to deprive the plaintiff of the spoliated communications in part because of "the history of the discovery dispute" between the parties, in which the defendant repeatedly sought "to avoid disclosing text messages and other communications between the key

players." 2025 U.S. Dist. LEXIS 123956, at *22-23. Here, too, Wadiak has been extremely evasive in discovery in a manner that indicates an intent to deprive Plaintiffs of relevant data from his damaged laptop. For over one year, Wadiak refused to produce any requested documents, claiming that Plaintiffs' requests should be directed to Cooks Venture directly. (Dkt. 188 at 12.) When Plaintiffs finally presented Wadiak's counsel with incontrovertible evidence that he was in possession of responsive communications, Wadiak produced a limited production of his text messages with Agrawal and Collins. (Dkt. 188 at 12-14.)

Even after producing these text messages, however, Wadiak maintained in his briefing and in his July 28 deposition that he produced these text messages, not because they are the complete set of responsive text messages in his possession, but merely to "quiet [Plaintiffs'] requisitions." (Dkt. 192 at 4; Sandhu Decl. ¶ 4; Ex. 2 at 164:8-11.) When questioned by Plaintiffs' counsel as to why and how he decided to produce this limited set of text messages when he believed they were not responsive, Wadiak started to respond but then paused and coyly said, "[t]hat was a little trick[y]," recognizing that Plaintiffs' counsel was forcing him to admit to the (self-serving) discretion he exercised. (Sandhu Decl. ¶ 4; Ex. 2 at 183:3-9.) The exchange highlights Wadiak's lack of credibility in this case thus far and his persistence in obfuscating the discovery process. As more fully explained in Plaintiffs' supplemental brief in support of their motion to continue trial and reset case deadlines, to compel discovery, and for sanctions, (Dkt. 208), Wadiak's testimony during his July 28 deposition established that even this latest production is deficient — and that he continues to withhold responsive text messages from Plaintiffs to this day.

If Wadiak has not acted with good faith in the discovery process so far in this litigation — indeed, if he continues to undermine the discovery process — how then can Plaintiffs or the Court trust his story regarding how his laptop was damaged and what was on it? Like the defendants in *Great American Insurance Company*, Wadiak's "pattern of discovery

violations and inconsistent representations [designed] to avoid disclosure of text messages and communications between key players . . . supports an inference that [Wadiak] acted intentionally" in destroying his laptop. 2025 U.S. Dist. Lexis 123956, at *27. Wadiak's history of withholding responsive communications establishes that he cannot be trusted and that it was likely in his best interest that the Cooks Venture data on his laptop never become available for Plaintiffs, or for any other party seeking recourse in the aftermath of Cooks Venture's shutdown.

Second, Plaintiffs have reason to doubt Wadiak's claim that the damage to his laptop was accidental in the first place. To begin with, shifting explanations for lost ESI demonstrate an intent to deprive. *Sandoval*, 2026 U.S. Dist. LEXIS 68727, at *26; *Kelley*, 657 B.R. at 489. In this vein, Wadiak's retelling of how his laptop was damaged is highly suspicious. He first claimed that his laptop "fried itself," then he claimed that "water spilled on it and it stopped working – or it got rained on," and finally he testified that he "had a backpack and water spilled into my backpack from the rain." (Sandhu Decl. ¶ 4; Ex. 2 at 29:5-11.) To be sure, some time has passed since Wadiak's laptop was allegedly damaged. But the details of the story itself are suspicious. How heavily was it raining that water poured into Wadiak's backpack and caused irreparable water damage to his laptop? Did Wadiak not have any kind of cover for his laptop within his backpack? How long was Wadiak outside in the rain that such significant water leakage and damage to his laptop was even possible? Why did Wadiak not seek shelter from the rain, like most reasonable people would do?

Again, had Wadiak engaged in discovery in good faith throughout this litigation and behaved like a reliable witness at his deposition, Plaintiffs would not be questioning his testimony in these ways. But, of course, in Wadiak's case, the opposite has been the rule. Plaintiffs have been forced to confirm every explanation Wadiak and his counsel have provided for deficient discovery responses thus far. And in his July 28 deposition, Wadiak struggled to

recall even the most basic of details regarding his time at Cooks Venture, including when he left his position, and contradicted himself repeatedly.

Another suspicious aspect of Wadiak's laptop-damage story is how it mirrors the testimony of Evans and Agrawal regarding how they disposed of the laptops they used to conduct Cooks Venture business. Agrawal initially testified that he was unsure if he destroyed his laptop or sent it back to Cooks Venture. (Sandhu Decl. ¶ 5; Ex. 3 at 132:17-23.) Later, however, when asked what he was instructed to do with his laptop, Agrawal testified, "I think it was just, you know, make sure you destroy everything, but I don't remember how I did that." (Sandhu Decl. ¶ 5; Ex. 3 at 132:24-133:1.) That instruction is not one that evokes confidence in Cooks Venture's data preservation practices. Rather, it suggests an intention to hide data. Moreover, Agrawal has proven to be an unreliable witness himself, claiming that he did not use his personal cell phone to conduct Cooks Venture business only for Wadiak to later produce text messages between him and Agrawal that showed the opposite was true. (Dkt. 188 at 14.) Evans also testified that his laptop went "on the fritz" around the time that Cooks Venture shut down. (Sandhu Decl. ¶ 3; Ex. 1 at 88:15-20.) It is a curious coincidence that so many former Cooks Venture executives damaged or destroyed their laptops almost immediately after leaving their positions *and* cannot recall the details of how that occurred.

Third, Wadiak's decision to retain some documents over others further demonstrates that he acted with bad faith. In *E*Trade*, the court found that the defendant's decision to retain certain documents prior to the destruction of the hard drives at issue in that case gave rise to an implication of bad faith on the part of the defendants. 2005 U.S. Dist. LEXIS 3021, at *589-91 (citing *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004) (explaining that a party's decision to selectively preserve some evidence while failing to retain other evidence demonstrates a party's bad faith)). Likewise, in *Paisley Park*, the court questioned the defendants' decision to select what evidence to produce and noted that "the failure to

preserve some types of ESI while destroying others is a reasonable basis to infer that the destroying party acted with bad faith." 330 F.R.D. at 235.

At this point, Wadiak has finally produced some of the text messages that Plaintiffs have been requesting for the past two years; specifically, he has produced his text messages with Agrawal and Ken Collins, both former chief financial officers of Cooks Venture. (Sandhu Decl. ¶ 4; Ex. 2 at 182:24-183:2.) Suspiciously, however, Wadiak could not explain why he chose to produce only his text messages with Agrawal and Collins during his deposition, even though he testified that he believed none of his text messages were responsive to Plaintiffs' requests. (Sandhu Decl. ¶ 4; Ex. 2 at 183:3-9.) In any event, Wadiak's decision to preserve and produce these documents but not to make any effort to retrieve the Cooks Venture ESI on his damaged laptop implies that his failure to preserve the latter was driven by bad faith.

Finally, while prejudice is not required for the Court to impose under Rule 37(e)(2), it does exist here, bolstering Plaintiffs' request for a permissive adverse-inference instruction to the jury. Like the plaintiffs in *Paisley Park*, Plaintiffs can never know "what ESI was lost or how significant that ESI was to this litigation." 330 F.R.D. at 236. Also like the plaintiffs in *Paisley Park*, Plaintiffs will be "forced to go to already existing discovery and attempt to piece together what information" could have been on Wadiak's laptop, "thereby increasing their costs and expenses." *Id*. The quantity of lost ESI is also important to consider here. In *Kelley*, the court noted that because the defendant destroyed "multiple years' worth of unique digital information," the plaintiff was undoubtedly prejudiced. 657 F.R.D. at 492. Wadiak used his personal laptop to conduct Cooks Venture business for nearly four years. That is certainly not an insignificant amount of digital information, and its unavailability prejudices Plaintiffs on its face. *See Id.*

In conclusion, because the circumstantial evidence indicates that Wadiak's laptop was damaged in bad faith and because of his unreliability as both a witness and a litigant, the

Court should find that Wadiak acted with the intent to deprive Plaintiffs of relevant evidence in disposing of his laptop. The remedy that Plaintiffs request — a permissive rather than a mandatory adverse jury instruction — is a less-harsh remedy and is appropriate given the circumstances. *Great Am. Ins. Co.*, 2025 U.S. Dist. LEXIS 123956, at *28. Additionally, Plaintiffs request for attorney's fees and costs related to this motion is also appropriate, given the time, expense, and effort Plaintiffs continue to expend in confirming and then reporting Wadiak's repeated misconduct to the Court. *See Sys. Spray-Cooled*, 2017 U.S. Dist. LEXIS 231587, at *18-19.

## CONCLUSION

The imposition of a permissive adverse inference under Rule 37(e)(2) that whatever information Wadiak's damaged laptop contained was unfavorable to him is warranted here to address his bad-faith conduct and remedy the prejudice suffered by Plaintiffs. Further, an award of attorney's fees and costs is necessary to compensate Plaintiffs for the unnecessary effort and expense they have incurred in moving for sanctions against Wadiak for a second time. Accordingly, Plaintiffs respectfully ask the Court to find that Wadiak spoliated evidence under Rule 37(e), impose a permissive adverse inference under Rule 37(e)(2) as a remedy, and order Wadiak to pay Plaintiffs' reasonable costs and fees related to this motion.

DATED: September 1, 2026

Respectfully submitted,

/s/*Basel J. Musharbash*
Basel J. Musharbash*
Texas Bar No. 24111402
Anureet K. Sandhu*
Illinois Bar No. 6336697
**ANTIMONOPOLY COUNSEL**
500 Clarksville Street
P.O. Box 795
Paris, Texas 75461
Phone: (903) 205-8422
Email: basel@antimonopoly.us

*Attorneys for Plaintiffs*

* Appearing *Pro Hac Vice*